UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MAIN PASS OIL GATHERING COMPANY, LLC<br><br>        Plaintiff,<br><br>v.<br><br>SUBSEA 7 MARINE (US) INC.<br><br>        Defendant | §<br>§<br>§<br>§<br>§<br>§ CIVIL ACTION NO. _____<br>§<br>§<br>§<br>§<br>§<br>§ |

**COMPLAINT**

Plaintiff Main Pass Oil Gathering Company, LLC ("MPOG") brings this Complaint for Defective Product against Defendant Subsea 7 Marine (US) Inc. ("Subsea 7"), formerly known as Big Inch Marine Systems, Inc., and alleges as follows:

**I.
NATURE OF ACTION**

1.      This action seeks the recovery of and contribution for damages arising out of a pollution event in the navigable waters of the Gulf of America off the coast of Louisiana. The leak and ensuing oil spill were caused by the failure of a defectively designed collet-grip flange connector ("Connector"), which joined two pipeline segments of a subsea pipeline owned by MPOG.  Subsea 7, which was formerly named Big Inch Marine Systems, Inc., designed, manufactured and sold the defective Connector for use on subsea oil pipelines.

2.      MPOG, which has been designated a Responsible Party under the Oil Pollution Act (33 U.S.C. §2701 *et seq.*), has sustained millions of dollars in damages arising out of the leak and spill.  In addition, MPOG faces potential claims from third parties seeking additional damages. MPOG now seeks to recover those damages and expenses from Subsea 7 and to obtain a

1

declaratory judgment as to Subsea 7's liability for future damages arising out of its defective Connector.

## II.
## PARTIES

3. Plaintiff Main Pass Oil Gathering Company, LLC is a limited liability company organized under the laws of the state of Delaware. Its principal place of business is in Houston, Texas.

4. Defendant Subsea 7 Marine (US) Inc. is a corporation organized under the laws of the state of Delaware. Its principal place of business is in Houston, Texas. Defendant can be served with process through its registered agent, The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801, or wherever it may be found.

## III.
## JURISDICTION AND VENUE

5. This Court has original subject matter jurisdiction pursuant to 33 U.S.C. § 2717(b) because MPOG has been designated a Responsible Rarty under the Oil Pollution Act and seeks contribution for damages under the Oil Pollution Act.

6. In addition to or in the alternative, the maritime tort claims in this Complaint are subject to federal subject matter jurisdiction because the incident occurred in the navigable waters of the United States and the nature of the incident has the potential to disrupt maritime and involves traditional maritime activities. This subject matter jurisdiction is conferred under 28 U.S.C. § 1333.

7. In addition to or in the alternative, any non-maritime claims in this Complaint are subject to federal subject matter jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA") 43 U.S.C. §§ 1331–1356b. This subject matter jurisdiction is conferred under 28 U.S.C. § 1331.

8.  This Court has personal jurisdiction over Subsea 7 because Subsea 7 regularly conducts business in Louisiana and in this District. Subsea 7 has the necessary minimum contacts with the State of Louisiana, and subjecting Subsea 7 to jurisdiction in Louisiana does not offend the traditional notions of fair play and substantial justice.

9.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and 33 U.S.C. § 2717(b) because Subsea 7 has regular and systematic contacts within this District and/or the location of the leak and release occurred within the District. The Connector was also installed in Louisiana's territorial waters or on the outer continental shelf adjacent to Louisiana. Both the installation and subsequent release relate to a subsea oil pipeline segment that runs, in part, near Venice, Louisiana.

## IV.
## FACTUAL BACKGROUND

**A. The Connector from Subsea 7 Was Defectively Designed.**

10. MPOG is the owner and operator of a subsea oil pipeline system in the Gulf of America, including the subsea oil pipeline segment at issue here that runs, in part, near Venice, Louisiana.

11. Subsea 7 manufactured and/or sold the Connector to repair and connect subsea oil and gas pipelines and mitigate the risk of an oil spill on navigable waters. MPOG purchased and used the Connector for just this purpose—to connect two sections of a subsea oil pipeline.

