UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MAIN PASS OIL GATHERING COMPANY, LLC** § § § § § § § § § § § | |
|  *Plaintiff*, | **CIVIL ACTION NO. 25-00890** |
| v. | **JUDGE IVAN L.R. LEMELLE** |
| **SUBSEA 7 MARINE (US) INC.** | **MAG. JUDGE EVA J. DOSSIER** |
|  *Defendant.* | |

**DEFENDANT-IN-INTERVENTION MAIN PASS OIL GATHERING COMPANY, LLC'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS ANADARKO PETROLEUM CORPORATION AND ANADARKO US OFFSHORE LLC'S <u>COMPLAINT-IN-INTERVENTION</u>**

Defendant-in-Intervention Main Pass Oil Gathering Company, LLC ("MPOG") files this Reply in Support of its Motion to Dismiss the claims brought against it by Anadarko Petroleum Corporation and Anadarko US Offshore LLC (collectively, "Anadarko") in Anadarko's Complaint-in-Intervention (Dkt. 16) ("Anadarko's Complaint" or "Complaint") under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### I.    INTRODUCTION

Anadarko, in its Memorandum in Opposition to Main Pass Oil Gathering Company, LLC's Motion to Dismiss Complaint of Plaintiffs-In-Intervention (Dkt. 37) ("Opposition") argues that the Court should dismiss MPOG's Motion to Dismiss because (1) Anadarko is entitled to pursue its claims for economic losses as damages arising from gross negligence cannot and have not been waived; (2) force majeure does not relieve MPOG of its obligations; (3) Anadarko has properly pleaded economic loss claims under OPA; and (4) Anadarko may recover removal costs because those costs do not need to be undertaken at the direction of the Federal On-Scene Coordinator

("FOSC"). For a number of reasons, Anadarko is incorrect, and Anadarko's claims should be dismissed.

First, Anadarko has failed to viably plead gross negligence against MPOG. Second, all the contracts at issue excuse MPOG's performance in the event of pipeline or machinery breakage—the exact event alleged by Anadarko to be the cause of the Incident. Third, Anadarko failed to plead the requisite casual connection or supporting details of its alleged economic damages claims under OPA, and, importantly, even if it had, Anadarko's alleged damages were contractually waived—a fact that Anadarko does not address. And finally, Anadarko's argument that "removal costs" need not be undertaken at the direction of the FOSC or determined by the FOSC to be consistent with the National Contingency Plan ("NCP") is flawed.

## II.    ANALYSIS AND ARGUMENT

### 1.    *Economic Loss Claims are Contractually Barred*

Anadarko spends the bulk of its Opposition discussing its right to recover claims for economic loss due to MPOG's alleged gross negligence. Specifically, Anadarko argues that these damages cannot and have not been waived. Anadarko misses the point. The issue is not waiver; the issue is Anadarko's allegations. Anadarko's reliance on its summary allegations to state a claim for gross negligence which, according to Anadarko, entitles it to seek all of its claimed damages, is misplaced. Aside from a passing reference, Anadarko ignores what it alleged in its Complaint—that the failure of the Subsea 7 Connector was the cause of the Incident. Specifically, Anadarko alleges:

- "Subsea 7 manufactured and/or sold the Connector to repair and connect subsea oil and gas pipelines to ensure operability and to mitigate the risk of an oil spill on navigable waters. MPOG purchased and used the Connector for that purpose." Anadarko's Complaint ¶ 57.

- "MPOG purchased the Connector from Subsea 7 in 2001 through its operator at the time for use in repairing the pipeline." *Id.* ¶ 58.

- "Subsea 7 defectively designed the Connector in such a way that once it was installed, *it was impossible to determine whether it was properly installed and tightened or for it to be properly inspected*." *Id.* ¶ 60 (emphasis added).

- "Given the risk of an oil release event and resulting shut-ins, regular inspections should have been conducted to ensure the integrity of the pipeline system and any connectors. Although alternative designs that would permit such an inspection were feasible, *Subsea 7 chose not to implement such a design, thus rendering the Connector unreasonably dangerous*." *Id.* ¶ 61 (emphasis added).

