**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MAIN PASS OIL GATHERING COMPANY, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 25-890** |
| **SUBSEA 7 MARINE** | **SECTION "B" (3)** |

**ORDER AND REASONS**

Before the Court are plaintiff Main Pass Oil Gathering Company's ("MPOG") Motion to Dismiss (Rec. Doc. 27), plaintiff-in-intervention Anadarko Petroleum Corporation and Anadarko US Offshore LLC's ("Anadarko") Opposition (Rec. Doc. 37), and plaintiff's reply (Rec. Doc. 38). For the following reasons,

**IT IS ORDERED** that plaintiff's Motion to Dismiss (Rec. Doc. 27) is **GRANTED in part and DENIED in part** as follows: plaintiff's motion to dismiss plaintiff-in-intervention's Oil Pollution Act ("OPA") claim for economic damages is **DENIED**, and plaintiff's motion to dismiss plaintiff-in-intervention's OPA claim for removal costs will be **GRANTED**, **unless** plaintiff-in-intervention files an amended complaint addressing the deficiencies relating to compliance with the National Contingency Plan ("NCP") within **14 days** of entry of this order.

## I. FACTUAL BACKGROUND PROCEDURAL HISTORY

Anadarko Petroleum Corporation and Anadarko US Offshore LLC ("Anadarko"), operate two oil producing platforms, Marlin and Horn Mountain, in the Eastern Gulf of Mexico, which ship crude oil via a pipeline system owned by Main Pass Oil Gathering Company ("MPOG"). Rec. Doc. 16 at 5. Five agreements govern the shipment of crude oil between Anadarko and MPOG. *Id.* MPOG delivers crude oil produced by Anadarko to the Main Pass Block 69. *Id*. MPOG is owned by Third Coast Infrastructure ("Third Coast"). MPOG's personnel report up through Third Coast.

*Id.* at 2. MPOG purchased a Connector from Subsea 7 Marine (US) Inc. ("Subsea 7") in 2001, and installed it in 2004 to repair the pipe after damage from Hurricane Ivan. *Id.* at 10.

On November 15, 2023, in the evening, the Third Coast Controller noticed a decrease in the flow rate of oil in the MPOG pipeline system. Rec. Doc. 16 at 5. The Controller continued operations as normal, having been repeatedly advised by the Pipeline Operator that the decrease was likely an equipment issue. *Id*. at 6. The Controller was told to keep the pipeline flowing multiple times during the oil release event. *Id.* Shortly after midnight on November 16, 2023, the flow rate went to zero, and the Controller did not shut down the pipeline. *Id.* at 7. The Controller received no specific shut-in training and Third Coast procedures did not require controllers to take action when the flow rate went to zero. *Id.* A visual inspection of the pipeline by field technicians did not identify any abnormalities. *Id.* Although the field technicians received visual training, they were not trained on how to recognize if there was a leak on the line. *Id.* Anadarko was not informed of any irregularities. *Id.* Approximately 1.1 million gallons of crude oil were released into the Gulf of Mexico during the oil release event. *Id*. at 8.

Anadarko alleges that MPOG had a limited ability to determine whether a leak occurred because MPOG had no leak detection system in place and because Third Coast did not have a formal Pipeline Safety Management System Program, which was a recommended practice by the American Petroleum Institute. Rec. Doc. 16 at 8. MPOG also had a limited ability to protect against the oil release event because its integrity management program was allegedly insufficient. *Id.* at 9. Further, Third Coast allegedly failed to evaluate the potential for the pipeline to move after a 2022 hydrographic survey, which showed sections of the MPOG pipeline that were exposed and unsupported by the sea floor. *Id.* Anadarko claims that MPOG knew the sea floor movement related to hurricane activity was a threat to its pipeline and failed to use a pipeline integrity program

that adequately considered this threat. *Id.* According to Anadarko, the oil release event was caused by a loss of seal in the Subsea 7 Connector due to pipeline movement caused by weather-related sea floor movement. *Id.* at 10.

Following the oil release event, Anadarko shut in production on both the Marlin and Horn Mountain platforms and mobilized its Incident Command Team to respond to the oil spill and assist MPOG and the Federal On Scene Coordinator ("FOSC"). Rec. Doc. 16 at 12. The Marlin and Horn Mountain platforms remained shut in for several months. *Id.* Anadarko presented MPOG with a presentment letter in December 2024 identifying its claims for removal costs associated with the oil release event, as well as costs incurred to maintain the shut in platforms. *Id*. Anadarko also included a claim for lost profits due to the delayed sales of crude oil while the platforms were unable to produce. *Id.* MPOG rejected Anadarko's claims in the presentment letter. *Id.*

On May 7th, 2025, MPOG filed a complaint against Subsea 7 in this Court. In its complaint, MPOG asserts (1) a claim for defective product under the general maritime law, (2) a claim for defective product under the Louisiana Product Liability Act, and (3) a claim for contribution under OPA. Rec. Doc. 1.

