**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MAIN PASS OIL GATHERING COMPANY, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**SUBSEA 7 MARINE (US) INC.,**<br><br>Defendant. | CIVIL ACTION NO. 25-00890<br><br>JUDGE IVAN L.R. LEMELLE<br><br>MAG. JUDGE EVA J. DOSSIER |

**SECOND SUPPLEMENTAL AND AMENDED COMPLAINT IN INTERVENTION**

NOW INTO COURT, through undersigned counsel, come Plaintiffs in Intervention Anadarko Petroleum Corporation and Anadarko US Offshore LLC (collectively herein, "Anadarko"), who file this Second Supplemental and Amended Complaint in Intervention against Main Pass Oil Gathering Company, LLC ("MPOG"), Third Coast Infrastructure LLC ("Third Coast"), Panther Operating Company, LLC ("Panther"), and Subsea 7 Marine (US) Inc. ("Subsea 7") pursuant to Federal Rules of Civil Procedure 15 and 24, and aver as follows:

**INTRODUCTION**

1. On the evening of November 15, 2023, a segment of the MPOG pipeline system began to leak crude oil into navigable waters off the coast of Louisiana.

2. The pipeline at issue is part of the Main Pass Oil Gathering pipeline system, which is owned by Third Coast and operated by its affiliate Panther. MPOG is a wholly owned subsidiary of Third Coast that holds the physical pipeline assets. As used herein, "Third Coast Entities" is defined to collectively include Third Coast, MPOG, and Panther.

3. For nearly twelve hours, the Third Coast Entities failed to respond to the leak or provide any alert or notification to Anadarko to shut in its production. By the time the leak was isolated, the line had released about 26,979 barrels (approximately 1.1 million gallons) of crude oil into an environmentally sensitive area in the Gulf of Mexico, causing damage to the region's natural resources. These events are referred to herein as the "MPOG Release."

4. As owners of the MPOG pipeline system, Third Coast and MPOG are each Responsible Parties under the Oil Pollution Act ("OPA").

5. As an operator of the MPOG pipeline system, Panther is also a Responsible Party under OPA.

6. On November 12, 2024, the National Transportation Safety Board published its findings that the cause of the leak was the failure of a Subsea 7 Connector.

7. On December 31, 2025, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") issued a Notice of Probable Violation, Proposed Civil Penalty, and Proposed Compliance Order ("NOPV") against Panther, finding eleven probable violations of the Pipeline Safety Regulations and proposing a record civil penalty of $9,622,054.

8. As a result of the MPOG Release, Anadarko was required to shut in two of its production platforms: the Horn Mountain platform and the Marlin platform. Anadarko was unable to use either the Horn Mountain or the Marlin platforms to produce crude oil for several months, resulting in Anadarko sustaining significant damages.

9. Anadarko has also suffered significant damages in the form of costs incurred for removal activities and loss of use damages.

10. Anadarko brings this action against the Third Coast Entities under OPA to recover response and removal costs, compensation for the loss of Anadarko's oil, and loss of use damages

caused by the shut-in of Anadarko's wells, platforms, and associated production facilities which occurred as a result of the Third Coast Entities' gross negligence, the damage to the pipeline, and the resulting release of oil. These loss of use damages are measured by, *inter alia*, delayed sales, lost production revenue, and lost profits during the shut-in period. Anadarko additionally seeks mitigation and preservation costs incurred as a direct result of the release and resulting shut-in, including costs necessary to safely man, maintain, inspect, and preserve tangible offshore production facilities, and to prevent physical injury to its platforms during the shut-in. Anadarko also brings breach of contract claims against MPOG. In addition to their own direct liability to Anadarko as an owner, operator, and/or contracting party, Third Coast, Panther, and MPOG are additionally and/or alternatively liable as the alter egos of one another. Further, Anadarko brings this action against Subsea 7 under the Louisiana Products Liability Act to recover damages caused by the failure of the Subsea 7 Connector, for which it is liable jointly, severally and *in solido* with the Third Coast Entities.

## PARTIES

11. Plaintiff in Intervention Anadarko Petroleum Corporation is a corporation organized under the laws of the state of Delaware with its principal place of business in The Woodlands, Texas.

12. Plaintiff in Intervention Anadarko US Offshore LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business in The Woodlands, Texas.

13. Defendant in Intervention Third Coast Infrastructure LLC is a limited liability company organized under the laws of the state of Delaware. Its principal place of business is in Houston, Texas.

14. Defendant in Intervention Main Pass Oil Gathering Company, LLC is a limited liability company organized under the laws of the state of Delaware. Its principal place of business is in Houston, Texas. MPOG is owned by Third Coast Infrastructure, LLC ("Third Coast").

15. Defendant in Intervention Panther Operating Company, LLC is a limited liability company organized under the laws of the state of Texas. Its principal place of business is in Houston, Texas.

16. Defendant in Intervention Subsea 7 Marine (US) Inc. is a corporation organized under the laws of the state of Delaware. Its principal place of business is in Houston, Texas.

## JURISDICTION AND VENUE

17. This Court has original subject matter jurisdiction over Anadarko's claims against the Third Coast Entities pursuant to 33 U.S.C. § 2717(b) because the Third Coast Entities are Responsible Parties under the Oil Pollution Act and Anadarko seeks to recover damages provided for by the Oil Pollution Act.

18. This Court has supplemental jurisdiction over Anadarko's breach of contract claims against MPOG pursuant to 28 U.S.C. § 1367(a) because Anadarko's breach of contract claims against MPOG are so related to Anadarko's claims against the Third Coast Entities under the Oil Pollution Act, as well as MPOG's claims against Subsea 7 (*see, e.g.*, MPOG Complaint at ¶¶ 36, 51), that they form part of the same case or controversy.

