**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MAIN PASS OIL GATHERING COMPANY, LLC** | **CIVIL ACTION NO. 2:25-cv-890** |
| **VERSUS** | **JUDGE IVAN L.R. LEMELLE** |
| **SUBSEA 7 MARINE (US) INC.** | **MAGISTRATE JUDGE EVA J. DOSSIER** |

**MEMORANDUM IN SUPPORT OF MOTION TO COMPEL**

Defendant Subsea 7 Marine (US) Inc. ("Subsea 7") respectfully submits this memorandum in support of its motion to compel.

## I. INTRODUCTION

In 2023, the Main Pass Oil Gathering System pipeline (the "MPOG Pipeline") released 1.1 million gallons of crude oil into the waters off the coast of Louisiana over the course of 13 hours. The National Transportation Safety Board ("NTSB") and the Pipeline and Hazardous Materials Safety Administration ("PHMSA") conducted thorough and detailed investigations into the incident. Those investigations unequivocally found that Main Pass and its affiliates caused the leak, including Third Coast Infrastructure, which purportedly owns the MPOG Pipeline, and Panther Operating Company, which purportedly operates it.[1] For its part, the PHMSA imposed historic fines on Main Pass and its affiliates for their failures.

Notwithstanding those investigations, Main Pass alleges that Subsea 7 manufactured the supposedly defective collet grip flange connector (the "Connector") from which the leak occurred.

[1] Subsea 7 states the ownership and operator roles of these entities based on the limited information presently available to it. As explained below, Subsea 7 requested documents depicting Main Pass's organizational structure precisely to determine which entities played a role in this incident and what those roles were. The facts remain unclear. For example, Main Pass alleges it is the owner and operator of the MPOG Pipeline (*see* Doc. 1, ¶10), but its discovery responses state that Third Coast owns the MPOG Pipeline, while Panther operates it.

Subsea 7 questions those products liability claims, particularly because the Connector functioned without issue for almost two decades, and neither the NTSB nor PHMSA identified it as a contributing factor to the leak. In an effort to answer these questions, Subsea 7 issued targeted discovery to Main Pass on January 26, 2026.[2]

The deficiencies in Main Pass's responses are pervasive.[3] Nearly every response is qualified by general and boilerplate objections that neither state their grounds with specificity nor disclose whether responsive information has been withheld. Main Pass then dumped approximately 42,000 pages of documents on Subsea 7 without identifying a single one as responsive to any particular request, leaving Subsea 7 to guess which portions of the production answer which request. The list goes on: Main Pass never served a privilege log, despite invoking privilege in response to nearly forty requests, and it lodged baseless objections where they simply could not apply. Perhaps worst of all, Main Pass withheld basic information in response to requests seeking the factual basis for the claims it filed against Subsea 7, instead deferring its response to a forthcoming expert report.

Subsea 7 spent considerable time attempting to resolve these issues with Main Pass to no avail.[4] As of the filing of this motion, Main Pass still has not served supplemental responses, and it has produced just thirty-eight e-mails in a case arising out of a catastrophic pipeline failure for which Main Pass apparently seeks in excess of $30 million.[5] Because it has become clear that

---

[2] Subsea 7's January 26, 2026, correspondence enclosing discovery requests to Main Pass is attached hereto as Exhibit 1.

[3] Main Pass's responses to Subsea 7's interrogatories and requests for production, served on March 12, 2026, are attached hereto as Exhibits 2 and 3, respectively.

[4] Those efforts are detailed more fully below.

[5] The use of "apparently" is necessary here because Main Pass objected to quantifying its damages in response to Subsea 7's discovery requests.

complete discovery responses will not come without this Court's intervention, Subsea 7 now brings this motion.

## II. BACKGROUND

The MPOG Pipeline is a subsea crude oil gathering system in the Gulf. It spans approximately sixty-nine miles, and six connection points along its route receive crude oil from seven offshore production platforms. A control room in Houston, Texas, staffed around the clock by employees of Main Pass's affiliates, monitors the pipeline.

On November 15, 2023, at 6:00 p.m., the on-duty controller was confronted with a barrage of warnings indicating that the MPOG Pipeline was leaking. By approximately 6:45 p.m., the controller noticed pressure changes in the pipeline, and he recognized that the volume of crude oil entering the pipeline exceeded the volume exiting at the delivery point.

