**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **MAIN PASS OIL GATHERING COMPANY, LLC** | § | |
| | § | **CIVIL ACTION NO. 2:25-cv-00890** |
| ***Plaintiff*,** | § | |
| | § | **JUDGE IVAN L.R. LEMELLE** |
| **v.** | § | |
| | § | **MAGISTRATE JUDGE EVA J. DOSSIER** |
| **SUBSEA 7 MARINE (US) INC.** | § | |
| | § | |
| ***Defendant.*** | § | |

**PLAINTIFF MAIN PASS OIL GATHERING COMPANY, LLC'S OBJECTIONS AND ANSWERS TO INTERROGATORIES**

To: Defendant Subsea 7 Marine (US) Inc., by and through its attorneys of record, Kevin J. LaVie, Arthur R. Kraatz, and Harrison M. Martin, PHELPS DUNBAR LLP, Canal Place | 365 Canal Street, Suite 2000, New Orleans, Louisiana 70130.

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Main Pass Oil Gathering Company, LLC ("Plaintiff" or "MPOG") submits the following Objections and Answers to Defendant Subsea 7 Marine (US) Inc.'s ("Defendant" or "Subsea 7") First Interrogatories.


BRACEWELL LLP

*/s/ Stephen B. Crain*
Stephen B. Crain
(T.A./pro hac vice)
Texas State Bar No. 04994580
Haley M. Bernal
(pro hac vice)
Texas State Bar No. 24132533
711 Louisiana Street, Suite 2300
Houston, TX 77002
Tele: (713) 221-1305
Fax: (800) 404-3970
Email: stephen.crain@bracewell.com
Email: haley.bernal@bracewell.com


EXHIBIT
2

and

MILLER HAHN, PLLC

*/s/ Stephanie D. Skinner*
Stephanie D. Skinner (#21100)
Kent B. Ryan (#18418)
365 Canal St., Ste. 860
New Orleans, LA 70130
Tele: (504) 684-5044
Fax: (866) 578-2230
Email: kryan@millerlaw-firm.com
Email: sskinner@millerlaw-firm.com

**ATTORNEYS FOR PLAINTIFF MAIN PASS OIL GATHERING COMPANY, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record pursuant to the Federal Rules of Civil Procedure on the 12th day of March, 2026.

Kevin J. LaVie
Arthur R. Kraatz
Harrison M. Martin
Phelps Dunbar LLP
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
(via email)

*/s/ Stephen B. Crain*
Stephen B. Crain

**GENERAL OBJECTION**

MPOG objects to the Interrogatories to the extent they seek to impose obligations on MPOG greater than the discovery obligations contemplated by the Federal Rules of Civil Procedure.

## OBJECTIONS AND ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:** Please identify by name, employer, address, and job title every person who assisted You in preparing responses to this Discovery.

**ANSWER:**

Abel Garcia
Project Manager
Third Coast Infrastructure, LLC

Ryan Newcomb
Senior Director – Capital, Operations, & Technical Strategy
Third Coast Infrastructure, LLC

Todd Rivera
Director – EHSR
Third Coast Infrastructure, LLC

**INTERROGATORY NO. 2:** Describe the complete ownership and corporate structure of MPOG from its formation to the present. In your answer, identify all entities or persons that have held any ownership interest in MPOG or operated the MPOG pipeline system (including, but not limited to, Third Coast Infrastructure LLC, Panther Operating Company, and any predecessor operators such as BP Pipelines (North America) Inc.), and for each such entity or person, state the nature of their role or interest and the time period during which they were involved.

**ANSWER:**

MPOG objects to the term "corporate structure" as inherently vague and ambiguous. Subject to that objection and the general objection, MPOG responds that MPOG, as specifically defined, is owned by Third Coast Infrastructure LLC ("Third Coast") and was acquired pursuant to a Contribution Agreement from Panther Offshore Gathering Systems, LLC ("POGS," which was an affiliate of MPOG) in 2023. The MPOG pipeline is operated by Panther Operating Company, a wholly owned subsidiary of Third Coast.

MPOG further responds that it provides this summary of the ownership history of MPOG; certain interim steps or details which are not germane have been omitted.