12. On information and belief, MPOG, through its operator at the time, BP Pipelines (N. America) Inc., purchased the Connector from Subsea 7 (at the time named Big Inch Marine Systems, Inc. in 2001 for use in repairing its pipeline.

13. In 2004, Hurricane Ivan damaged a portion of this MPOG pipeline, requiring significant repairs. MPOG hired a contractor, Cal Dive International Inc., to provide a vessel and divers to install the Connector.

14. Subsea 7, however, defectively designed the Connector in such a way that once installed, it was impossible to determine whether it was properly installed and tightened or to properly inspect it over the years of expected use to determine whether it maintained its integrity to prevent pollution in navigable waters.

15. Given the risk of a spill into navigable waters from subsea oil pipelines, regular inspection is required to ensure the integrity of those pipes and any connectors, such as the Connector here.  And although alternative designs that would permit such an inspection are feasible, Subsea 7 chose not to design the Connector here to ensure a proper installation or permit inspection at any point after installation to ensure it was tight, rendering it unreasonably dangerous.

16. While MPOG did in fact conduct regular inspections, the defectively designed Connector made it impossible to determine whether the Connector maintained its integrity to prevent pollution in navigable waters.  Therefore, MPOG was unable to detect a problem with the defectively designed Connector until it failed.

17. Subsea 7 further failed to warn that the Connector could not be reliably inspected to confirm it was properly installed and tightened.  Although Subsea 7 identified methods of testing the Connector, Subsea 7 failed to warn that these tests were not reliable or were reliable only under very limited conditions that would not be present in the intended subsea application of the Connector.  Nor did Subsea 7 warn that installing the device into a marine environment may make successful installation infeasible or impossible.

**B. The Subsea 7 Connector Separated and Caused an Oil Spill in the Gulf of Mexico.**

18. In November 2023, MPOG's Operational Control Center detected changes in pressure on the MPOG system. Based on a review of the data, MPOG shut in the pipeline and dispatched personnel to conduct an overflight. During the overflight, personnel observed an oil sheen on the surface of the water near the MPOG pipeline system in the Gulf of America off the coast of Louisiana. MPOG then notified the National Response Center of the observed oil sheen, and following that notification, the United States Coast Guard, with support from MPOG and the Louisiana Oil Spill Coordinators Office, activated a Unified Command, which included additional federal departments and agencies to conduct a response.

19. In the days and months that ensued, MPOG made extensive efforts to determine the nature, scope, and location of release from the MPOG pipeline, which was near or adjacent to shipping lanes. These efforts and those of the agencies included the deployment of helicopters and vessels to observe, deploy containment booms, and skim oil.

20. MPOG carried out extensive testing and examination of its pipeline in order to determine the precise source of the release from the MPOG pipeline. Divers and remote operated vehicles controlled from vessels subsequently identified the likely source of the leak to be the defective Connector, which was subsequently retrieved by vessel:



Further testing and examination of the pipeline may identify additional factors that contributed to the leak.

21.    On May 1, 2024 and February 11, 2025, the United States Coast Guard designated MPOG to be the Responsible Party under the Oil Pollution Act for the release from the MPOG pipeline.

22.    MPOG, the National Transportation Safety Board, and others have since participated in testing the failed Connector. On November 8, 2024, MPOG participated in an initial meeting of federal and state natural resource trustees to address the investigation and assessment of potential natural resource damages.

23. After costly and extensive investigative efforts, it was determined that the Subsea 7 Connector, located on a section of the pipe near Venice, Louisiana, had failed, resulting in a release of oil to the Gulf of America.

24. The failure of the defective Connector required MPOG to shut in the pipeline for an extended period of time. In addition, the defective Connector caused damage to other property of MPOG including the pipeline.

25. To date, MPOG has spent well in excess of thirty million dollars responding to the observed oil spill. State authorities in Louisiana and federal authorities have indicated that they intend to seek natural resources damages related to the spill.