- "Subsea 7 further failed to warn that the Connector could not be reliably inspected to confirm it was properly installed and tightened. While Subsea 7 provided MPOG with identified methods of testing the Connector, it failed to warn that these tests were not reliable or were only reliable under very limited conditions that would not be present in the intended subsea application of the Connector. Nor did Subsea 7 warn that installing the device into a marine environment may make successful installation infeasible or impossible." *Id.* ¶ 63.

- "On November 12, 2024, the National Transportation Safety Board published its findings on the cause of the MPOG Release and found that the pipe installed in the Subsea 7 Connector had been pulled out of the fitting and was no longer in contact with the sealing surfaces, thus leading to the discharge." *Id.* ¶ 65.[1]

- "The failure of the defective Subsea 7 Connector caused Anadarko to incur significant damages." *Id.* ¶ 66.

In summary, Anadarko alleges that Subsea 7 manufactured a defective Connector that could not be inspected; that Subsea 7 provided testing instructions while not disclosing that the tests were not reliable; and that the spill was the result of the failure of the Subsea 7 Connector. Despite all that Anadarko alleges MPOG did not know and could not know about the "defective" Connector, Anadarko nonetheless argues that MPOG acted with "actual, subjective awareness of the risk involved [and] nevertheless proceed[ed] in conscious indifference to the rights, safety, or welfare of others." Opposition at 4 (citing Tex. Civ. Prac. & Rem. Code § 41.001(11)). Anadarko's

---

[1] As MPOG set out in its Motion to Dismiss, Anadarko's reliance on "findings" of the NTSB is expressly prohibited; the NTSB report is inadmissible. MPOG's Motion to Dismiss at 3 n.2. Above, MPOG refers to the NTSB report only in the context of Anadarko's allegations against Subsea 7.

3

conclusory allegations do not support the notion that MPOG acted with conscious indifference.

Other courts have addressed similar pleading deficiencies:

> "To establish gross negligence, a plaintiff must show that (1) viewed objectively from the actor's standpoint, the act involve[d] an extreme degree [of] risk, considering the probability and magnitude of the potential harm to others and (2) the actor had actual, subjective awareness of the risk involved, but nevertheless proceed[ed] in conscious indifference to the rights, safety, or welfare of others. Plaintiff's gross negligence cause of action merely tracks the aforementioned language, without presenting any facts to support her assertion that [Defendant] w[as] grossly negligent. Such pleading is conclusory and thus insufficient to survive the Rule 12(b)(6) legal standard."

*Riley v. Amazon.com, Inc.*, No. 7:17-CV-223, 2017 WL 7035755, at *5 (S.D. Tex. Aug. 4, 2017) (internal quotation marks omitted) (all alterations in original except for the last two).

While Anadarko may have pleaded facts giving rise to a gross negligence claim against Subsea 7, it has not made similar allegations against MPOG. Anadarko's list of allegations against MPOG does not include allegations that MPOG's actions actually caused the Subsea 7 Connector to fail; Anadarko lays the blame for the actual failure and release squarely on Subsea 7. Anadarko's bare allegations against MPOG are objectively insufficient. "Simply labeling part of the Complaint 'gross negligence' does not allege a cause of action and is nothing more than a mere 'label[ ] and conclusion [ ]' of the sort rejected by *Twombly*." *Watson v. Citimortgage, Inc.*, 814 F. Supp. 2d 726, 736 (E.D. Tex. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (alterations in original).

### 2. *Force Majeure Relieves MPOG of its Obligations to Perform*

Anadarko also argues that the contractual force majeure provisions do not relieve MPOG of its obligations to perform. That is incorrect.

As MPOG laid out in its Motion to Dismiss, the force majeure clauses are clear: MPOG's performance is excused in the event of pipeline or machinery breakage—the exact event alleged

by Anadarko to be the cause of the Incident.[2] *See* Anadarko's Complaint ¶ 4. Anadarko now attempts to argue that "MPOG's failure to exercise due diligence . . . render[s] the Force Majeure exception inapplicable." Opposition at 11. But this is in stark contrast to what Anadarko pleaded in its Complaint. Under Anadarko's own recitation of the facts the "***cause of the [Incident] was the failure of a Subsea 7 Connector***" which was a component of MPOG's facilities (Anadarko's Complaint ¶ 4 (emphasis added)); in other words, the cause of the Incident was a defined event of force majeure.