On September 9th 2025, Anadarko filed a complaint in intervention against MPOG and Subsea 7 in this Court. In its complaint, Anadarko asserts (1) a claim for damages under OPA against MPOG and alternatively, (2) a breach of contract claim against MPOG and (3) a claim for defective product under the Louisiana Product Liability Act against Subsea 7. Rec. Doc. 16. MPOG has moved to dismiss the claims against it, arguing that Anadarko's economic loss claims are barred by contract and are too vague to be actionable. Rec. Doc. 27-1. MPOG additionally argues that Anadarko's claim for removal costs should be dismissed because Anadarko failed to

allege facts essential to the claim. Rec. Doc. 27-1. Anadarko opposes the motion to dismiss. Rec. Doc. 37.

## II. LAW AND ANALYSIS

### A. Legal Standard

Rule 8 of the Federal Rules of Civil Procedure requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard does not require "detailed factual allegations" but does require more than a recitation of the elements of a claim in the form of conclusory statements. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A plaintiff's complaint may survive a Rule 12(b)(6) motion to dismiss where the complaint contains sufficient facts, which accepted as true, "state a claim to relief that is plausible on its face." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In deciding a motion to dismiss, the court is restricted and can generally only consider the face of the pleadings. *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). However, contracts that are attached to a motion to dismiss may be considered part of the pleadings if they were referenced in the plaintiff's complaint and are central to the claim. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Motions to dismiss for failure to state a claim are disfavored. *Scanlan,* 343 F.3d at 536.

### B. Analysis

Anadarko asserts two alternative claims for damages: the first, for damages under OPA; the second, for damages because of MPOG's alleged breach of contract. In response to these claims, MPOG moves to dismiss, asserting that economic damages, under either alternative, are barred because of contracts between the parties which bar recovery of consequential damages, including lost profits. Rec. Doc. 27-1. Anadarko responds that because it has pleaded that MPOG

was grossly negligent, its economic damages claims are thereby saved. Whether Anadarko may recover damages depends on whether Anadarko has sufficiently pleaded gross negligence. Anadarko's claim for removal costs will be addressed second and depends on whether Anadarko has pled all the required elements of a claim for removal costs under OPA.

1. Economic Damages - Gross Negligence

Anadarko attempts to save its economic damages claim by arguing that MPOG was grossly negligent. Texas law prohibits pre-injury waivers of liability arising from gross negligence. *Zachry Const. Corp. v. Port of Houston Auth of Harris Cnty*., 449 S.W. 3d 98 (Tex. 2014) ("We have indicated that pre-injury waivers of future liability for gross negligence are void as against public policy. Generally, a contractual provision 'exempting a party from tort liability for harm caused intentionally…is unenforceable on grounds of public policy.' We think the same may be said of contract liability."). The Court now determines whether Anadarko adequately pleaded gross negligence in its complaint.

Under Texas Law, gross negligence has an objective and a subjective component. *Medina v. Zuniga*, 593 S.W.3d 238, 247 (Tex. 2019).[1] The first objective prong is that the act or omission must involve an extreme degree of risk. *Id*. To establish an extreme risk, there must be a likelihood of serious injury to the plaintiff. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). The second subjective prong is that the defendant must have subjective awareness of that risk and proceed regardless with conscious indifference to the rights, safety, or welfare of others. *Id*. The second, subjective element of awareness "means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care." *Id.*

[1] The choice of law provisions in the relevant contracts point to Texas law.

Contrary to MPOG's arguments, Anadarko has pleaded both prongs of a gross negligence claim. Anadarko pleaded that the likelihood of substantial injury was high due to the nature of the oil release event. Rec. Doc. 37 at 5. Anadarko has also alleged facts that indicate MPOG was aware of the risk and proceeded with conscious indifference by continuing to operate its business during the oil release event. *Id.* at 5-6. Anadarko has also alleged acts which could indicate MPOG's conscious indifference to Anadarko's rights, including MPOG's failure to inform Anadarko that anything was wrong during the oil release event. *Id.* More specifically, Anadarko has alleged that (1) the lack of a leak detection system increased the likelihood of an oil release event which would cause serious injury to Anadarko, (2) MPOG knew sea floor movement posed a risk to its pipelines yet nevertheless utilized an ineffective pipeline integrity program, (3) MPOG proceeded with its business despite these failures, and (4) MPOG failed to inform Anadarko that anything was amiss during the oil release event. Rec. Doc. 38 at 3-4. After review of the complaint, the Court concludes that Anadarko has adequately pleaded MPOG's gross negligence. Therefore, because Texas law prohibits pre-injury waivers of liability for gross negligence, Anadarko's claims for economic damages are not barred under the contracts between the parties. *See Zachry*, 449 S.W.3d at 116; *Hill v. Fitness Int'l, LLC*, No. 02-22-00142-CV, 2023 WL 2607646 at *8 (Tex. App. Mar. 23, 2023).