19. This Court has supplemental jurisdiction over Anadarko's claims against Subsea 7 pursuant to 28 U.S.C. § 1367(a) because Anadarko's claims against Subsea 7 are so related to Anadarko's claims against the Third Coast Entities under the Oil Pollution Act, as well as MPOG's claims against Subsea 7 (*see, e.g.*, MPOG Complaint at ¶¶ 36, 51), that they form part of the same case or controversy.

20. In addition or in the alternative, Anadarko's claims against the Third Coast Entities and Subsea 7 are subject to federal subject matter jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA") because such claims arise out of or in connection with operations on the Outer Continental Shelf that involve the production of minerals. 43 U.S.C. § 1349(b)(1).

21. This Court has personal jurisdiction over Third Coast because Third Coast regularly conducts business in Louisiana and in this District. Third Coast has the necessary minimum contacts with Louisiana, and subjecting Third Coast to jurisdiction in Louisiana does not offend the traditional notions of fair play and substantial justice.

22. This Court has personal jurisdiction over MPOG because MPOG regularly conducts business in Louisiana and in this District. MPOG has the necessary minimum contacts with Louisiana, and subjecting MPOG to jurisdiction in Louisiana does not offend the traditional notions of fair play and substantial justice. Further, MPOG voluntarily submitted itself to the jurisdiction of this Court with respect to claims arising from the November 2023 oil release when it brought its claims against Subsea 7 before it.

23. This Court has personal jurisdiction over Panther because Panther regularly conducts business in Louisiana and in this District. Panther has the necessary minimum contacts with Louisiana, and subjecting Panther to jurisdiction in Louisiana does not offend the traditional notions of fair play and substantial justice.

24. This Court has personal jurisdiction over Subsea 7 because Subsea 7 regularly conducts business in Louisiana and in this District. Subsea 7 has the necessary minimum contacts with Louisiana, and subjecting Subsea 7 to jurisdiction in Louisiana does not offend the traditional notions of fair play and substantial justice.

25. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2), (c)(2) and 33 U.S.C. § 2717(b) because the Connector failed in this District, the oil release occurred in this District, and Anadarko sustained damages in this District.

## FACTUAL BACKGROUND

### I. Agreements Between Anadarko and MPOG

26. Anadarko is the fourth-largest oil and gas producer in the deep-water Gulf of America, operating 8 strategically located deep-water floating platforms, and producing from 14 active fields while owning a working interest across 230 blocks, including approximately 0.8 million net acres.

27. Crude oil produced by Anadarko from the MC-127 ("Horn Mountain") and VK-915 ("Marlin") platforms in the Eastern Gulf of Mexico is shipped into the MPOG pipeline system pursuant to agreements between Anadarko and MPOG.

28. Interconnection Agreements and Oil Gathering Agreements between Anadarko and MPOG provide that MPOG is responsible for the gathering of crude oil and condensate produced by Anadarko at the Horn Mountain and Marlin platforms and for the delivery of such crude oil and condensate to Anadarko or its designee at the agreed upon delivery point.

29. The MPOG pipeline system terminates in Main Pass Block 69 (MP 69). MPOG is contractually obligated to deliver crude oil and condensate produced by Anadarko at the Horn Mountain and Marlin Platforms to MP 69 through the MPOG pipeline system.

30. Upon information and belief, MPOG generally fulfills its contractual obligations through its arrangements with Panther, Third Coast, and/or other business entities that are owned or otherwise affiliated with Third Coast, including but not limited to Third Coast Employee Services LLC and Lighthouse Midstream Services LLC.

31. Anadarko's production from the Horn Mountain and Marlin platforms constitutes a significant portion of the volumes that flow through the MPOG pipeline system. Accordingly, the majority of the oil lost during the MPOG Release belonged to Anadarko.

## II. The November 2023 Oil Release Event

32. At or around 6:45 p.m. on November 15, 2023, the Controller on duty, who worked for the Third Coast Entities, first began to notice the supervisory control and data acquisition (SCADA) system indicated pressure changes in the MPOG pipeline system.

33. SCADA records indicate that flow rate fluctuations started about 6:12 p.m., with a significant decrease in flow rate beginning just before 7:00 p.m.

34. Around 9:00 p.m., the Controller called personnel at two other control rooms, including at the MP 69 station, to verify whether they observed similar flow data decreases. In both cases, the other control room personnel reported that the flow rates matched those shown by the SCADA system.

35. Also around 9:00 p.m., the Controller first contacted the off-duty Pipeline Operator to express his concern over the data but was advised to continue operations and keep the pipeline flowing. The Controller stated that he told the Pipeline Operator that they "need[ed] to shut down the system as a precaution," but he was told "not to shutdown to give it a bit more time and see if accumulations and flow rates would start going the other way." The Controller repeatedly contacted the Pipeline Operator throughout the night but was continually advised that it was likely an equipment issue and to keep the pipeline flowing.

36. Despite the fact that Anadarko's production constituted the majority of flow on this line, Anadarko was not advised of any irregularities, and the Third Coast Entities did not request that it shut in.

37. At 10:15 p.m., the Controller first reported the abnormal data to the Operations Supervisor, who again advised him to keep the pipeline and operations flowing despite the trends in the data and the Controller's concern. Again, the Third Coast Entities failed to notify Anadarko of any irregularities or request that it shut in. The Controller failed to enter the 22:30 pm imbalance reading, as was required by the Third Coast Entities' manual line balance policies.

38. Third Coast had been experiencing issues with debris clogging the meter system. The Pipeline Operator relied in part on this interference to justify continuing to operate the pipeline system. Upon information and belief, the Third Coast Entities knew about this interference and had failed to address the issue, thus allowing operations to continue with the knowledge that the meter readings were an unreliable method of determining whether a leak had occurred.