The controller repeatedly voiced concerns to his colleagues and superiors. Those concerns were dismissed. The controller contacted an off-duty field technician, telling him that the system needed to be shut down as a precaution. The technician told him not to shut down and to give the system more time. The controller then reported the abnormal data to his supervisor, who told him to follow the field technician's recommendation and keep the pipeline operational. The controller called the field technician repeatedly through the night, and the technician assured him each time that the readings most likely reflected an equipment failure. The pipeline therefore ran until the morning shift change.

At 6:00 a.m., the morning shift controller reviewed the preceding twelve hours of pressure and flow data, observed a zero-flow reading downstream of the leak, and commenced shutdown procedures approximately thirty minutes later. The system was isolated by 9:00 a.m., at which point the recorded volume imbalance approached 27,000 barrels (approximately 1.1 million

gallons of crude oil). Main Pass's affiliate reported the release to the National Response Center less than an hour later.

The NTSB launched its investigation on November 16, 2023, which spanned over a year and a half. The agency determined that in the years leading up to the accident, Third Coast failed to evaluate how geohazards threatened the pipeline's integrity, even though alignment maps prepared in 2005 showed significant areas of exposed pipeline and mudflows, and over a dozen weather events affecting the pipeline. As to the control room's response, the NTSB found that the plethora of alerts and warnings offered ample justification for the pipeline controller to shut down the pipeline, and it further concluded that had the controller shut down the pipeline when he first identified a flow mismatch, or when he first reported the issue to his management, far less crude oil would have been released. In no uncertain terms, the NTSB determined Main Pass and its affiliates caused the leak.

While the leak occurred in a section of the pipeline that had been repaired (nearly twenty years earlier) with the Connector, none of the investigations suggested that there was any defect in the Connector or that the Connector played any role with respect to the incident. To the contrary, the NTSB recovered the fitting and determined it could function as designed, just as it had without incident for the preceding twenty years. Nonetheless, Main Pass filed this lawsuit against Subsea 7, alleging that Subsea 7 manufactured the Connector, that the Connector was defective, and that the defects in the Connector were the cause of the leak.

Against this backdrop, Subsea 7 issued targeted discovery requests to Main Pass to better understand its allegations.[6] Main Pass's responses are woefully inadequate. General and boilerplate objections obfuscate what minimal substance the responses provide. Privileges are

[6] *See* Exhs. 2-3.

repeatedly invoked without a privilege log or any hint as to what was withheld as privileged. Main Pass produced tens of thousands of pages of documents with no apparent organization and without identifying which documents are responsive to which request.

Subsea 7 has been patient with Main Pass in the nine months since serving its discovery. First, Subsea 7 granted Main Pass extensions of time to serve responses. Subsea 7 then granted Main Pass additional time to produce responsive documents. Later, on July 2, 2026, Subsea 7 sent a thorough letter to Main Pass detailing the deficient responses, after which the parties held a lengthy conference to discuss the issues raised in this motion.[7] At that conference, Main Pass made no substantive concessions but suggested that Subsea 7 would be satisfied if only Subsea 7 would be more patient and await an allegedly forthcoming complete document production, which was promised by the end of August. Main Pass agreed to make a supplemental production by the end of August 2026 that would be "substantially complete," and it agreed to consider Subsea 7's requests that it remedy the defects identified in this motion.

None of that came to pass. Main Pass made a supplemental production, but it is utterly implausible that the production is complete. By way of illustration, to date, Main Pass has produced thirty-eight e-mails (among other materials). Given the scope and magnitude of the leak and the response, it is beyond obvious that Main Pass has not even scratched the surface on producing responsive materials. Main Pass never served the supplemental responses it "considered" serving, and it never produced a privilege log. The overwhelming majority of the deficiencies identified in Subsea 7's July 2 letter remain unresolved today, necessitating this motion. Nonetheless, Subsea 7 afforded Main Pass one last opportunity to avoid the motion when

[7] Subsea 7's deficiency letter to Main Pass is attached hereto as Exhibit 4.

Subsea 7 informed Main Pass on September 10, 2026, that this motion was forthcoming.[8] Main Pass did not acknowledge Subsea 7, necessitating this motion.