Based on available information, MPOG further responds that MPOG was originally a partnership between Centana Oil Gathering Company ("Centana"), Amoco Main Pass Gathering Company ("Amoco"), and CNG Oil Gathering Company ("CNG") and was formed in January 1996.

Sometime prior to or around 2007, the ownership changed, and the owners of MPOG were Centana and Amoco. Based on available information, at that point in time, Centana owned a 66 2/3% interest in MPOG (presumably after acquiring CNG's interest), and Amoco owned a 33 1/3% interest in MPOG. Amoco merged with BP in 1998.

In 2014, pursuant to an "Amended and Restated Purchase and Sale Agreement" between DCP LP Holding, LLC ("DCP"; which owned Centana) and American Midstream, LLC ("AMID") dated as of August 11, 2014, AMID purchased Centana Gathering, LLC, which owned 100% of Centana Oil Gathering, LLC, which owned, as of that date, 66 2/3% interest in MPOG.

Based on available information, in 2016, Amoco divested its 33 1/3% interest to POGS.

In 2017, an "Assignment Agreement" was executed between Centana and POGS by which POGS became the 100 percent owner of MPOG.

**INTERROGATORY NO. 3:** Describe in detail MPOG's corporate relationship with Third Coast Infrastructure LLC and Panther Operating Company. In your answer, include whether MPOG is wholly or partially owned by Third Coast (and since what date), the role that Panther Operating Company currently plays in operating or managing the MPOG pipeline, and any changes in operational control or corporate structure that occurred when Third Coast acquired or reorganized MPOG.

**ANSWER:**

MPOG refers to its response to Interrogatory No. 2. MPOG further responds MPOG is owned 100 percent by Third Coast. "Panther Operating Company," which MPOG presumes refers to "Panther Operating Company, LLC" operates the MPOG pipeline and is 100 percent owned by Third Coast.

**INTERROGATORY NO. 4:** Describe the circumstances of the original purchase or acquisition of the Connector that You claim was allegedly defective and caused the Leak. In Your answer, state when the Connector was purchased, the identity of the purchaser acting for the pipeline, the identity of the seller or manufacturer, and whether any specifications, manuals, or special instructions were provided to the purchaser at the time of sale.

**ANSWER:**

The "purchase or acquisition" of the Connector predates MPOG's ownership of the MPOG pipeline (see responses to Interrogatories 2 and 3). Based on available information, MPOG responds that the Connector was sold to BP (a prior owner of the MPOG pipeline) from Big Inch Marine Systems on an order placed in 1998 with delivery in 2001. Big Inch Marine Systems is now owned by Oil States Industries, Inc. MPOG has copies of the installation and repair procedures for the Connector that will be produced.

**INTERROGATORY NO. 5:** In Paragraph 15 of the Complaint, You allege that "alternative designs that would permit such an inspection are feasible." Identify and describe each specific alternative design for a pipeline connector or fitting that You contend was feasible and available at the time the Connector was designed or installed, which would have permitted inspection or verification of proper installation/tightness after installation. For each such alternative design, state the basis for Your contention that it was feasible and how its use would have prevented or minimized the Leak.

**ANSWER:**

MPOG objects to Interrogatory No. 5 to the extent that it requires MPOG to identify "each specific alternative design for a pipeline connector" as being impermissibly burdensome under the Federal Rules of Civil Procedure. Subject to that objection, MPOG responds that, in part, its answer to this interrogatory will rely on expert testimony, and it will supplement its response to this interrogatory on the basis of expert disclosures. MPOG further responds that during post-incident inspection of the Connector, it was found that the Connector contained wood jammed between the front of the "Collet Grip" and the "Pusher." A second piece of wood or wood-like debris was also found in the Connector between the "Slip Collet" and "Collet Driver" wedges. MPOG will supplement its response to this interrogatory regarding alternative designs that would have prevented or detected the presence of debris in the Connector post-installation.