## V.
## CLAIM FOR DEFECTIVE PRODUCT UNDER THE GENERAL MARITIME LAW

26. MPOG re-alleges and incorporates all allegations set forth herein.

27. Subsea 7 is strictly liable to MPOG under the general maritime law.

28. Subsea 7 designed, manufactured, and sold the defective Connector installed on MPOG's subsea oil pipeline at issue in this dispute.

29. The Subsea 7 Connector was specifically designed, marketed, and intended for repairing subsea oil pipelines and to prevent the release of oil into navigable waters.

30. The nature of the Connector was such that it must be properly installed using a vessel and removed by a vessel.

31. The Subsea 7 Connector was defectively designed and unreasonably dangerous when it left Subsea 7's control because the design prevented inspection of the Connector upon installation, via inline inspection, divers, or remote operated vehicles from vessels, to ensure it was installed and tightened correctly, or at any time after the installation to ensure that it was properly tightened and retained its integrity.

32. Subsea 7 also failed to warn of this unreasonably dangerous condition despite knowing that its intended use was on subsea oil pipelines where regular inspections to confirm the integrity of the pipe and connectors are the norm. Therefore, the ordinary user of the product, such as MPOG, would reasonably expect that there would be a reliable method to inspect the Connector upon initial installation to confirm it is tight and also on an ongoing basis to confirm that it retains its integrity.

33. MPOG incurred substantial damage to its pipeline and its business, and costs in responding to the oil spill directly and proximately caused by the defective Subsea 7 Connector and Subsea 7's failure to warn.

34. MPOG also faces potential substantial damages and liability related to natural resource damages directly and proximately caused by the defective Subsea 7 Connector and Subsea 7's failure to warn.

35. MPOG incurred and will continue to incur substantial costs and damages arising out of the leak and spill that, if proved, would be directly and proximately caused by the defective design of the Subsea 7 Connector.

36. MPOG also faces potential claims for damages from third parties, including state authorities in Louisiana, federal authorities, and MPOG's customers. Any such alleged damages would arise directly from the failure of the Subsea 7 Connector and Subsea 7's negligent design of the Connector and Subsea 7's failure to warn.

## VI.
## CLAIM FOR DEFECTIVE PRODUCT UNDER THE LOUISIANA PRODUCT LIABILITY ACT

37. MPOG re-alleges and incorporates all allegations set forth herein.

38. In the alternative and to the extent the general maritime law does not apply, Subsea 7 is liable to MPOG under the Louisiana Product Liability Act ("LPLA") because the incident occurred in Louisiana's territorial waters or on the outer continental shelf adjacent to Louisiana. 43 U.S.C. § 1333(a)(2)(A).

39. The LPLA makes a manufacturer of a product liable for damage or injury caused by its product. La. R.S. 9:2800.52. Under the LPLA, a manufacturer is liable for damages caused by products that are unreasonably dangerous in design. La. R.S. 9:2800.54(B)(1)-(4). A manufacturer is also liable for damages caused by products that are unreasonably dangerous because of inadequate warning. La. R.S. 9:2800.57.

40. Subsea 7 designed, manufactured and sold the defective Connector installed on MPOG's subsea oil pipeline at issue in this dispute.

41. The Subsea 7 Connector was specifically designed, marketed, and intended for repairing subsea oil pipelines.

42. The Subsea 7 Connector was installed under Subsea 7's supervision as part of a repair of MPOG's subsea oil pipeline.

43. The Subsea 7 Connector separated and failed and was the direct cause of a leak and oil spill into the Gulf of America.

44. The Subsea 7 Connector was defectively designed and unreasonably dangerous because the design prevented inspection of the Connector upon installation, via inline inspection, divers, or remote operated vehicles from vessels, to ensure it was installed and tightened correctly, or at any time after the installation to ensure that it was properly tightened and retained its integrity.

45. Subsea 7 could have employed feasible alternative designs for this type of connector that would have permitted both inspection on installation to ensure proper tightness and

installation and routine inspection during the lifetime of the product. These alternative designs would have prevented the oil spill at issue here, allowing MPOG to detect that the Connector was not tight and prone to separate, permitting MPOG to repair or replace it.