Anadarko's reliance on *Mieco L.L.C. v. Targa Gas Mktg. L.L.C.*, No. 23-20567, 2025 WL 3523835 (5th Cir. Dec. 9, 2025) is misplaced. The *Mieco* court confronted the issue of whether a gas marketer used reasonable efforts to supply gas when gas supplies were curtailed during winter storm Uri and where the relevant contract explicitly provided that the parties must use "reasonable efforts to avoid the adverse impacts of a *Force Majeure*." *Id.* at *2. In contrast, the contracts between Anadarko and MPOG provide that "[t]he term 'Force Majeure' … shall mean … breakage or accidents to machinery or lines of pipe … which, by the exercise of due diligence, [the party claiming force majeure] has been or is unable to prevent or overcome." *See, e.g.,* Original Marlin Oil Gathering Agreement § 11.2.[3] Anadarko, in its allegations against Subsea 7, makes clear that

---

[2] MPOG lays out each of the force majeure provisions in its Motion to Dismiss. These include: the Horn Oil Gathering Agreement §§ 11.1, 11.2 (Exhibit 1-D to MPOG's Memorandum in Support of Its Motion to Dismiss (Dkt. 27-1)); the Horn Offshore Pipeline Connection Agreement §§ 13.1, 13.2 (Exhibit 1-E to same); the Original Marlin Oil Gathering Agreement §§ 11.1, 11.2 (Exhibit 1-A to same); the Second Marlin Oil Gathering Agreement §§ 11.1, 11.2 (Exhibit 1-B to same); and the Marlin Tie-In Agreement § 13 (Exhibit 1-C to same). Each of these provisions explicitly include pipeline or machinery breakage as a qualifying or triggering event.

[3] Exbibit 1-A to MPOG's Memorandum in Support of Its Motion to Dismiss (Dkt. 27-1). The other contracts at issue contain consistent language. *See also* Horn Oil Gathering Agreement §§ 11.1, 11.2 (Exhibit 1-D to same) (stating that an event of force majeure excuses performance and includes "any event or circumstance not reasonably within the control of the Party claiming Force Majeure ... including ... breakage or accidents to machinery or lines of pipe ... or any other causes not reasonably within the control of the Party claiming suspension"; Horn Offshore Pipeline Connection Agreement §§ 13.1, 13.2 (Exhibit 1-E to same) (stating that an event of force majeure includes "any event or circumstance not reasonably within the control of the Party claiming Force Majeure and which, by the exercise of due diligence, such Party has been unable to prevent or overcome, including ... breakage or accidents to machinery or lines of pipe ... or any other causes not reasonably within the control of the Party claiming suspension"; Second Marlin Oil Gathering Agreement §§ 11.1, 11.2 (Exhibit 1-B to same) (stating that an event of force majeure excuses

the breakage that was the "cause" of the Incident was an event that MPOG could not have prevented.

### 3. *Anadarko Failed to Adequately Plead Economic Loss Claims Under OPA*

Anadarko fails to address MPOG's argument that economic loss claims under OPA are not adequately pleaded. In a footnote, Anadarko states that "MPOG frames its argument in terms of 'vagueness,' but Anadarko understands the thrust of their argument to be that Anadarko has not adequately pleaded a causal relationship between the [Incident] ... and Anadarko's damages." Opposition at 12 n.35. Anadarko misses the point.

While MPOG does highlight the relevant legal standard requiring a direct causal relationship between the Incident and the claimed economic loss, it does so to point out Anadarko's failure to adequately plead those details. As MPOG set out in its Motion to Dismiss, "Anadarko does not allege a legally viable causal link between the injury, destruction, or loss of property or natural resources and its claimed economic damages. In fact, Anadarko does not even communicate *what* the relevant damages are and *how* they were incurred. To the contrary, . . . Anadarko does little more than name the categories of economic damages it seeks to recover; conclusory allegations of vague damages do not meet the pleading standards required under OPA 90." MPOG's Motion to Dismiss at 8.