2. Economic Damages – Force Majeure

Also at issue is whether the force majeure provisions in the contracts between the parties bar recovery for economic damages. MPOG argues that the force majeure provisions in the contracts bar recovery because pipeline breakage is a force majeure event that excuses non-performance. Rec. Doc. 27-1 at 6. MPOG continues that Anadarko has already alleged that the cause of the oil release event was the failure of the Subsea 7 Connector; in other words, the cause was an event included within the parties' force majeure provisions. *Id.* This argument fails. The

provision in question[2] defines force majeure as "acts of God, . . . breakage or accidents to machinery or lines of pipe, . . . or any other causes not reasonably within the control of the Party claiming suspension, . . . and which, by the exercise of due diligence, such Party has been or is unable to prevent or overcome . . . ." Rec. Doc. 27-3 at 13. Anadarko's alleges that with due diligence, MPOG could have prevented the breakage of the pipeline. Rec. Doc. 37 at 11. As this is a motion to dismiss, evidence has not yet been presented whether this is so. But at this stage of the proceedings, Anadarko has at the very least pled that Main Pass, with due diligence, could have prevented the oil spill release incident. Specifically, Anadarko alleges that MPOG could have taken action, including adequately addressing geohazards, which would have prevented the pipeline breakage. *Id.* The Court therefore concludes that the force majeure provision does not bar recovery. *See Mieco, L.L.C. v. Pioneer Nat. Res. USA, Inc.,* 109 F.4th 710, 727 (5th Cir. 2024) (declining to grant summary judgment on the issue of reasonable efforts and due diligence because genuine fact disputes remained about those issues).

3. Economic Damages – Causation

MPOG alternatively argues that Anadarko's claim for economic damages is too vague and not causally linked to the oil release event to the level required under OPA. Rec. Doc. 27-1 at 7-8. In its complaint, Anadarko pleads that (1) it was required to shut in the Marlin and Horn Mountain platforms and was unable to produce oil and lost profits as a result, and (2) that it incurred costs to man and maintain both platforms during the shut-in. Rec. Doc. 37 at 13. MPOG argues that Anadarko pled only categories of damages, but Anadarko's pleadings go beyond this, specifically mentioning costs to maintain platforms and lost profits due to the shut-in. The causal link between the incident and injury meets the standard required under the OPA. In *In re Deepwater Horizon*,

[2] All five agreements use the same contractual language for the force majeure provision. The 2022 agreements place the reasonable control and due diligence language before the list of events.

48 F.4th 378, 383 (5th Cir. 2022), the court held that the "substantial-nexus" should apply to claims for lost profits under OPA, specifying that this requires a significant causal link. Anadarko has pled that the oil release event caused a months-long shut in of its platforms and that it suffered lost profits as a result. Rec. Doc. 37 at 13. While close, the Court concludes that the causal link between the event and the injury is sufficient to survive a motion to dismiss. MPOG's motion to dismiss Anadarko's claim for economic damages under either the OPA or for breach of contract is **DENIED**.

4. <u>Removal Costs under OPA</u>

Anadarko's claim for removal costs under OPA must follow certain requirements to be recoverable. Under the OPA, recoverable removal costs are those that are consistent with the National Contingency Plan. 33 U.S.C.A. § 2702(b)(1)(B) ("Covered removal costs . . . any removal costs incurred by any person for acts taken by the person which are consistent with the National Contingency Plan."). While Anadarko has pled that it mobilized helicopters and vessels to assist MPOG and the FOSC to conduct inspections along the pipeline and located the leak, Anadarko has not pled that its actions were consistent with the NCP. Rec. Doc. 37 at 15. As this is a requirement for removal costs to be recoverable under OPA, MPOG's motion to dismiss Anadarko's claim for removal costs under OPA will be granted **unless** Anadarko files an amended complaint correcting the foregoing deficiency relating to compliance with the National Contingency Plan ("NCP") within <u>**14 days**</u> of entry of this order.

New Orleans, Louisiana this 31st day of August 2026

Senior United States District Judge