39. At approximately 12:29 a.m. on November 16, 2023, the flow rate at the MP 69 station went to *zero*.




Figure 4. MP-69A Flow Rate Data (November 15-16, 2023). NTSB Human Performance, System Safety and SCADA Report, PLE-24-FR-001 (September 28, 2024).

40. The valves at the MP 69 station were programmed to close when the flow rate went to zero, but for reasons yet to be determined, they did not close. The Controller was waiting for these valves to close, but the valves did not close, and the Controller was unclear why this did not occur.

41. Valve maintenance, inspection, and operability expectations require that valves necessary for safe operation function on demand, including under emergency conditions. The failure of these valves demonstrates that the valves were not maintained in good working order at all times.

42. The Controller communicated the valve failure to the Pipeline Operator, who continued to assure the Controller that it was most likely an equipment failure.

43. The Third Coast Entities' procedures did not require controllers to take any action when MP 69 had zero flow.

44. The Controller again failed to shut down the pipeline. The Third Coast Entities still failed to notify Anadarko of the irregularities or request it to shut in.

45. The Controller concluded, based on conversations with his colleagues and the performance of the valves, that the data received was attributable to equipment issues and did not shut down the pipeline.

46. Around 2:00 a.m., the Controller contacted field technicians at MP 69 who did a visual inspection for a spill and did not identify any abnormalities. Beyond visual training, the field technicians were not trained on how to recognize whether there might be a leak on the line. The Third Coast Entities again failed to notify Anadarko of the irregularities or request that it shut in.

47. Despite the fact that no equipment issues were observed, the Controller and his colleagues continued to doubt the accuracy of the SCADA data which plainly indicated that the pipeline system should have been shut down.

48. The Controller failed to document imbalance values between the accumulation receipts and accumulation deliveries every four hours as required by the Third Coast Entities' policy.

49. The Controller did not contact his shift lead to discuss his concerns at any point throughout the night.

50. The Controller had received no shut-in specific training.

51. The controller training program failed to communicate that a zero-flow condition at MP 69 may be an indication of a leak and failed to instruct controllers on whether and when immediate shutdown or escalation should be performed in response to a zero-flow indication at MP 69.

52. The training program further failed to train controllers on responding to abnormal operating conditions likely to occur in simultaneously or in sequence, such as gradual line imbalance, zero-flow indications at MP 69, and automatic valve failures – precisely what occurred here.

53. No SCADA system alarms were triggered for the decrease in flow rate or accumulation imbalance for this event despite data indicating that something was very awry.

54. Third Coast did not have a formal Pipeline Safety Management System program in accordance with the American Petroleum Institute Recommended Practice.

55. There was no leak detection system in place despite the fact that the pipeline was capable of flowing incredibly significant volumes of crude oil.

56. The Third Coast Entities' Operations & Maintenance Manual did not implement an appropriate or reliable leak detection method for the MPOG pipeline system, did not include sufficient procedures for response to pressure abnormalities. To the extent the Manual did provide guidance like those that occurred during the MPOG Release, response actions were discretionary and repetitive, allowing the release to continue.

57. require or document any evaluation of the effectiveness of the leak detection methods actually relied upon for the MPOG pipeline; it did not establish any process, criteria, performance thresholds, or acceptance metrics for the methods actually relied on; and it did not require periodic review, validation, or modification of that method.

58. The Third Coast Entities' Operations & Maintenance Manual did not include procedures for responding to, investigating, and correcting the cause of an increase or decrease in pressure or flow rate outside normal operating limits or equipment malfunction. Importantly, the Third Coast Entities' Operations & Maintenance Manual failed to specify controller actions in response to a zero-flow indication or an imbalance magnitude such as those that occurred during the MPOG Release.

59. The Operations & Maintenance Manual further failed to specify the types of situations, operational indicators, or objective evidence that would lead personnel to recognize that an emergency had occurred and take required emergency actions.

60. Despite representing to federal authorities that detection and shutdown response time for an uncontrolled blowout was estimated to be 0.25 hours, the Third Coast Entities did not communicate this expectation to its pipeline controllers, nor did it implement sufficient mechanical or procedural to actually achieve this standard.

61. The lack of leak detection system, the unreliability of the meters, and the inadequate response procedures left the Third Coast Entities with effectively no method of determining whether a leak occurred and no protocol for ensuring such an event was properly responded to. As a result, the Third Coast Entities permitted crude oil to be pumped unabated into Louisiana's state waters throughout the night.

62. Post-accident, the Pipeline Controller Lead, who had reviewed the SCADA and logger data following the event, told investigators that both the emerging flow and the pressure data gave him concerns. He had concerns about the system based on the imbalance that began to grow around 7:30 p.m. that continued for five hours. He considered this "very indicative of an issue." That, along with the pressure trend and zero flow rate at midnight (the latter he considered "the number one red flag"), would have warranted shutting down the pipeline around midnight.

63. At a post-accident meeting with company officials to discuss the Controller's termination, the Controller told officials that the field technician had guided him through different scenarios in the past and he trusted him based on his knowledge and expertise. When the official advised the Controller that the indicators to shut down the line were obvious, he stated "I should have shut down the line."

64. By the time the pipeline was shut in, the Third Coast Entities had allowed the release of approximately 1.1 million gallons of crude oil into the Gulf of Mexico.

65. On the night of the MPOG Release, the Marlin and Horn Mountain platforms introduced the largest amount of crude oil into the MPOG pipeline system, and thus lost the largest amount of oil. Yet, MPOG failed to notify Anadarko and request that it shut in until nearly twelve hours had elapsed.