## III. LAW AND ARGUMENT

### A. Applicable Law

Main Pass's general discovery obligations are well-established. Main Pass is required to "fully answer each request" issued by Subsea 7. *Exactdistribution, LLC v. Bergeron Freight Servs., Inc.*, No. 25-931, 2026 WL 2096877, at *3 (E.D. La. July 21, 2026) (citing Fed. R. Civ. P. 34(b)(2)(B)). In accordance with that requirement, Main Pass must "affirmatively explain what portion of an interrogatory or document request is objectionable and why, affirmatively explain what portion of the interrogatory or document request is not objectionable and the subject of the answer or response, and affirmatively explain whether any responsive information or documents have been withheld." *Id.* (citation omitted). In response to Subsea 7's requests for production, Main Pass "must either state that the inspection or production will be permitted or state with specificity the grounds for objecting to the request, including the reason." *Id.* at *5.

### B. Main Pass's General and Boilerplate Objections Should Be Stricken

Main Pass's discovery responses begin with "general objections" and nearly every single response is prefaced by a series of boilerplate objections with "standardized, ready-made, or all-purpose language without regard to the discovery request."[9] *Exactdistribution*, 2026 WL 2096877, at *6. It is beyond well-settled that such objections are unenforceable and should be stricken. These objections are not tailored to the specific nature of each request and are therefore improper, as the Fifth Circuit has held. *See McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d

[8] Subsea 7's post-meet-and-confer correspondences are attached hereto as Exhibit 5.

[9] *See* Exhs. 2 and 3.

1482, 1485 (5th Cir. 1990) (holding that merely stating that a discovery request is "overly broad, burdensome, oppressive and irrelevant" "was not adequate to voice a successful objection to" the request); *see also Lee v. Aramark Facility Servs., LLC*, No. 20-2049, 2021 WL 6070448, at *3 (E.D. La. July 15, 2021) ("General or boilerplate objections are insufficient. An objection to a discovery request is boilerplate when it merely states the legal grounds for the objection without: (1) specifying how the discovery request is deficient and (2) specifying how the objecting party would be harmed if it were forced to respond to the request. General, boilerplate, unsupported objections that fail to state their grounds with specificity are improper and result in waiver of those objections."); *Pitre v. Epps*, No. 18-1562, 2018 WL 3094367, at *2 (E.D. La. June 22, 2018) (holding same). Accordingly, Subsea 7 requests that the Court strike Main Pass's general and boilerplate objections, order that all objections not specifically made in Main Pass's original responses are waived, and order Main Pass to supplement its responses accordingly.

### C. Main Pass Should Be Ordered to Specifically Identify Documents in Its Responses

Main Pass's responses to Subsea 7's Requests for Production fail to identify ***any*** documents with the required specificity. Instead, Main Pass generally references production of "non-privileged documents that are responsive to this Request" without specifying which documents respond to which requests. This failure to identify documents by Bates number is equivalent to not responding at all. *See Rosalez Funez v. E.M.S.P., LLC*, No. 16-1922, 2016 WL 5337981, at *3 (E.D. La. Sept. 23, 2016) (ordering supplemental discovery responses to specifically identify which documents are responsive to each request).

In *Rosalez Funez v. E.M.S.P., LLC*, this Court explained:

> Federal Rule of Civil Procedure 37(a)(4) states that an evasive answer is treated the same as not responding to the request. Here, by dumping more than one thousand documents on the Plaintiffs, the Defendants have not properly responded to the

> individual requests for production. Rather, the Defendants should have attempted to identify which documents were responsive to which requests.

2016 WL 5337981, at *3.

*Rosalez* is on point. Main Pass produced **1,370** discrete documents without identifying a single one in its responses, leaving Subsea 7 to guess which document is responsive to which request, and even to guess as to the identity of many of the documents. Because Subsea 7 "is entitled to have responsive documents identified for each of its requests for production of documents," Main Pass should be ordered to supplement its responses by specifically identifying the responsive documents in their corresponding discovery responses. *Mr. Mudbug, Inc. v. Bloomin' Brands, Inc.*, No. 15-5265, 2017 WL 111268, at *2 (E.D. La. Jan. 11, 2017) (ordering supplemental discovery responses to identify the Bates numbers of the documents responsive to each particular request for production).