**INTERROGATORY NO. 6:** In Paragraph 17 of the Complaint, You allege that Subsea 7 "failed to warn that [the Connector] could not be reliably inspected to confirm it was properly installed and tightened," and failed to warn of limitations of testing methods and installation challenges in a marine environment. Describe in detail every warning, instruction, or advice that You contend should have been given by Subsea 7 (or its predecessor) in connection with the Connector. In Your answer, specify: (a) the substance of any such warning or instruction (e.g. what it should have

stated about inspection or installation); (b) when, how, and to whom it should have been communicated; and (c) how the absence of such warning contributed to the Connector's failure or the Leak.

**ANSWER:**

MPOG objects to Interrogatory No. 6 to the extent that it requires MPOG to identify "in detail every warning, instruction, or advice that [MPOG] contend[s] should have been given" as being impermissibly burdensome under the Federal Rules of Civil Procedure. MPOG further objects that the interrogatory seeks information beyond the allegations in the case. Subject to those objections MPOG responds that the Connector was sold to BP (a prior owner of the MPOG pipeline) from Big Inch Marine Systems on an order placed in 1998 with delivery in 2001. MPOG has copies of the installation and repair procedures for the Connector which do not provide warnings. MPOG further responds that the warnings that "should have been given" will be the subject of expert testimony, and MPOG will supplement its response to this interrogatory on the basis of expert disclosures.

**INTERROGATORY NO. 7:** Describe in detail all inspections, maintenance activities, or integrity monitoring measures performed on the portion of the pipeline containing the Connector from the time the Connector was installed until the Leak. For each such activity, identify the date(s), the method or type of inspection, the entity or personnel who performed it, and summarize the observations or results, including whether any issues with the Connector were noted.

**ANSWER:**

Subject to the general objection, MPOG responds that since it acquired an ownership in the MPOG pipeline (see responses to Interrogatories 2 and 3), three In-line inspections ("ILIs") were conducted. Regarding the discoverable information sought by Interrogatory No. 7, records of the ILIs will be produced. To the extent MPOG has historical records of inspections of the MPOG pipeline prior to its ownership, those will be produced.

**INTERROGATORY NO. 8:** Identify any instances of pipeline movement, stress, or geotechnical events (such as seafloor subsidence, mudslides, or hurricane-related seabed shifts) known to You that occurred at the Connector's location from the time the Connector was installed until the date of the Leak. For each such instance, provide the date and nature of the event, how

You became aware of it, and what, if any, actions were taken to evaluate or mitigate its impact on the pipeline or Connector.

**ANSWER:**

MPOG objects to the terms "pipeline movement" and "stress" in Interrogatory No. 8 as undefined, inherently vague terms. Subject to that objection and the general objection, MPOG responds that POGS, defined above, acquired 100 percent ownership in the MPOG pipeline in 2017 (see responses to Interrogatories 2 and 3). MPOG does not have historical records that predate its ownership that indicate "pipeline movement, stress, or geotechnical events (such as seafloor subsidence, mudslides, or hurricane-related seabed shifts)" in the area of the Connector prior to its ownership. However, MPOG is aware that there was movement of a segment of the MPOG pipeline in 2004, during Hurricane Ivan. MPOG further responds that an investigation that followed the date of the Leak determined that high seas caused by a winter storm at the time of the "Leak" may have caused a mudslide or other comparable occurrence in the area of the Connector.

**INTERROGATORY NO. 9:** Identify all investigations or analyses of the Connector's failure or the Leak of which You are aware, whether conducted by You, a government agency or a third party. For each investigation, state whether You or any of Your affiliates participated or provided information, and summarize any findings or conclusions that have been reported to You.

**ANSWER:**

MPOG objects to Interrogatory No. 9 as being impermissibly burdensome under the Federal Rules of Civil Procedure. Subject to that objection and the general objection, MPOG responds that it will produce germane records in its possession of the following investigations regarding the "Connector's failure or the Leak": (1) investigations performed by the US Coast Guard, the National Transportation Safety Board, the Pipeline and Hazardous Materials Safety Administration, the Bureau of Safety and Environmental Enforcement, the Department of the Interior, the U.S. Fish and Wildlife Service, the National Oceanic and Atmospheric Administration, the Louisiana Oil Spill Coordinators Office, the Louisiana Department of Energy and Natural Resources, the Louisiana Department of Environmental Quality, the Louisiana Department of Wildlife and Fisheries, and the Louisiana Coastal Protection and Restoration Authority and (2) non-destructive testing of the Connector and the associated pipe by Ethos Laboratories.