46. Subsea 7's use of a Connector design that prevented inspection was particularly unreasonably dangerous given its intended and expected use on a subsea oil pipeline where failure would naturally result in an oil spill into the surrounding water. Thus, the risks avoided by such an alternative design far outweighed any burden of its adoption.

47. Subsea 7 also failed to warn of this unreasonably dangerous condition despite knowing that the Connector's intended use was on subsea oil pipelines where regular inspections to confirm the integrity of the pipe and connectors are the norm. Therefore, the ordinary user of the product, such as MPOG, would reasonably expect that there would be a reliable method to inspect the Connector upon initial installation to confirm it is tight and also on an ongoing basis to confirm that it retains its integrity.

48. MPOG incurred substantial damage to its pipeline and its business and costs in responding to the oil spill directly and proximately caused by the defective Subsea 7 Connector and Subsea 7's failure to warn.

49. MPOG also faces potential substantial damages and liability related to natural resource damages directly and proximately caused by the defective Subsea 7 Connector and Subsea 7's failure to warn.

50. MPOG incurred and will continue to incur substantial costs and damages arising out of the leak and spill that, if proved, would be directly and proximately caused by the defective design of the Subsea 7 Connector.

51. MPOG also faces potential claims for damages from third parties, including state authorities in Louisiana, federal authorities, and MPOG's customers. Any such alleged damages would arise directly from the failure of the Subsea 7 Connector, and these damages are based on Subsea 7's negligent design of the Connector and Subsea 7's failure to warn.

## VII.
## CLAIM FOR CONTRIBUTION UNDER THE OIL POLLUTION ACT

52. MPOG re-alleges and incorporates all allegations set forth herein.

53. The United States Coast Guard designated MPOG a Responsible Party under the Oil Pollution Act. Subsea 7 is an "other person" who is liable or potentially liable under the Oil Pollution Act or another law.

54. MPOG has incurred removal costs and damages recoverable under the Oil Pollution Act. These damages were caused in whole or in part by Subsea 7's defective Connector and its failure to warn. Subsea 7, therefore, is liable to MPOG for contribution under the Oil Pollution Act pursuant to 33 U.S.C. § 2709.

## VIII.
## DECLARATORY JUDGMENT

55. MPOG re-alleges and incorporates all allegations set forth herein.

56. A justiciable controversy exists between MPOG and Subsea 7 regarding liability for damages under the Oil Pollution Act and at law.

57. Entry of a declaratory judgment pursuant to 28 U.S.C. § 2201 and 33 U.S.C. § 2717 is necessary and proper to resolve this controversy.

## IX.
## PRAYER FOR RELIEF

58. For the above reasons, MPOG respectfully requests that the Court:

a. award MPOG actual damages suffered by it in responding to and as a result of the oil spill caused by the defective Subsea 7 Connector, including damages or costs incurred for any claims by third parties for damages resulting from the oil spill at an amount to be determined by a jury;

b. enter a judgment declaring the parties' rights and other legal relations;

c. order Subsea 7 to pay attorneys' fees and costs; and

d. award MPOG such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

59. Plaintiff MPOG respectfully requests a trial by jury on all issues triable thereby.

DATED: May 7, 2025

        By:*/s/ Andrew M. Stakelum*
        Andrew M. Stakelum, *Trial Attorney*
        La. Bar No. 30738
        Christie L. Cardon (*pro hac vice to be filed*)
        Texas Bar No. 24036326
        KING & SPALDING LLP
        1100 Louisiana Street
        Suite 4100
        Houston, Texas 77002
        Telephone: (713) 751-3200
        Facsimile: (713) 751-3290
        astakelum@kslaw.com
        ccardon@kslaw.com

        Connor Brewer (*pro hac vice to be filed*)
        Texas Bar No. 24132471
        KING & SPALDING LLP
        2601 Olive Street
        Suite 2300
        Dallas, Texas 75201
        Telephone: (214) 764-4600
        Facsimile: (214) 764-4601
        cbrewer@kslaw.com

        *Attorneys for Plaintiff Main Pass Oil Gathering Company, LLC*