Anadarko does not provide *any* response to MPOG's argument that it failed to adequately plead its alleged damages. Instead, Anadarko again offers a series of conclusory statements: "It is not difficult, under these circumstances, to draw a causal link" between the Incident and the alleged

---

performance and includes "breakage or accidents to machinery or lines of pipe ... or any other causes not reasonably within the control of the Party claiming suspension ... and which, by the exercise of due diligence, such Party has been or is unable to prevent or overcome"); and Marlin Tie-in Agreement § 13 (Exhibit 1-C to same) (defining an event of force majeure as "breakage or accidents to machinery or lines of pipe ... or any other causes not reasonably within the control of the party claiming suspension, ... and which, by the exercise of due diligence, such party has been or is unable to prevent or overcome").

"economic losses suffered by Anadarko." Opposition at 13. Missing from Anadarko's Opposition is any response to MPOG's argument that Anadarko pleaded only conclusory statements such as it incurred "damages to property and loss of profits or impairment of earning capacity," "suffered property damage in the form of costs incurred to mitigate harm to its platforms," and "sustained financial damages as a result of MPOG's grossly negligent breach of contract." Anadarko's Complaint ¶¶ 77, 79, 96.

Conclusory statements are not enough. "A plaintiff is required to provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Randstad Gen. Partner (US), LLC v. Beacon Hill Staffing Group, LLC*, No. 3:20-CV-2814-N, 2021 WL 8442885, at *5 (N.D. Tex. Aug. 4, 2021) (quoting *Twombly*, 550 U.S. at 555). "To avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations." *Id.* (citing *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003)). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir. 1993).

Additionally, the parties' agreements make clear that the types of damages sought by Anadarko are waived under *any* theory of recovery—a fact that Anadarko chose not to address. Anadarko's waiver of the damages sought is express and applies whether "such damages are based upon contract, warranty, negligence, strict liability, ***or any other remedy at law or equity***." Horn Oil Gathering Agreement § 13.4[4] (emphasis added); *see also* Original Marlin Oil Gathering Agreement § 12.2.[5] Anadarko cannot mask its economic loss claims as claims under OPA 90 and survive dismissal. "[T]he *sole* way to avoid enforcement of an agreement to limit or exclude

---

[4] Exhibit 1-D to MPOG's Memorandum in Support of Its Motion to Dismiss (Dkt. 27-1).
[5] Exhibit 1-A to MPOG's Memorandum in Support of Its Motion to Dismiss (Dkt. 27-1).

consequential damages is to show that the waiver was unconscionable." *Safety Vision LLC v. LEI Tech. Canada*, 738 F. Supp. 3d 859, 871 (S.D. Tex. 2024) (applying Texas law) (emphasis in original). Anadarko has not, and cannot, make that showing. "[T]here is nothing in the substance of the [relevant agreements'] consequential damages waiver to suggest it is unconscionable—to the contrary, it appears to be exactly the sort of risk allocation provision that is common in commercial contracts." *Id.* at 872.

To avoid the application of the terms to which it agreed, Anadarko argues that its alleged lost profits may be recovered as "direct damages." Opposition at 8. But Anadarko cannot overcome the fact that the parties, in defining damages to be excluded, specifically excluded claims for lost profits. *See, e.g.*, Horn Oil Gathering Agreement § 13.4 (precluding recovery of "special, indirect, incidental, or consequential damages, ***or damages arising from lost profits, business interruption, lost products, or delayed production*** ('Consequential Damages') ... irrespective of whether such losses or actions for such damages are based upon contract, warranty, negligence, strict liability, or any other remedy at law or equity." (Emphasis added).[6]

Because Anadarko fails to plead the requisite casual connection or supporting details of its alleged damages, and because, in any event, the alleged damages were contractually waived, the claims should be dismissed.

### 4. Alleged "Removal Costs" are Not Recoverable

Anadarko has not pleaded that its alleged actions giving rise to its claim for "removal costs" were done at the direction of the FOSC, and Anadarko makes no attempt to avoid its failure to make that allegation (although Anadarko continues to try to blur the line by claiming that it acted

---

[6] Exhibit 1-D to MPOG's Memorandum in Support of Its Motion to Dismiss (Dkt. 27-1). Similar language can be found in the parties' other contracts. *See* Horn Offshore Pipeline Connection Agreement § 10.1 (excluding the recovery of damages "arising from lost profits, business interruption, lost products, or delayed production ('Consequential damages')." (Exhibit 1-E to same).