66. Upon information and belief, the MPOG pipeline system was unable to resume the transportation of crude oil until late April 2024 because of the damage to the physical pipeline, the scope and extent of the spill (including both a loss to and a continuing threat of further loss or damage to the surrounding natural resources), and the state and/or federal regulators' lack of confidence in the Third Coast Entities' ability to operate the MPOG pipeline system in a safe manner and in compliance with applicable regulations.

## III. The Third Coast Entities' Insufficient Integrity Management Program

67. The Third Coast Entities' integrity management program was insufficient to protect against an oil release event such as the one that occurred in November 2023.

68. As discussed below, the MPOG Release occurred at a location repaired after the pipeline system was damaged by Hurricane Ivan in 2004.

69. Alignment maps from 2005 showed significant areas of exposed pipeline and mudflows over or near it, along with a mudflow in the same area as the MPOG Release.

70. At the site of the MPOG Release, where the MPOG pipeline system crossed a Shell Nakika pipeline, over 7,125 feet of the MPOG pipeline was laterally displaced up to 3,000 feet, and the area was designated as a mud flow area.

71. While damages sustained as a result of Hurricane Ivan were repaired, twelve additional hurricanes and six tropical storms have battered MP 69 and the MPOG pipeline system since that time.

72. A 2022 hydrographic survey showed more than a dozen exposed sections of the MPOG pipeline system, as well as twenty-four locations where the pipeline may have been unsupported by the sea floor.

73. Although the Third Coast Entities corrected the unsupported and exposed sections of the MPOG pipeline system in 2023, they failed to evaluate the potential for the pipeline to move and for the Subsea 7 Connector to fail before the oil release event.

74. The Subsea 7 Connector and the connected pipeline segments were not configured in a manner consistent with the expansion, displacement-stress relief, and load-management requirements of the installation environment, creating conditions that compromised the integrity of the pipeline.

75. The Third Coast Entities failed to account for anticipated external loads, including storm-related forces, geotechnical movement, loss of support, and pipeline displacement in its design of the pipeline system and its use of the Subsea 7 Connector, leaving the system in a configuration that was unable to accommodate the foreseeable and anticipated external loads.

76. Foreseeable storm-driven and geotechnical loads caused seabed instability and pipeline displacement that were not mitigated through expansion, flexibility, restraint, or support measures.

77. Upon information and belief, the Third Coast Entities knew that sea floor movement related to hurricane activity was a threat to pipelines in the Gulf, including the MPOG pipeline system.

78. An effective pipeline integrity program would have incorporated information on potential weather-related geohazards to identify pipeline areas for further assessment.

79. Despite the long-standing and repeatedly documented evidence of geotechnical risk, the Third Coast Entities failed to incorporate these conditions into their integrity management assessment schedule or to adjust their integrity management assessment schedule to reflect the elevated risk posed by recurring geotechnical hazards.

80. The Third Coast Entities' in-line inspection assessment schedule prior to the MPOG Release did not include tools which could address any geotechnical risk factors.

81. Accordingly, the Third Coast Entities' integrity assessment schedule did not account for known threats that directly affected the structural integrity and stability of the pipeline segment in which the Subsea 7 Connector was located.

82. The Third Coast Entities possessed substantial information indicating long-term, geohazard-driven instability in the area around the source of the MPOG Release that posed a threat the MPOG pipeline system. The Third Coast Entities also possessed information demonstrating uneven and evolving seabed geometry.

83. However, the Third Coast Entities consciously disregarded these risks, and failed to integrate any of this available data into an information analysis capable of identifying geohazards and displacement-related loading as credible threats to the pipeline.

84. The Third Coast Entities did not appropriately integrate data associated with displacement history, seabed instability, survey findings, or mechanical connector performance into its integrity management program with respect to the segment in which the Subsea 7 Connector was located and accordingly lacked a valid analytical basis for its integrity management program to manage geohazard-related threats to the MPOG pipeline system.

85. The Third Coast Entities further disregarded these known risks by failing to perform new integrity analysis or evaluations following changes in circumstances that identified new and elevated risk factors for the MPOG pipeline system, despite having evidence of ongoing pipeline movement, seabed instability, and progressive degradation of the Subsea 7 Installation

## IV. Deficient Equipment, Warning Systems, and Procedures

86. In addition to the failure of the Subsea 7 Connector, the MPOG Release was caused and exacerbated by multiple independent operational failures by Panther in violation of federal pipeline safety regulations.[1] Upon information and belief, each of these failures are jointly attributable to Third Coast and MPOG based upon the conduct, business practices, and structure of decision-making authority of the Third Coast Entities.

87. Panther failed to provide for anticipated external loads, including storm-related forces, geotechnical movement, loss of support, and pipeline displacement, in its design of the MPOG pipeline system in violation of 49 C.F.R. § 195.110(a). Despite documented evidence of geotechnical instability at MP 69 dating back to at least 2004—including significant lateral displacement, suspended spans, mudflow areas, and unstable slopes—it failed to incorporate these conditions into the pipeline design or to implement expansion, flexibility, restraint, or support measures at the Subsea 7 Connector location.

88. Panther failed to maintain each valve necessary for the safe operation of its pipeline system in good working order at all times in violation of 49 C.F.R. § 195.420(a). On the date of the release, mainline valves 301, 303, and 305 at MP 69 failed to close by automatic operation when triggered by zero-flow conditions, and failed to close when commanded from the control room by the pipeline controller.