### D. Main Pass Should Be Ordered to Produce a Privilege Log

"A responding party withholding information based on privilege 'must (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable the other parties to assess the claim.'" *Exactdistribution*, 2026 WL 2096877, at *7 (citing Fed. R. Civ. P. 26(b)(5)(A)). "The 'privilege log's description of each document and its contents must provide sufficient information to permit courts and other parties to 'test[ ] the merits of' the privilege claim.'" *Id.* (quoting *Equal Emp. Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 697 (5th Cir. 2017)). "It 'should not only identify the date, the author, and all recipients of each document listed therein, but should also 'describe the document's subject matter, purpose for its production, and specific explanation of why the document is

privileged or immune from discovery.'" *Id.* (citing *Peacock v. Merrill*, No. 08-01, 2008 WL 687195, at *3 (M.D. La. Mar. 10, 2008)).

In response to Request for Production Nos. 2-9, 11-25, 27-28, and 34, Main Pass states it will produce "non-privileged documents that are responsive to this Request." Similarly, in response to Request for Production Nos. 3, 10, 11, 13, 14, 15-17, 20-21, 25-26, and 30, Main Pass objects to producing responsive documents on attorney-client privilege and work product grounds. Despite invoking these privileges, Main Pass has not provided a privilege log in connection with its document production.

To the extent Main Pass has withheld production of certain documents and communications based on the attorney-client privilege and/or work product doctrine, it should be ordered to submit a privilege log specifically identifying those documents and communications in accordance with Rule 26(b)(5)(A). To the extent Main Pass has not withheld any responsive materials based on these objections, it should be ordered to remove the objections and affirmatively state that no materials have been withheld.

### E. Main Pass's Vagueness Objections Are Improper and Should Be Removed

Main Pass lodges vagueness objections throughout its responses to Subsea 7's Requests for Production, including in its responses to RFP Nos. 4, 5, 8, 9, 12, 20, 22, 23, and 27. In many of these responses, Main Pass uses the vagueness objection as a pretext to improperly rewrite and narrow the scope of Subsea 7's requests. For example, in response to RFP No. 8, which seeks Main Pass's Integrity Management Program documents addressing geotechnical hazards, underwater pipeline stability, or inspections following significant events (such as hurricanes), Main Pass objects that "significant events" and "November 2023 incident" are vague and ambiguous, then states that it "will interpret these phrases as referring to severe meteorological phenomena and the Leak, respectively." Similarly, in response to RFP No. 9, which seeks

inspection, survey, or maintenance records concerning the "condition or stability" of the pipeline, Main Pass objects that "condition" and "stability" are vague and ambiguous, then announces it "will interpret these phrases as referring to the physical integrity of the pipeline." The same issue recurs in response to RFP Nos. 4, 5, 12, 20, 22, 23, and 27, among others. This approach is improper for two reasons. First, the challenged terms cannot reasonably be described as vague or ambiguous. Second, even if any ambiguity existed, Main Pass is not entitled to unilaterally rewrite Subsea 7's discovery requests to narrow their scope. Subsea 7 requests that the Court strike every vagueness objection from Main Pass's discovery responses.

### F. Main Pass's "Specific" Objections Are Meritless

Many of Main Pass's responses contain improper boilerplate objections cloaked in a veneer of specificity. These objections are not wholly untethered from the requests to which they respond because Main Pass parrots back the particular terms and phrases each request uses. Nowhere in its responses does Main Pass specifically identify how any request is objectionable or how it would be harmed were it required to respond. *See Exactdistribution, LLC v. Bergeron Freight Servs., Inc.*, No. 25-931, 2026 WL 2096877, at * (E.D. La. July 21, 2026) ("Any objection must clearly state how the information sought is not relevant to any claim or defense, or how the request is overbroad, burdensome or oppressive.").

While all of these objections should be struck as improper boilerplate objections, they are each addressed in turn.

### 1. RFP No. 3 – Documents regarding Main Pass's organizational structure

Request for Production No. 3 seeks documents relating to the formation, ownership, and organizational structure of Main Pass.[10] Main Pass objects to this straightforward request as vague and ambiguous, claiming that the terms "organizational structure" and "organizational charts," among others, are unclear. Main Pass also objects on relevance grounds.

During the parties' meet and confer, Subsea 7 went so far as to clarify its facially unambiguous request, explaining that it seeks documents evidencing the corporate relationship between Main Pass and its affiliates.[11] Contrary to Main Pass's baseless objections, this information is directly relevant because multiple Main Pass affiliates—including Third Coast Infrastructure, LLC and Panther Operating Company—are implicated in the underlying events, as documents from the NTSB investigation demonstrate.