**INTERROGATORY NO. 10:** Identify each Person who has knowledge of facts relevant to this Action, including but not limited to individuals with knowledge of: (a) the design, specifications, or installation of the Connector; (b) the purchase or contracting for the Connector; (c) any inspections, maintenance, or integrity management efforts for the Connector; (d) the detection,

response, and impact of the Leak; or any post-incident investigations or analyses. For each Person identified, provide their name, current or last-known employer and job title, and a brief description of the specific knowledge they possess.

**ANSWER:**

MPOG objects to Interrogatory No. 10 as being impermissibly burdensome under the Federal Rules of Civil Procedure. Subject to that objection and the general objection, MPOG responds, as to subparts (a) and (b) of the interrogatory, that the "design, specifications, or installation of the Connector" predate MPOG's ownership of the MPOG pipeline (see responses to Interrogatories 2 and 3); the Connector was sold to BP from Big Inch Marine Systems on an order placed in 1998 with delivery in 2001. Big Inch Marine Systems is now owned by Oil States Industries, Inc. As to subpart (c) of the interrogatory, and limiting its answer to MPOG's period of ownership, MPOG responds that David LaGrange has knowledge of MPOG's ILI inspections. As to subpart (d), MPOG emphasizes its objection that the interrogatory is unduly burdensome in that investigations and analyses were performed by various entities subsequent to the Leak (see response to Interrogatory 9), and MPOG does not possess information regarding the "specific knowledge" of all personnel involved from those entities.

MPOG also notes that due to the number of persons involved in "the detection, response, and impact of the Leak; or any post-incident investigations or analyses" that it has endeavored to list persons who took significant roles or who provided information during "the detection, response, and impact of the Leak; or any post-incident investigations or analyses."

MPOG further responds that the NTSB "Pipeline Operations/Integrity Management Group" involved in the post-Leak investigation included:

Dane Spillers of the NTSB
Curtis Huff and Anthony Wright of the Pipeline and Hazardous Materials Safety Administration
Brian Nielsen and Ryan Newcomb of Third Coast
Bill Reidler and Alex Melvin of Oil States Industries
Elizabeth Borecki of the Bureau of Safety and Environmental Enforcement

MPOG further responds that the NTSB "Human Performance And System Safety Group" involved in the post-Leak investigation included:

Stephen M. Jenner and Crystal Thomas of the NTSB
Karen Butler of the Pipeline and Hazardous Materials Safety Administration
Buddy Gray of Lighthouse Midstream Services, LLC (a wholly owned subsidiary of Third Coast)

MPOG further responds that the NTSB "Environmental Response Group" involved in the post-Leak investigation included:

Elena Bozhko of the NTSB
Sara Moore of the Bureau of Safety and Environmental Enforcement

Todd Rivera and Nicklas Pavlovsky of Third Coast

MPOG further responds that the following additional MPOG personnel (employees of MPOG or an MPOG affiliate) have knowledge or relevant facts regarding subpart (d) of this interrogatory:

Abel Garcia
Chris Bierly
Robert Billeck
Ben Puckett
Samuel Brakefield
Glenn Raggio
Travis Grove

MPOG's counsel will confer with opposing regarding the areas in which MPOG employees may have specific knowledge.

**INTERROGATORY NO. 11:** Describe how and when the Connector was installed on the MPOG pipeline. In Your answer, Identify the date of installation, all contractors or personnel who participated in the installation, and any measures taken at that time to verify that the Connector was properly installed and secured.

**ANSWER:**

As set out previously, the purchase or acquisition of the Connector predates MPOG's ownership of the MPOG pipeline (see responses to Interrogatories 2 and 3). Based on available information, MPOG responds that the Connector was sold to BP (a prior owner of the MPOG pipeline) from Big Inch Marine Systems on an order placed in 1998 with delivery in 2001. Big Inch Marine Systems is now owned by Oil States Industries, Inc. MPOG has copies of the installation and repair procedures for the Connector that will be produced.