"to assist … the [FOSC]"). Opposition at 2. Instead, without citing a case, Anadarko argues that "removal costs" need not be undertaken at the direction of the FOSC or determined by the FOSC to be consistent with the National Contingency Plan ("NCP") unless it is seeking to recover from the Oil Spill Liability Trust Fund ("OSLTF").

The statutory scheme makes clear that "all claims for removal costs or damages must be presented first to the responsible party" before any claim can be made against the OSLTF. 33 C.F.R. § 136.103(a). These include claims for "uncompensated removal costs or uncompensated damages resulting from the discharge, or substantial threat of discharge, of oil from a vessel or facility" under OPA 90. 33 C.F.R. § 136.1(a)(1). Section 136.205 is titled "Compensation allowable" and states: "The amount of compensation allowable is the total of uncompensated reasonable removal costs of actions taken that were determined by the FOSC to be consistent with the National Contingency Plan or were directed by the FOSC. Except in exceptional circumstances, removal activities for which costs are being claimed must have been coordinated with the FOSC." 33 C.F.R. § 136.205.

Anadarko argues without authority that "[t]hese regulations plainly do not govern damages recoverable by a private entity directly from a responsible party." Opposition at 16. But that is not what the statutes say. To recover "compensation allowable" under the regulation, a claimant must first present "all claims for removal costs or damages … to the responsible party." 33 C.F.R. §§ 136.205 and 136.103(a). Anadarko's construction is that the claim that it first presented to MPOG (and that is asserted in this lawsuit) is somehow not bounded by the definition of "compensation allowable" in the statutory scheme. There is no authority to support this position, and the definition of "compensation allowable" does not contain a proviso that "notwithstanding this definition of

Compensation Allowable, a private party may seek 'other compensation' from a responsible party."

Anadarko does not discuss another element in the statute: that "removal costs" must be consistent with the NCP. 33 U.S.C. § 2702(b)(1)(B). Anadarko fails to plead this requirement in its Complaint; in fact, Anadarko does not even reference the NCP in its Complaint. But as Anadarko admits in its Opposition, the NCP "is a spill response guide designed to provide for 'efficient, *coordinated*, and effective action to minimize damage from oil and hazardous substance discharges.'" Opposition at 15 (quoting 33 U.S.C. § 1321(d)(2)) (emphasis added). There was no coordination here—not with the FOSC and not with MPOG. Anadarko did not allege that its actions were consistent with the NCP. Lacking allegations that Anadarko acted at the direction of the FOSC in a manner consistent with the NCP, Anadarko has failed to allege facts giving rise to a claim for alleged "removal costs."

Anadarko has failed to plead that it acted in accordance with the NCP at the direction of the FOSC, and its claims for "recovery costs" should be dismissed.

### III.  CONCLUSION

For the foregoing reasons, MPOG respectfully requests that the Court dismiss all claims in Anadarko's Complaint with prejudice.

Respectfully submitted this 5th day of January, 2026.

          BRACEWELL LLP

          */s/ Stephen B. Crain*
          Stephen B. Crain
          (T.A./pro hac vice)
          Texas State Bar No. 04994580
          Haley M. Bernal
          (pro hac vice)
          Texas State Bar No. 24132533
          711 Louisiana Street, Suite 2300
          Houston, TX 77002
          Tele:   (713) 221-1305
          Fax:   (800) 404-3970
          Email: stephen.crain@bracewell.com
          Email: haley.bernal@bracewell.com

                    and

          MILLER HAHN, PLLC

          */s/ Stephanie D. Skinner*
          Stephanie D. Skinner (#21100)
          Kent B. Ryan (#18418)
          365 Canal St., Ste. 860
          New Orleans, LA 70130
          Tele:   (504) 684-5044
          Fax:   (866) 578-2230
          Email: kryan@millerlaw-firm.com
          Email: sskinner@millerlaw-firm.com

          **ATTORNEYS FOR PLAINTIFF,**
          **MAIN PASS OIL GATHERING**
          **COMPANY, LLC**

## CERTIFICATE OF SERVICE

     I hereby certify that on this 5th day of January, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to those who are on the list to receive e-mail notices for this case, having enrolled in this Court's CM/ECF program and otherwise consented to receive notice and service via CM/ECF. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all non-CM/ECF participants.

                                      */s/ Stephanie D. Skinner*
                                      Stephanie D. Skinner