89. Panther failed to evaluate the capability of its leak detection means and modify, as necessary, to protect the high consequence area in which the MPOG pipeline system was located, in violation of 49 C.F.R. § 195.452(i)(3). Panther's leak detection system relied solely on controller

[1] From November 16, 2023 to November 14, 2025, representatives of PHMSA, Office of Pipeline Safety, investigated the MPOG Release. PHMSA's investigation culminated in the issuance of a Notice of Probable Violation, Proposed Civil Penalty, and Proposed Compliance Order (CPF 4-2025-012-NOPV) on December 31, 2025 issued to Panther Operating Company, LLC, which found 11 probable violations proposed a record setting penalty of $9,622,054.

interpretation of flow, pressure, and imbalance data without automated alarming, sensitivity thresholds, or validated response criteria.

90. Panther failed to define a controller's role when an abnormal operating condition is detected, including the controller's responsibility to take specific actions and to communicate with others, in violation of 49 C.F.R. § 195.446(b)(2). The Control Room Management Plan failed to identify any specific imbalance level, equipment malfunction, or zero-flow condition that would constitute an abnormal operating condition requiring defined controller action.

91. Panther failed to define a controller's role during an emergency, including the controller's responsibility to take specific actions and communicate with others, in violation of 49 C.F.R. § 195.446(b)(3). Although its Oil Spill Response Plan assumed a pipeline system detection and shutdown response time of 0.25 hours, its procedures did not communicate this expectation to controllers, did not reference the 0.25-hour assumption, and did not require controllers to act within any defined timeframe during an emergency.

92. Panther failed to include in its Operations and Maintenance Manual procedures for responding to, investigating, and correcting the cause of abnormal flow rate or pressure conditions, or the malfunction of a component, in violation of 49 C.F.R. § 195.402(d)(1)(ii) and (v). The Manual failed to specify controller actions in response to a zero-flow indication or to a specific imbalance magnitude.

93. Panther failed to have emergency procedures to take necessary actions to minimize hazards of released hazardous liquid in violation of 49 C.F.R. § 195.402(e)(4). The Manual failed to specify the types of situations, operational indicators, or objective evidence that would lead personnel to recognize that an emergency had occurred and take required emergency actions.

94. Panther failed to establish a controller training program that provided for training each controller to carry out the roles and responsibilities defined by the operator in violation of 49 C.F.R. § 195.446(h). Their training program failed to communicate that a zero-flow condition at MP 69 may indicate a leak, failed to instruct controllers on when immediate shutdown or escalation should be performed, and failed to train controllers on responding to abnormal operating conditions likely to occur simultaneously or in sequence.

95. Panther failed to base its integrity management assessment schedule on all risk factors and to maintain a continual assessment and evaluation process in violation of 49 C.F.R. § 195.452(e)(1) and (f)(5). Despite long-standing and repeatedly documented evidence of geotechnical risk at and near MP 69, it failed to incorporate geotechnical conditions into its assessment schedule or to adjust its assessment strategy to reflect elevated risk posed by recurring geotechnical hazards.

96. Upon information and belief, Third Coast has been identified as a Responsible Party in five other oil discharge violations since 2020. Three of the discharges resulted in warnings, one resulted in a notice of violation, and one is pending enforcement.

**V. Subsea 7 Connector**

97. In addition to the Third Coast Entities' failures as alleged herein, the MPOG Release occurred due to a loss of seal in the Subsea 7 Connector from pipeline movement caused by geohazards.

98. Subsea 7 manufactured and/or sold the Connector to repair and connect subsea oil and gas pipelines to ensure operability and to mitigate the risk of an oil spill on navigable waters. The Third Coast Entities purchased and used the Connector for that purpose.

99. Upon information and belief, the Third Coast Entities purchased the Connector from Subsea 7 in 2001 through its operator at the time for use in repairing the pipeline.

100. In 2004, Hurricane Ivan damaged the MPOG pipeline system where it crossed a Shell Nakika pipeline. Pipe movement caused by the hurricane caused the Shell pipeline to come into contact with the MPOG pipeline and resulted in pin hole corrosion and leakage. The Subsea 7 Connector was installed as part of the repair of the pipe resulting from this damage.

101. Subsea 7 defectively designed the Connector in such a way that once it was installed, it was impossible to determine whether it was properly installed and tightened or for it to be properly inspected.

102. Given the risk of an oil release event and resulting shut-ins, regular inspections should have been conducted to ensure the integrity of the pipeline system and any connectors. Although alternative designs that would permit such an inspection were feasible, Subsea 7 chose not to implement such a design, thus rendering the Connector unreasonably dangerous.

103. The risk of an oil release event and a resulting shut-in event was exacerbated due to increased hurricane activity in the region of the Gulf where the Subsea 7 Connector was installed and the related threat of geohazard impact on the pipeline system. This risk was known to both the Third Coast Entities and Subsea 7 but they failed to act to mitigate this risk.

104. Subsea 7 further failed to warn that the Connector could not be reliably inspected to confirm it was properly installed and tightened. While Subsea 7 provided the Third Coast Entities with identified methods of testing the Connector, it failed to warn that these tests were not reliable or were only reliable under very limited conditions that would not be present in the intended subsea application of the Connector. Nor did Subsea 7 warn that installing the device into a marine environment may make successful installation infeasible or impossible.

105. The cause of the MPOG Release was that the pipe installed in the Subsea 7 Connector had been pulled out of the fitting and was no longer in contact with the sealing surfaces, thus leading to the discharge.

106. The failure of the defective Subsea 7 Connector caused Anadarko to incur significant damages.

## VI. Damages Sustained by Anadarko as a Result of the November 2023 Oil Release Event

107. Around 6:00 a.m. on November 16, approximately twelve hours after the Third Coast Entities first began receiving data indicated that pressure had been lost on the pipeline system, Anadarko was first contacted by a representative of the Third Coast Entities indicating that they had lost communications with meters on the MPOG pipeline system. The Third Coast Entities requested that Anadarko shut in production from both the Marlin and Horn Mountain platforms.