Main Pass's obstructive discovery practices have already affected Subsea 7's defense of this case. Weeks *after* Subsea 7 filed a third-party complaint against Third Coast Midstream, LLC, Main Pass disclosed that Third Coast Midstream is not affiliated with Main Pass and was not affiliated with it at the time of or leading up to the leak. Had Main Pass simply provided the organizational information to which Subsea 7 is entitled, Subsea 7 would not have incurred the time and expense of filing a claim against and serving an entity that may have no connection to the events at issue.[12] *See State Nat'l Ins. Co. v. Settoon Towing*, No. 07-4230, 2010 U.S. Dist. LEXIS 164763, at *21-23 (E.D. La. May 21, 2010) (granting motion to compel organizational chart).

---

[10] Exh. 3, pp. 5-6.

[11] Exh. 4, pp. 2-3.

[12] Given Main Pass's failure to adequately respond to this discovery request, Subsea 7 cannot appropriately evaluate whether Main Pass's contentions about Third Coast Midstream, LLC are accurate.

### 2. RFP No. 5 – Contracts relating to Main Pass's acquisition of the MPOG Pipeline

Request for Production No. 5 seeks all contracts or agreements related to Main Pass's acquisition of the pipeline in which the Connector was installed.[13] Main Pass objects on grounds of overbreadth, burden, and irrelevance.

Main Pass's objections based on relevance and breadth are meritless. Contracts relating to Main Pass's ownership of the pipeline—the equipment at the center of its claims—are plainly relevant. Main Pass's assertion that "contracts or agreement" and "acquisition of the pipeline" are vague phrases is not credible. Nor has Main Pass made any showing that this request is unduly burdensome or overly broad.

### 3. RFP No. 10 – Documents and communications relating to the October 2023 in-line inspection

In RFP No. 10, Subsea 7 requested all documents and communications relating to an October 2023 in-line inspection.[14] Subsea 7 was aware of that inspection because Main Pass's affiliate, Third Coast, submitted a Supplemental Submission to the NTSB in which it represented:

> On October 10, 2023, just over a month before the Incident, NDT Global completed an In-Line Inspection (ILI) run on the MPOG Pipeline. NDT Global is considered state-of-the-art regarding these types of ILI assessments. NDT's inspection found no anomalies, deformations, or excessive metal loss outside of allowable design parameters in the area of the failed CFG connector.
>
> As part of this inspection, NDT Global also analyzed the pipeline spools and fittings at the 2004 repair location in the area of the CGF connector at issue here. The inspection confirmed that the collet connector was in the correct position on the pipe end at the northern end of the repair.[15]

---

[13] Exh. 3, p. 6.

[14] Exh. 3, p. 8.

[15] *See* Supplemental Submission of Third Coast Infrastructure, LLC, attached hereto as Exhibit 5, pp. 23-25.

Main Pass objects to this request on the grounds that "in line inspection vendor report" and "inline inspection data" are vague and ambiguous, and further invokes the attorney-client privilege and work product doctrine. Once again, Main Pass cannot credibly claim that Subsea 7's request is vague and ambiguous when its own affiliate publicly references the very documents and communications Subsea 7 seeks, and when Subsea 7 placed Main Pass on notice of that reference.[16]

**4. RFP Nos. 13 and 14 – Communications about the leak and the Connector**

Subsea 7 requested all communications relating to the oil leak and the design, performance, inspection, or alleged defects in the Connector.[17] Main Pass objected to the requests as overly broad and unduly burdensome "because a request for *all* communications necessarily calls for communications unrelated to the parties' claims or defenses."[18]

Main Pass's objection is meritless. By limiting the requests to communications relating to the leak itself, Subsea 7 appropriately tailored them as to both time and scope. Moreover, all communications in Main Pass's possession relating to the leak and to the design, performance, inspection, and alleged defects of the Connector are squarely relevant to the claims and defenses at issue in this products liability case: the leak is the occurrence giving rise to Main Pass's claims, and Main Pass alleges that the Connector failed because of a design defect.

**5. RFP No. 18 – Documents relating to oil spill response and cleanup costs**

Request for Production No. 18 seeks all documents relating to the costs or expenditures incurred in responding to, containing, and cleaning up the oil spill, including invoices, receipts,

---

[16] Exh. 4, p. 3.