**INTERROGATORY NO. 12:** Identify each alternative design, device, or method that You contend should have been used or provided in lieu of the collet-grip flange Connector. For each such alternative, provide the name or description of the design or device, indicate whether it was available or in common use at the time the Connector was installed, and explain how the use of that alternative would have permitted effective inspection or confirmation of proper installation, or otherwise would have prevented the failure and leak). Also state the basis for your contention

that the alternative was feasible and safer, such as any industry standards, publications, or expert opinions that support its use.

**ANSWER:**

MPOG objects to Interrogatory No. 12 to the extent that it requires MPOG to identify "each alternative design, device, or method" as being impermissibly burdensome under the Federal Rules of Civil Procedure. Subject to that objection, MPOG responds that, in part, its answer to this interrogatory will rely on expert testimony, and it will supplement its response to this interrogatory on the basis of expert disclosures. MPOG further responds that during post-incident inspection of the Connector, it was found that the Connector contained wood jammed between the front of the "Collet Grip" and the "Pusher." A second piece of wood or wood-like debris was also found in the Connector between the "Slip Collet" and "Collet Driver" wedges. MPOG will supplement its response to this interrogatory regarding alternative designs that would have prevented or detected the presence of debris in the Connector post-installation.

**INTERROGATORY NO. 13:** Describe in detail the basis for Your allegation that Subsea 7 failed to provide adequate warnings or instructions regarding the Connector. In your answer, specify what particular warning, instruction, or information You believe should have been given by Subsea 7 (or its predecessor) about the Connector's installation or inspection, identify when and how such warning or instruction should have been communicated and to whom, and explain how the absence of this warning or instruction contributed to the Connector's failure or the inability to detect the problem sooner. Additionally, state whether any employee or agent of MPOG (or its operators) was, before the Leak, independently aware of the limitations in inspecting or testing the Connector's installation, and if so, describe that knowledge.

**ANSWER:**

MPOG objects to Interrogatory No. 13 as being impermissibly burdensome under the Federal Rules of Civil Procedure in that it seeks "when and how … and to whom" warnings should have been given in a period prior to MPOG's ownership of the MPOG pipeline (see responses to Interrogatories 2 and 3). Subject to that objection and the general objection, MPOG responds that the Connector was sold to BP (a prior owner of the MPOG pipeline) from Big Inch Marine Systems on an order placed in 1998 with delivery in 2001. MPOG has copies of the installation and repair procedures for the Connector which do not provide warnings. MPOG further responds that the warnings that "should have been given" and the impact of the lack of warnings will be the subject of expert testimony, and MPOG will supplement its response to this interrogatory on the basis of expert disclosures.

**INTERROGATORY NO. 14:** Itemize and describe the categories of damages or losses that You claim resulted from the Connector's failure and the ensuing oil spill. For each category of damages, provide an estimate or quantification of the amount of such damages (if known) or otherwise describe the extent of harm suffered. Also state whether You contend that any portion of these damages was increased or aggravated by any act or omission of Subsea, or whether the damages are solely the result of the occurrence of the Leak itself.

**ANSWER:**

MPOG has incurred damages related to its incident response to the Leak, its participation in investigations, potential fines associated with the Leak, and pending third party claims. It has not quantified its damages and will supplement its response to this interrogatory.

**INTERROGATORY NO. 15:** Identify each and every Person, whether employed by You or not, that has knowledge Relating to the facts and circumstances described in the Complaint and include in Your Identification a description of the nature of their respective knowledge.

**ANSWER:**

MPOG objects to Interrogatory 15 as being impermissibly burdensome under the Federal Rules of Civil Procedure; the interrogatory, as written, requires the disclosure of every Person who may have knowledge of the "facts and circumstances" of the Connector, the Leak, and the investigation of and response to the Leak. Subject to that objection and the general objection, MPOG refers you to its response to Interrogatory No. 10.

**INTERROGATORY NO. 16:** Identify all witnesses that you intend to call at the trial of this matter.

**ANSWER:**

MPOG will provide this information when and as required by the Scheduling Order.

**INTERROGATORY NO. 17:** Identify all exhibits that you intend to introduce at the trial of this matter.

**ANSWER:**

MPOG will provide this information when and as required by the Scheduling Order.