108. Anadarko complied with the request and assembled its Incident Command Team to assist with the response.

109. At its own expense and with the Third Coast Entities' knowledge, Anadarko mobilized helicopters and various vessels to assist the Third Coast Entities and the Federal On Scene Coordinator ("FOSC") in conducting inspections along the MPOG pipeline system and in supporting the Third Coast Entities and the FOSC in their efforts to locate a potential leak on the MPOG pipeline system.

110. Anadarko's removal costs were incurred pursuant to direct and sustained operational support to the Third Coast Entities' response and investigation efforts following the MPOG Release.

111. Anadarko contracted with and deployed multiple vessels to conduct a subsea inspection of the MPOG pipeline system immediately following the MPOG Release. The mobilization of these vessels was coordinated with the Third Coast Entities, including coordination on: where the inspection would occur; when the vessels would be deployed; the exchange of hourly status updates; ensuring safety when inspecting in the vicinity of other platforms; and setting up a live stream for the Third Coast Entities to monitor this inspection as it proceeded.

112. On or around November 18, 2023, a Third Coast representative boarded one of the Anadarko contracted vessels to support the subsea inspection operations. A boarding agreement was entered into between Panther and Anadarko to allow the Third Coast Entities to "view, operate, maintain and repair" the MPOG pipeline system.

113. Also on or around November 18, 2023, two personnel from the United States Coast Guard were flown out to a vessel contracted by Anadarko in furtherance of the response efforts.

114. Anadarko's actions taken in response to the MPOG Release were consistent with the National Contingency Plan, which prioritizes "stabilizing the situation to preclude the event from worsening" by "securing the source of the spill" and timely, coordinated response actions. 40 C.F.R. § 300.317.

115. The Third Coast Entities reported the information gathered from these inspection operations to the Incident Command Center, which included the FOSC. Upon information and belief, the actions taken by Anadarko in supporting the Third Coast Entities in responding to the MPOG Release were directed by the FOSC or otherwise determined by the FOSC to be consistent with the National Contingency Plan.

116. On November 19, 2023, Third Coast told Anadarko that it recognized that its support was "invaluable to this effort and has certainly conveyed the same to the Unified Command Center managing this campaign."

117. Unfortunately for Anadarko, the shut in of the Horn Mountain and Marlin platforms was not short lived. Anadarko was unable to use either the Horn Mountain or Marlin platforms to produce crude oil for several months.

118. On December 20, 2024, Anadarko served MPOG with a presentment letter identifying Anadarko's claims for removal costs and damages dating from December 21, 2023 to April 19, 2024. The presentment letter identified costs incurred as removal costs as a result of the MPOG Release, costs incurred to man and maintain both the Horn Mountain and Marlin platforms during the shut-in, and losses due to the delayed sales of crude oil during the shut-in. The presentment letter specifically preserved Anadarko's rights associated with asserting damages from November 16, 2023, through December 21, 2023.

119. In its January 23, 2025 response to Anadarko's presentment letter, MPOG blatantly rejected Anadarko's claims in full.

120. Anadarko provided MPOG with a supplemental presentment letter on August 20, 2025. This presentment letter included claims for damages from November 16, 2023 through December 21, 2023. Anadarko informed MPOG that its investigation into the full scope of damages remained ongoing.

121. On July 16, 2025, Anadarko provided Third Coast and Panther with a similar presentment letter including claims for damages from November 16, 2023, through April 19, 2024.[2]

---

[2] Because MPOG was the only entity formally designated as a Responsible Party by the Coast Guard under 33 U.S.C. §2714(a) for the purposes of establishing a procedure for the payment or settlement of claims under Sections 2714(b)

122. Anadarko is still in the process of assessing the full extent of the economic losses resulting from delayed production and other effects of the shut-in. Anadarko intends to provide supplemental presentments to the Third Coast Entities identifying the full scope of OPA damages Anadarko seeks to recover. As necessary, Anadarko will amend and/or supplement this Complaint based on its supplemental presentment.

**VII. Alter Ego Liability**

123. Third Coast, MPOG, and Panther are alter egos of one another, and the corporate separateness among them should be disregarded. A unity of interest exists among these entities such that adherence to the fiction of separate existence would promote injustice. Upon information and belief:

a. Third Coast wholly owns both MPOG and Panther;

b. Third Coast, MPOG, and Panther share the same principal place of business in Houston, Texas;

c. Panther is a non-revenue producing entity and has no assets, indicating that it is severely undercapitalized to bear operational liabilities associated with operating a major offshore pipeline system;

d. Third Coast, Panther, and MPOG each perform business functions for one another without arms-length agreements governing the relationship between one another;

e. Third Coast, MPOG, and Panther share common management (such as their CEO), common employees, and common business purposes;

---

and 2705(a), as well as the relationship between and among the Third Coast Entities, Anadarko does not believe that such presentment is necessary, but does so out of an abundance of caution.

f. Upon information and belief, neither Panther nor MPOG have employees, and are operated by personnel employed by Third Coast and/or a different Third Coast affiliate business;

g. Third Coast, Panther, and MPOG share common business departments;

h. The officers and directors of MPOG and Panther act in Third Coast's interest;

i. Third Coast, Panther, and MPOG were each involved in the acts giving rise to Anadarko's claims.

## CLAIMS

### Claim for Damages Under the Oil Pollution Act Against the Third Coast Entities

124. Anadarko incorporates all previous allegations as though fully set forth herein.

125. On May 1, 2024 and February 11, 2025, the U.S. Coast Guard designated MPOG as the Responsible Party under the Oil Pollution Act for the November 2023 oil release from the MPOG pipeline system.