[17] Exh. 3, p. 10.

[18] *Id.*

contracts with spill response organizations, and internal summaries itemizing those costs. Main Pass objects as overbroad and unduly burdensome "to the extent it seeks documents relating to costs or expenditures incurred by any Person," a defined term that is not contained in the request, then narrows its response to documents "summarizing any expenditures MPOG has incurred."[19]

Subsea 7 seeks all documents supporting Main Pass's damages for the claims it is pursuing. These are documents Main Pass is obligated to produce even without a discovery request, and there can be no reasonable objection to producing them.

### 6. RFP No. 20 – Documents showing Main Pass's loss of product and revenue

Request for Production No. 20 seeks all documents showing any loss of product or revenue Main Pass suffered as a result of the leak and subsequent shutdown, including calculations quantifying the volume of oil lost and any business interruption analyses. Main Pass objects that the phrase "loss of product" is "not defined and does not adequately apprise MPOG of the information sought."[20]

Though these terms are unambiguous, Subsea 7 clarified that it seeks all documents supporting Main Pass's allegations and claims for damages relating to loss of product, loss of use, and lost revenue, all of which Main Pass alleges to have lost as a result of the leak. Yet, Main Pass still has not produced responsive documents or otherwise clarified its responses.

### 7. RFP No. 22 – Contracts relating to the operation of the MPOG Pipeline

Request for Production No. 22 seeks all contracts related to the operation of the pipeline in which the Connector was installed that were in effect at the time of the leak, together with the documents and communications related to each. Main Pass objects as overbroad, unduly

---

[19] *Id.*, pp. 11-12.

[20] *Id.*, p. 12.

burdensome, and irrelevant, objects that the phrase "related to the operation of the pipeline" is undefined, and then unilaterally rewrites the request, announcing that it "will interpret this Request as seeking contracts relating to the maintenance and management of the pipeline itself."[21]

Main Pass's contracts are squarely relevant in light of its allegations concerning its customers' potential claims and the resulting damages.[22] Nor has Main Pass demonstrated how Subsea 7's request is unduly burdensome or overbroad.

**8. RFP No. 23 – Communications regarding the MPOG Pipeline's condition in the three years before the leak**

Request for Production No. 23 seeks all communications related to the physical condition of the portion of the pipeline in which the Connector was installed for the three years preceding the leak. Main Pass objects that the phrase "condition of the portion of the pipeline in which the Connector was installed" is not a defined term, and further objects that the request is "unduly burdensome and disproportionate to the needs of the case because it seeks Communications remote in time from the period relevant to this Action."[23]

Subsea 7's request is reasonably limited in scope to three years and is directly relevant to Main Pass's allegation that the Connector failed. Subsea 7 seeks communications relating to the physical condition of the Pipeline in the area where the Connector was installed during the three years preceding the leak. Those communications are reasonably limited in time and scope, relevant to the claims and defenses at issue, and discoverable. *See, e.g.*, *Frazier v. Runnels*, No. 18-2340, 2019 WL 398930, at *5 (E.D. La. Jan. 31, 2019) (responsive information over a three-year period is not overly broad or unduly burdensome).

[21] *Id.*, p. 13.

[22] *See, e.g.*, Rec. Doc. 1, Compl. ¶¶ 36, 51.

[23] Exh. 3, p. 13.

**9. RFP No. 25 – Documents and communications relating to Main Pass's insurance claims**

Request for Production No. 25 seeks all documents and communications related to any insurance claims Main Pass made with respect to the leak or the alleged failure of the Connector. Main Pass invokes the attorney-client privilege and work product doctrine and objects as "overbroad, unduly burdensome, and irrelevant to the extent it seeks documents unrelated to the parties' claims or defenses," without explaining how its own claims for the very losses at issue in this case could be unrelated to them.[24] Because these documents are plainly relevant and discoverable, Main Pass's objection should be overruled and Main Pass compelled to produce the documents.

**10. RFP Nos. 3, 12, 13, 16, 17, 21, 27, and 28 – Main Pass's "equal accessibility" objections**

In response to Request for Production Nos. 3, 12, 13, 16, 17, 21, 27, and 28, Main Pass objects "to the extent" each request "seeks documents that are in Subsea 7's possession, custody, or control, and/or are equally available to Subsea 7."[25] That is not a valid objection, nor is it a plausible one here: Subsea 7 has no access to Main Pass's internal communications, corporate records, agency correspondence, or environmental sampling data. These objections serve no purpose but to obscure the completeness of the responses and should be stricken.