126. Third Coast and Panther are also Responsible Parties as owner and operator of the MPOG pipeline system, respectively.

127. As Responsible Parties, the Third Coast Entities are liable for removal costs and other damages recoverable under the Oil Pollution Act.

128. Third Coast, Panther, and MPOG are additionally and/or alternatively liable as the alter egos of one another.

129. Anadarko incurred response and removal costs in response to the MPOG Release. The removal costs incurred by Anadarko were incurred in operational support to the Third Coast Entities and the Federal On Scene Coordinator's investigation and efforts, were incurred with the Third Coast Entities' knowledge, and were consistent with the National Contingency Plan.

130. Anadarko has suffered property damage in the loss of its oil and additional loss of use damages, including loss of profits, impairment of earning capacity, and costs incurred to mitigate harm to its platforms as a result of the forced shut-in as a result of the damage to the pipeline and surrounding natural resources associated with the MPOG Release.

131. The absence of a leak detection system and an inadequate pipeline integrity program posed an extreme degree of risk considering the likelihood that an oil release event would occur and that significant damages would be inflicted as a result of an oil release event.

132. The Third Coast Entities knew of the risks posed by their operations but nevertheless proceeded to operate in such a manner.

133. Damages such as those sustained by Anadarko as a result of the MPOG Release were highly foreseeable.

134. While the Third Coast Entities are strictly liable under OPA, the damages sustained by Anadarko are the direct and proximate cause of the Third Coast Entities' gross negligence, as evidenced by and including but not limited to the following:

a. Failure to incorporate known geotechnical hazards into their integrity assessment schedule;

b. Failing to provide for anticipated external loads on the pipeline;

c. Failure to evaluate leak detection capability;

d. Failure to have adequate procedures for abnormal and emergency operations;

e. Failure to define required controller actions;

f. Failure to adequately train controllers;

g. Failure to maintain valves in working order;

h. Failure to shut down the pipeline for more than eleven hours;

i. Failure to notify Anadarko for more than eleven hours;

j. Failure to implement a Pipeline Safety Management System;

k. Operating without any leak detection system;

l. Assuming a 15-minute detection-to-shutdown window in the event of an oil release, yet the actual response time exceeding eleven hours;

m. Consciously failing to implement a leak detection system in a high consequence area;

n. Consciously failing to address debris clogging the metering system;

o. Supervisory personnel's repeated overrides of the controller's instinct to shut down the pipeline;

p. Failing to provide for anticipated external loads, including storm-related forces, geotechnical movement, loss of support, and pipeline displacement, in its design of the MPOG pipeline system, in violation of 49 C.F.R. § 195.110(a);

q. Failing to maintain each valve necessary for the safe operation of its pipeline system in good working order at all times in violation of 49 C.F.R. § 195.420(a);

r. Failing to evaluate the capability of their leak detection means and modify, as necessary, to protect the high consequence area in which the MPOG pipeline system was located, in violation of 49 C.F.R. § 195.452(i)(3);

s. Failing to define a controller's role when an abnormal operating condition is detected, including the controller's responsibility to take specific actions and to communicate with others, in violation of 49 C.F.R. § 195.446(b)(2);

t. Failing to define a controller's role during an emergency, including the controller's responsibility to take specific actions and communicate with others, in violation of 49 C.F.R. § 195.446(b)(3);

u. Failing to include in their Operations and Maintenance Manual procedures for responding to, investigating, and correcting the cause of abnormal flow rate or pressure conditions, or the malfunction of a component, in violation of 49 C.F.R. § 195.402(d)(1)(ii) and (v);

v. Failing to have emergency procedures to take necessary actions to minimize hazards of released hazardous liquid in violation of 49 C.F.R. § 195.402(e)(4);

w. Failing to establish a controller training program that provided for training each controller to carry out the roles and responsibilities defined by the operator in violation of 49 C.F.R. § 195.446(h);

x. Failing to base their integrity management assessment schedule on all risk factors and to maintain a continual assessment and evaluation process in violation of 49 C.F.R. § 195.452(e)(1) and (f)(5); and/or

y. Consciously disregarding the lessons learned, and/or lessons that should have been learned, from the five previous oil discharge violations since 2020.

135. The Third Coast Entities could have prevented the MPOG Release through the exercise of due diligence but failed to do so. Preventative actions that could have been taken include but are not limited to:

a. Installing a leak detection system;

b. Providing improved training on oil release events and shut-ins;

c. Resolving debris concerns to improve reliability of data readings;

d. Implementing a Pipeline Safety Management System in accordance with the American Petroleum Institute Recommended Practice; and

e. Adequately addressing geohazards.

136. The Third Coast Entities' separate and/or related acts and/or omissions as set forth above, when considered in sum, constitute gross negligence and a conscious indifference to one or more known hazards.

137. The gross negligence of the Third Coast Entities' in the control room at the time of the MPOG Release is not only evidence of their general conscious disregard, but, by greatly increasing the extent and duration of the spill, directly contributed to Anadarko's response costs, and also directly contributed to Anadarko's economic damages, by considerably extending the shut-in, both due to the practical need for additional time to inspect and repair and also due to the regulator concerns about the competence of the Third Coast Entities and their employees.

138. The Third Coast Entities are thus liable to Anadarko for all response and removal costs, property damages, and loss of use damages sustained as a result of the MPOG Release.

139. The damages suffered by Anadarko are a result of The Third Coast Entities' gross negligence and thus OPA's limitations on liability do not apply to the damages Anadarko may recover. OPA's limitations on liability also do not apply because the MPOG Release was proximately caused by the Third Coast Entities' violation of one or more applicable Federal safety, construction, and/or operating regulations.