**11. Interrogatory Nos. 5 and 12 – The factual bases for Main Pass's alternative design allegations**

Interrogatory No. 5 asks Main Pass to identify and describe each specific alternative connector design it contends was feasible and available when the Connector was designed or installed, and to state the basis for that contention and how the alternative would have prevented

[24] *Id.*, p. 14.

[25] Exh. 3.

the leak. Interrogatory No. 12 asks Main Pass to identify each alternative design, device, or method it contends should have been used in lieu of the Connector, and to cite the industry standards, publications, or expert opinions supporting its position. Main Pass answers neither, stating only that its "answer to this interrogatory will rely on expert testimony" and that it "will supplement" on the basis of expert disclosures.[26]

These answers are evasive. Main Pass pleaded in its Complaint that "alternative designs that would permit such an inspection are feasible."[27] Main Pass must have had some factual basis for that allegation when it filed suit, and it cannot defer its obligation to disclose that basis to a future expert report. Subsea 7 is entitled to the factual bases on which Main Pass's claims rely.

**12. Interrogatory No. 14 – Main Pass's itemization of its claimed damages**

Interrogatory No. 14 asks Main Pass to itemize and describe the categories of damages it claims resulted from the Connector's failure and the ensuing spill, and to quantify each category. Main Pass identifies four categories—incident response, participation in investigations, potential fines, and pending third-party claims—but answers that it "has not quantified its damages and will supplement its response to this interrogatory," offering no figures and no date by which it will do so.[28] Nearly three years after the incident, and having pleaded damages in excess of $30 million, Main Pass must at a minimum have preliminary figures for the response costs it has already incurred.

---

[26] Exh. 2, pp. 6, 10-11.

[27] Rec. Doc. 1, Main Pass's Complaint, ¶15.

[28] Exh. 2, p. 12.

**13. Interrogatory No. 10 – Identification of persons with knowledge of relevant facts**

Interrogatory No. 10 asks Main Pass to identify each person with knowledge of facts relevant to this action and, for each, to describe the specific knowledge that person possesses. Main Pass lists seven of its own personnel—Abel Garcia, Chris Bierly, Robert Billeck, Ben Puckett, Samuel Brakefield, Glenn Raggio, and Travis Grove—without describing any of their knowledge, stating instead that its "counsel will confer with opposing [counsel] regarding the areas in which MPOG employees may have specific knowledge."[29] An offer to confer does not qualify as a written answer, and Main Pass remains obligated to provide one.

## IV. CONCLUSION

This is a significant case. The leak purportedly caused tens of millions of dollars in property damage, required substantial remedial measures off the coast of Louisiana, and prompted a $9.62 million fine against Main Pass's affiliate, Panther Operating Company—the largest of its kind in this country's history. Main Pass sued Subsea 7 for defectively designing the Connector, yet, nine months after Subsea 7 served discovery requests, Main Pass has still failed to provide even the most basic factual information on which its products liability claims rest.

Subsea 7's discovery requests are eminently reasonable given the stakes. Main Pass answered them by obscuring its responses, hiding behind inapplicable objections, and making no attempt to identify the documents it produced. Such tactics have long been rejected by this Court and have no place in this matter. Subsea 7 respectfully requests that the Court grant its motion and

[29] Exh. 2, 8-10.

order Main Pass to supplement its discovery responses, identify the documents responsive to each request, and produce a privilege log for any materials withheld on privilege grounds.[30]

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY: *s/ Harrison M. Martin*
Kevin J. LaVie (Bar #14125)
Arthur R. Kraatz (Bar #35194)
Harrison M. Martin (Bar #39271)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone: 504 566 1311
Facsimile: 504 568 9130
Email: kevin.lavie@phelps.com
Email: arthur.kraatz@phelps.com
Email: harrison.martin@phelps.com

**ATTORNEYS FOR DEFENDANT SUBSEA 7 (US), INC.**

[30] While the circumstances plainly support it, Subsea 7 is not presently seeking an award of fees and costs incurred in connection with this motion, but reserves the right to do so, particularly if Main Pass's improper discovery tactics continue.