140. Under OPA, the Third Coast Entities are each strictly, jointly and severally liable for all removal cost and damages resulting from the MPOG Release.

**Claim for Breach of Contract Against MPOG**

141. Anadarko incorporates all previous allegations as though set forth fully herein.

142. In the alternative, MPOG is liable to Anadarko for breach of contract.

143. MPOG was contractually bound to receive into the MPOG pipeline system crude oil and condensate produced by Anadarko at the Marlin and Horn Mountain platforms and to deliver such crude oil and condensate to a delivery point agreed upon by the parties on account of Anadarko or its designee.

144. MPOG failed to abide by its contractual obligations as MPOG did not receive crude oil and condensate from Anadarko's Marlin and Horn Mountain platforms for many months.

145. As a result of the oil release event, Anadarko was required to shut in the Marlin and Horn Mountain platforms and was unable to produce crude oil and condensate from such platforms.

146. MPOG was grossly negligent in the manner with which it breached its contractual obligations. Anadarko specifically incorporates by reference its allegations as to MPOG's gross negligence as articulated in ¶ 84.

147. MPOG could have avoided the shut in through the exercise of due diligence. Anadarko specifically incorporates by reference its allegations as to potential acts of due diligence as articulated in ¶ 85.

148. Anadarko has sustained financial damages as a result of MPOG's grossly negligent breach of contract. Such damages include but are not limited to removal costs incurred to respond to the MPOG Release, costs incurred to mitigate potential property damage, and lost profits suffered as a result of the shut-in.

**Claim for Defective Product Under the Louisiana Product Liability Act Against Subsea 7**

149. Anadarko incorporates all previous allegations as though set forth fully herein.

150. Subsea 7 designed, manufactured and sold the defective Connector installed on MPOG pipeline system at issue in this dispute.

151. The Subsea 7 Connector was designed, marketed, and intended for repairing subsea oil pipelines.

152. The Subsea 7 Connector was installed under Subsea 7's supervision as part of a repair to the MPOG pipeline system.

153. Subsea 7 had a duty to ensure that the Connector was not unreasonably dangerous so as to safeguard against an oil release event and to ensure that the pipeline remained operable.

154. The failure of the Subsea 7 Connector was a direct cause of the MPOG Release.

155. The Subsea 7 Connector was defectively designed and unreasonably dangerous because the design prevented inspection of the Connector upon installation to ensure it was installed and tightened correctly, or at any time after the installation to ensure that it was properly tightened and retained its integrity.

156. Subsea 7 could have employed feasible alternative designs for this type of connector that would have permitted both inspection on installation to ensure proper tightness and installation and routine inspection during the lifetime of the product. Alternative designs would have prevented the MPOG Release, allowing the Third Coast Entities to detect that the Connector was not tight and prone to separate, permitting the Third Coast Entities to repair or replace it.

157. Subsea 7's use of a Connector design that prevented inspection was particularly unreasonably dangerous given its intended and expected use on a subsea oil pipeline approximately 40 feet below the surface of the water where failure would naturally result in an oil spill into the surrounding water and a shut-in of the platforms that used the MPOG pipeline system for the

transportation of oil. Thus, the risks avoided by such an alternative design far outweighed any burden of its adoption.

158. Subsea 7 also failed to warn of this unreasonably dangerous condition despite knowing that the intended use was on subsea oil pipelines where regular inspections to confirm the integrity of the pipeline and connectors are standard practice to prevent oil releases and to maintain operations. Therefore, the ordinary user of the product, such as the Third Coast Entities, would reasonably expect that there would be a reliable method to inspect the connector upon initial installation to confirm it is tight and also on an ongoing basis to confirm that it retains its integrity.

159. Anadarko incurred substantial damages proximately caused by the defective Subsea 7 Connector and Subsea 7's failure to warn.

160. Among other damages and losses, Anadarko has suffered property damage in the form of lost product and costs incurred to mitigate harm to its platforms as a direct and proximate result of the defective Connector's failure and resulting release.

161. It was easily foreseeable that Anadarko would suffer harm as a result of the failure of the Subsea 7 Connector.

162. There is an ease of association between the harms suffered by Anadarko and Subsea 7's breach of its duty to ensure that the Connector was not unreasonably dangerous so as to protect against an oil release.

## PRAYER FOR RELIEF

163. Anadarko respectfully requests that this Court:

i. Grant judgment in favor of Anadarko and against Third Coast, MPOG, and Panther for damages recoverable under the Oil Pollution Act; or, in the

alternative, grant judgment in favor of Anadarko against MPOG for damages recoverable as a result of MPOG's breach of contract;

ii. Grant judgment in favor of Anadarko and against Subsea 7 for damages to which it is entitled as a result of the failure of the Subsea 7 Connector;

iii. Grant such other and further relief that the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

164. Anadarko respectfully requests a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ James R. Swanson*
James R. Swanson (La. Bar No. 18455)
Stephen J. Herman (La. Bar No. 23129)
Zoe C. Vogel (La. Bar No. 40982)
FISHMAN HAYGOOD LLP
201 St. Charles Ave, Ste 4600
New Orleans, LA 70170
Tel: (504) 586-5252
Fax: (504) 586-5250
jswanson@fishmanhaygood.com
sherman@fishmanhaygood.com
zvogel@fishmanhaygood.com

*Counsel for Anadarko Petroleum Corporation, Anadarko US Offshore LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served upon all counsel of record through the CM/ECF filing system with the Clerk of Court of the United States Court for the Eastern District of Louisiana, this 14th day of September, 2026.

*/s/ James R. Swanson*