# EXHIBIT 1-A

Original

# OIL GATHERING AGREEMENT

THIS OIL GATHERING AGREEMENT ("Agreement"), dated as of the 19th day of January, 1996, is by and between AMOCO PRODUCTION COMPANY, a Delaware corporation, ("Producer") and MAIN PASS OIL GATHERING COMPANY, a Delaware partnership ("Gatherer"). Producer and Gatherer are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

A. Producer owns interests in the offshore Gulf of Mexico leases described in Exhibit A-1, including any renewals or extensions of such leases (the "Dedicated Leases").

B. Producer also owns interests in the offshore Gulf of Mexico leases described in Exhibit A-2, including any renewals and extensions of such leases (the "Additional Leases").

C. Gatherer plans to construct a pipeline in the vicinity of the Dedicated Leases and the Additional Leases which is described in Exhibit C (the "Gathering System"). The Gathering System may be used to gather oil and condensate ("oil") produced from or attributable to the Dedicated Leases and the Additional Leases to Shell Pipeline Company's ("Shell") or Chevron Pipeline Company's ("Chevron") Main Pass 69 terminal facilities, located in Plaquemines Parish, Louisiana ("MP 69").

D. Producer desires that Gatherer gather and deliver to MP 69 all oil produced from or attributable to the Dedicated Leases for the account of Producer in the Gathering System, and Gatherer desires to gather and deliver to MP 69 for Producer's account (or its designee) in the Gathering System all such quantities of oil, subject to the terms, conditions, and limitations of this Agreement.



Contract # 123529

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein, the Parties agree as follows:

## ARTICLE 1

## SCOPE OF AGREEMENT

1.1 *Gathering from Dedicated Leases.* Subject to the terms, conditions, and limitations hereof, and commencing on the date of initial deliveries of oil from the Dedicated Leases ("Commencement Date"), Producer agrees to deliver to the Receipt Point for gathering on the Gathering System and delivery by Gatherer to the Delivery Point, and Gatherer agrees to receive into its Gathering System at the Receipt Point and to deliver to the Delivery Point for the account of Producer, or its designee, Producer's working interest share of the oil produced from or attributable to the Dedicated Leases.

1.2 *Additional Oil Production.*

(a) *Dedication.* After the date hereof, Producer agrees to diligently proceed, and to use all reasonable efforts, to cause all oil production from, or attributable to, (i) its working interest in the Nile Prospect and the working interests of its co-owners in the Nile Prospect and (ii) the working interests of its co-owners in the Marlin Prospect to be dedicated and delivered to Gatherer. If oil production will be dedicated to Gatherer from such interests in the Nile Prospect or the Marlin Prospect, Gatherer and Producer and/or its co-working interest owners shall execute a Gathering Agreement covering all oil production from such interests in the Nile Prospect or the Marlin Prospect in a form substantially the same as this Agreement (including the same Gathering Fee).

(b) *Nile and Marlin Prospect.* If Producer causes the Nile Prospect to be dedicated to Gatherer under a Gathering Agreement in a form substantially the same as this Agreement, the

"Initial Amount" (as hereinafter defined) under such Gathering Agreement shall be the capacity on the Gathering System that Gatherer desires to commit under such Gathering Agreement to the Nile Prospect. If Producer causes the twenty five percent (25%) working interest of its co-owner in the Marlin Prospect to be dedicated to Gatherer under a Gathering Agreement in a form substantially the same as this Agreement, the Initial Amount under such Gathering Agreement for oil production attributable to such working interest of Producer's co-owner shall be 10,000 barrels per day.

1.3 *Memorandum.* If requested by the Gatherer, Producer agrees to execute a memorandum, in recordable form, that sets forth the principal terms of this Agreement which may be filed by Gatherer in the real property records of all applicable jurisdictions.

1.4 *Producer's Loss Allowance.* Gatherer shall redeliver to the Delivery Point all quantities of Producer's oil received at the Receipt Point, less Producer's Loss Allowance. "Producer's Loss Allowance" means (i) the total actual line loss on the Gathering System (including shrinkage, evaporation, and other losses) multiplied by (ii) a fraction the numerator of which is the quantity of oil delivered by Producer and the denominator of which is the total quantity of oil delivered to the Gathering System. The Receipt Point and Delivery Point are described in Exhibit B.

1.5 *Interconnection.* By April 1, 1996, Gatherer shall determine whether the Gathering System will connect to Chevron facility and/or Shell facility at MP 69, after full consultation with Producer.

1.6 *Quantity Limits.* Subject to the limitations stated below, Gatherer shall receive at the Receipt Point and gather for Producer on each day all quantities of oil produced and made available to Gatherer. Beginning on the first day after Gatherer has notified Producer that the Gathering

System is operating at full capacity, Gatherer shall only be obligated to receive on any day for each Prospect a quantity of Producer's oil equal to the Maximum Daily Quantity for each such Prospect. "Maximum Daily Quantity" means, for each Prospect, the maximum quantity (expressed in barrels) of oil production actually produced from or attributable to Producer's working interest in the Dedicated Leases for such Prospect during any day which Gatherer shall be required to receive pursuant to this Agreement. The Maximum Daily Quantity for each Prospect for the first three (3) Contract Years after the Commencement Date shall be the Initial Amount (as hereinafter defined). For each Contract Year thereafter, the Maximum Daily Quantity for such Prospect shall be the lesser of either (i) the Initial Amount or (ii) a number of barrels of oil equal to the greatest daily average number of barrels of oil production actually produced from or attributable to Producer's working interest in the Dedicated Leases for such Prospect during any six consecutive month period during the immediately preceding Contract Year.

1.7 *Establishing the Initial Amount.*

(a) *Initial Amount Definition.* "Initial Amount" means, for each Prospect, the amount of capacity (in barrels per day) that initially will be reserved on the Gathering System by Gatherer to gather oil production from or attributable to Producer's working interest in such Prospect, as such amount is established under this Section 1.7 for Producer's working interest in the Marlin Prospect, King Prospect, and Swordfish Prospect and under Section 1.2(b) for the Nile Prospect.

(b) *Marlin Prospect.* The Initial Amount for Producer's seventy five percent (75%) working interest in the Marlin Prospect shall be 30,000 barrels per day.

(c) *King Prospect and Swordfish Prospect.*

(1) *Production Plan.* As Producer develops the King Prospect and the Swordfish Prospect, Producer shall provide written reports to Gatherer at least once every 6 months of Producer's estimates of the reserves attributable to each such Prospect and the projected production profile for each such Prospect that have been prepared in accordance with sound and reasonable engineering practices (each a "Production Plan"). Producer's final Production Plan for each such Prospect shall be provided to Gatherer no later than thirty (30) days after Producer receives final management approval to develop each such Prospect.

(2) *Initial Amount.* Within 30 days after receipt of the final Production Plan for the King Prospect or the Swordfish Prospect, Gatherer and Producer shall meet to establish the Initial Amount for each such Prospect. The Initial Amount for each such Prospect shall be based on the reserve and production estimates set forth in the Production Plan.

(3) *Excess Production.* If the Production Plan shows that the production profile for each such Prospect will exceed the capacity on the Gathering System that Gatherer is willing to commit to gather such oil production, Producer may request that Gatherer increase the capacity of the Gathering System to receive such increased production. If Gatherer elects to so increase the capacity of the Gathering System, such expansion must be completed within 12 months after receipt of Producer's final Production Plan. If Gatherer elects not to increase the capacity of the Gathering System to accommodate the increased production from the Dedicated Leases for such Prospect, such Dedicated Leases shall be released from this Agreement.

1.8 *Interconnecting Facilities.* Producer shall be responsible for the cost of building all pipelines and other facilities necessary to connect Producer's oil production from each Prospect to the Receipt Point.

1.9 *Additional Definitions.*

(a) *Contract Year.* "Contract Year" means the balance of the calendar year beginning on the Commencement Date and each subsequent calendar year thereafter.

(b) *King Prospect.* "King Prospect" means the oil and gas prospect in the Gulf of Mexico comprised of the oil and gas leases described in Part 1 of Exhibit A-1.

(c) *Marlin Prospect.* "Marlin Prospect" means the oil and gas prospect in the Gulf of Mexico comprised of the oil and gas leases described in Part 3 of Exhibit A-1.

(d) *Nile Prospect.* "Nile Prospect" means the oil and gas prospect in the Gulf of Mexico comprised of the oil and gas leases described in Exhibit A-2.

(e) *Prospect.* "Prospect" means either the King Prospect, the Swordfish Prospect, or the Marlin Prospect.

(f) *Swordfish Prospect.* "Swordfish Prospect" means the oil and gas prospect in the Gulf of Mexico comprised in Part 2 of Exhibit A-1.

## ARTICLE 2

## TERM

2.1 *Term.* This Agreement shall be effective as of the date hereof, and unless sooner terminated as provided herein, shall continue in full force and effect for the economic life (as determined in Producer's sole opinion) of production from the Dedicated Leases.

2.2 *Uneconomic.* If the Gathering System becomes uneconomical (in Gatherer's sole discretion) at any time, Gatherer may cease operation of the Gathering System after 30 days' prior written notice to Producer. If Gatherer gives such notice to Producer, Producer may request that Gatherer continue operation of the Gathering System if Producer and all other shippers on the Gathering System agree to pay or cause to be paid all of Gatherer's Operating Costs (as defined in Section 6.4(d)) to maintain and operate the Gathering System. If Producer and all other shippers agree to pay Gatherer monthly, and continue to pay timely each month, all Operating Costs for the Gathering System, Gatherer shall continue to operate the Gathering System under this Agreement. In such event, Producer shall not be obligated to pay the Gathering Fee in any such month.

## ARTICLE 3

## RECEIPT POINT PRESSURE

Producer shall deliver oil for gathering hereunder at a pressure sufficient to effect delivery into the Gathering System at the Receipt Point against the pressure prevailing therein from time to time, but not at a pressure in excess of the maximum allowable operating pressure of the Gathering System as it may be established from time to time.

## ARTICLE 4

## DEDICATION OF LEASES

Producer dedicates to the Gatherer pursuant to this Agreement Producer's working interest share of all oil developed by Producer and produced from or attributable to the Dedicated Leases, other than condensate that leaves Producer's facility in a gas stream and subsequently liquefies in or is processed from such gas stream. This Agreement shall be a covenant running with the Dedicated Leases. Producer shall not assign its interest in the Dedicated Leases unless the Producer

imposes on the assignee and the assignee assumes in the conveyance instrument for such Dedicated Leases the obligations of this Agreement as well as the obligation to impose such similar assumption obligation on any subsequent assignee of the Dedicated Leases. Such imposition of and assumption of the obligations under this Agreement shall have the effect of releasing the assigning party from any further obligations hereunder after the effective date of such transfer.

## ARTICLE 5

## DESCRIPTION OF GATHERING FACILITY

A description of the Gathering System is shown in Exhibit C.

## ARTICLE 6

## GATHERING FEE

6.1 *Fee*. Producer shall pay Gatherer a gathering fee of $0.75 per barrel of oil delivered to the Receipt Point (the "Gathering Fee"). The Gathering Fee shall escalate 1% (rounded to the nearest one-tenth of a cent per annum) beginning January 1, 1998 and each January 1 thereafter until the Gathering Fee has increased to a maximum of $0.95 per barrel.

6.2 *Payout*. Effective on the first day of the month following the day on which Payout occurs, the Gathering Fee then in effect shall be reduced by $0.10 per barrel. The Gathering Fee, as so reduced, shall escalate 1% (rounded to the nearest one-tenth of a cent per annum) beginning on the following January 1 and each January 1 thereafter until the Gathering Fee has increased to a maximum of $0.95 per barrel.

6.3 *Annual Statement*. Within 60 days after the end of each Contract Year, Gatherer shall furnish to Producer a written statement of the Payout status of the Gathering System.

6.4 *Definitions.*

(a) *Payout.* "Payout" means, with respect to the Gathering System, the day on which the cumulative Gathering Income received by Gatherer from the Gathering System equals 150% of the cumulative Capital Costs and Operating Costs for the Gathering System.

(b) *Gathering Income.* "Gathering Income" means the actual cash proceeds received by Gatherer from the gathering of oil production on the Gathering System, as it may be expanded or extended from time to time.

(c) *Capital Costs.* "Capital Costs" means all of the actual and direct costs and expenses attributable to designing, fabricating, constructing, and installing the Gathering System, including all of the actual and direct costs and expenses attributable to expanding or extending the Gathering System.

(d) *Operating Costs.* "Operating Costs" means all costs attributable to operating and maintaining the Gathering System, including, but not limited to:

(i) the cost of labor and other services necessary for the maintenance and operation of the Gathering System;

(ii) the cost of materials, supplies, transportation, repairs, and replacements used in the maintenance and operation of the Gathering System, including replacements of or repair to all equipment, pumps, pipes or other materials;

(iii) the cost of repairing, modifying, or altering the Gathering System; and

(iv) all other costs and expenses allocated to the operation and maintenance of the Gathering System in accordance with Gatherer's usual and customary accounting practices (including overhead charges under the operating

agreement then in effect between Gatherer and the party then operating the Gathering System).

## ARTICLE 7

## QUALITY AND MEASUREMENT

7.1 *Quality.* All oil tendered to Gatherer at the Receipt Point shall conform to the minimum quality specifications set forth in Exhibit D, the quality requirements of all pipelines transporting Producer's oil downstream of the Delivery Point, and any more stringent requirements prescribed by law from time to time.

7.2 *Quality Bank.* Upon the request any shipper on the Gathering System, Gatherer shall establish and maintain a market based gravity and sulfur bank ("Quality Bank") that is acceptable to all such shippers for all oil delivered to the Gathering System and reasonably and acceptable to Gatherer. The Quality Bank will make adjustments based on the average gravity and the average sulphur content of the common oil stream in the Gathering System and the gravity and sulfur content of Producer's oil at the Receipt Point. If any shipper requests the establishment of a Quality Bank and the shippers are unable to unanimously accept the terms of a Quality Bank, Gatherer shall establish and maintain a Quality Bank on behalf of all shippers with terms and conditions deemed reasonably acceptable by Gatherer to all Shippers.

7.3 *Measurement.* The measurement equipment at the Receipt Point shall be installed, owned, operated, and maintained by Producer. The design, installation, modification, replacement, operation, calibration, and proving of Producer's measurement equipment at the Receipt Point shall

be performed in accordance with the measurement practices set forth in Exhibit E, as such practices may be amended from time to time.

## ARTICLE 8

## NOMINATIONS

Producer (or its designee) shall nominate oil production to the Gathering System monthly in accordance with the procedures established by Gatherer from time to time. Gatherer shall establish such nomination procedures within 60 days after the date hereof and shall give Producer at least 30 days' written notice prior to modifying or changing such nomination procedures.

## ARTICLE 9

## BILLING AND PAYMENT

9.1 *Monthly Payment.* Beginning on the Commencement Date and continuing throughout the term hereof, Producer shall pay Gatherer each month the product of (i) the Gathering Fee multiplied by (ii) the quantity of oil (in barrels) measured at the Receipt Point in each such month, less Producer's Loss Allowance for such month.

9.2 *Billing.* Gatherer shall bill Producer (or its designee) on or before the tenth (10th) day of each month for amounts owing under Sections 9.1 and 9.2 for the preceding month. Producer shall pay Gatherer within twenty (20) days of receipt of the bill, regardless of whether billed before, on, or after the tenth (10th) day of the month, the amount specified on the bill. Such payment shall be by electronic transfer of federal funds.

9.3 *Disputed Payment.* Producer may dispute in good faith the amount of any such bill. Producer shall timely pay to Gatherer all amounts which Producer concedes are correct. Producer and Gatherer agree to begin settlement of any amount in dispute within thirty (30) days of

notification by one party to the other of such dispute. Gatherer shall not be entitled to suspend further service unless and until default is made in the conditions of such settlement. No payment by Producer of the amount of a disputed bill shall prejudice the right of Producer to claim an adjustment of the disputed bill.

9.4 *Default.* Should Producer fail to pay part or all of the amount of any undisputed bill, Gatherer may charge interest at the rate equal to the prime rate of Citibank, N.A., New York, New York plus two percent (2%) on the unpaid portion of the bill computed from the date payment is due until the date payment is received. If such failure to pay continues for thirty (30) days after payment is due, Gatherer, in addition to any other remedy it may have hereunder or otherwise, may suspend further service for Producer under this Agreement until such undisputed amount is paid. During any such suspension, production of oil from the Dedicated Leases shall remain dedicated to this Agreement and shall not be delivered to any third party pipeline facility. In the event, however, service is suspended as provided above for a period of three (3) or more months, then Gatherer, in addition to any other remedies it may have hereunder, may terminate this Agreement by giving Producer thirty (30) days prior written notice of such termination.

9.5 *Audit.* Each party hereto shall have the right at all reasonable times to examine the books and records of the other party to the extent necessary to verify the accuracy of any statement, charge, computation, invoice, or demand made pursuant to this Agreement. Any payment shall be final as to both parties unless questioned within two (2) calendar years from the date of such payment.

9.6 *Producer Bankruptcy.* In the event Producer applies for bankruptcy or is forced into bankruptcy under Title 11 of the United States Code, 11 U.S.C. 101, *et seq.*, (the "bankruptcy act").

Gatherer may suspend further service under this Agreement; provided, however, Gatherer shall continue such service if Producer pays to Gatherer prior to each month the amount due for services during that month based upon Producer's nominations for such month or furnishes good and sufficient surety bond, or other good and sufficient security.

9.7 *Gatherer Bankruptcy.* If Gatherer applies for bankruptcy or is forced into bankruptcy under the bankruptcy act, Producer shall pay all monies due Gatherer under this Agreement until otherwise directed by a bankruptcy court. Gatherer shall not suspend or discontinue service but shall continue its obligations under the Agreement during such time as monies are paid to the Gatherer or the court or its designee.

## ARTICLE 10

## LAWS AND REGULATIONS

10.1 *Regulations.* This Agreement is made subject to and Gatherer will build, maintain, and operate the Gathering System in compliance with all existing and future lawful rules, regulations, orders, and laws of any duly constituted governmental authority having jurisdiction over the parties hereto or the subject matter hereof.

10.2 *Access.* Producer recognizes that under the provisions of the Interstate Commerce Act and the Outer Continental Shelf Lands Act a regulatory agency may act to reduce the volume of Producer's oil pro rata to allow other Producers access to the Gathering System.

10.3 *Choice of Law.* This Agreement and all matters pertaining hereto, including without limitation, matters of performance, non-performance, breach, remedies, procedures, rights, duties and interpretations or construction, shall be governed by the laws of the State of Texas to the extent the laws of another jurisdiction are not mandatorily applicable.

ARTICLE 11

FORCE MAJEURE

11.1 *Excused Performance.* If either party is rendered unable, wholly or in part, by Force Majeure to carry out its obligations under this Agreement, other than to make payments due hereunder, it is agreed that on such party's giving notice and full particulars of such Force Majeure in writing to the other party as soon as possible after the occurrence of the cause relied on, the obligations of the party giving such notice, so far as they are affected by such inability, shall be excused for the duration of such Force Majeure event. Force Majeure events shall be remedied, subject to the other provisions hereof, with all reasonable dispatch.

11.2 *Definition.* The term "Force Majeure" as employed herein shall mean acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, war, blockades, insurrections, riots, epidemics, lightning, earthquakes, fires, hurricanes, tropical storms and disturbances, and other storms, storm warnings, floods, washouts, arrests, and restraints of governments and people, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, partial or complete failure of wells or pipelines, partial or entire failure of wells or other sources of oil supply, scheduled maintenance of equipment or facilities, or any other causes not reasonably within the control of the party claiming suspension, whether similar or dissimilar to any of the foregoing causes, and which, by the exercise of due diligence, such party has been or is unable to prevent or overcome. Such term shall likewise include, in those instances where either party hereto is required to obtain right-of-way grants, permits or licenses to enable such party to fulfill its obligations hereunder, the inability of such party to acquire, or the delays on the part of such party in acquiring, at reasonable costs and after the exercise of reasonable diligence, such right-of-way

grants, permits or licenses. The settlement of strikes or lockouts shall be entirely at the discretion of the party involved therein, and the above requirements that any Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of the opposing party when such course is inadvisable in the discretion of the party involved.

11.3 *Termination.* Within thirty (30) days after the occurrence of a Force Majeure event, Gatherer shall give written notice to Producer of Gatherer's estimate of the expected duration of the Force Majeure event and Gatherer's plans to remedy the Force Majeure event. If (i) Gatherer's notice states that the Force Majeure event will not be remedied within six (6) months after the commencement of the Force Majeure event or (ii) Gatherer's notice states that the Force Majeure event will be remedied within six (6) months after the commencement thereof but Gatherer fails to cause the Force Majeure event to be remedied within such six (6) month period, the Party not experiencing such Force Majeure may, at any time thereafter but prior to the remedying of such Force Majeure, terminate this Agreement on ten (10) days' prior written notice.

## ARTICLE 12

## POSSESSION OF OIL AND WARRANTY OF TITLE

12.1 *Possession.* Producer shall be deemed to be in control and possession of the oil deliverable hereunder and responsible for, and shall indemnify Gatherer against, any damage (including pollution damages) or injury caused thereby until the oil shall have been delivered by Producer to Gatherer at the Receipt Point and after the oil is redelivered to Producer (or its designee) at the Delivery Point, EVEN IF SUCH DAMAGE OR INJURY IS CAUSED BY THE SOLE. JOINT, AND/OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT

OF GATHERER, EXCEPT TO THE EXTENT DUE TO THE GROSS NEGLIGENCE OF GATHERER. After delivery of the oil by Producer to Gatherer at the Receipt Point, Gatherer shall be deemed to be in control and possession of the oil and responsible for, and shall indemnify Producer against, damage (including pollution damages) or injury caused thereby until the oil shall have been redelivered by Gatherer at the Delivery Point, EVEN IF SUCH DAMAGE OR INJURY IS CAUSED BY THE SOLE, JOINT, AND/OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF PRODUCER, EXCEPT TO THE EXTENT DUE TO THE GROSS NEGLIGENCE OF PRODUCER.

12.2 *WAIVER.* TO THE MAXIMUM EXTENT PERMITTED BY LAW, A PARTY SHALL NOT BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, IRRESPECTIVE OF WHETHER CLAIMS OR ACTIONS FOR SUCH DAMAGES ARE BASED UPON CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER REMEDY AT LAW OR EQUITY.

12.3 *Title Warranty.* Producer warrants to Gatherer that it has good and merchantable title to all oil that it will deliver or cause to be delivered to Gatherer hereunder free and clear of all liens, encumbrances, and claims whatsoever. Title to the oil received by Gatherer from Producer at the Receipt Point shall remain with Producer (or its designee) during its transportation in the Gathering System.

12.4 *Risk of Loss.* Producer agrees to indemnify Gatherer and hold it harmless from all suits, actions, debts, accounts, damages, costs, losses and expenses arising from or out of adverse claims of any or all persons to said oil or to royalties or charges thereon, whether or not directly or indirectly related to Gatherer's gathering of the oil as provided for in this Agreement. All risk of loss

of Producer's oil by Gatherer in the Gathering System shall remain with Producer, EVEN IF SUCH LOSS IS CAUSED BY THE SOLE, JOINT, AND/OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF GATHERER, EXCEPT IN THE EVENT OF LOSS DUE TO GROSS NEGLIGENCE OF GATHERER.

12.5 *Taxes.* Gatherer warrants to Producer that Gatherer has good title to the Gathering System and has the requisite authority to enter into this Agreement. Gatherer assumes liability for the payment of any taxes and assessments attributed to the Gathering System. Gatherer agrees to indemnify Producer and hold it harmless from all suits, actions, debts, accounts, damages, costs, losses and expenses arising from or out of adverse claims related to ownership of the Gathering System or, except as expressly provided otherwise herein, operation of the Gathering System.

## ARTICLE 13

## NOTICE

Any notice, payment, statement, bill or other communication provided for in this Agreement shall be in writing and mailed by United States certified or registered mail. with postage prepaid, to the party's address as follows, or at such other address or addresses as either party hereto may designate from time to time by written notice of change given to the other:

PRODUCER: Notices:
Amoco Production Company
P. O. Box 50879
New Orleans, Louisiana 70150-0879
Attn: Jerry Wenzel

GATHERER: Notices:
Main Pass Oil Gathering Company
c/o Amoco Pipeline Company
One Mid-America Plaza, Suite 300
Oakbrook Terrace, Illinois 60181
Attn: President - Main Pass Oil Gathering Company

PAYMENTS: To the bank and account number designated on the invoice.

**ARTICLE 14**

**OTHER PROVISIONS**

14.1 *Binding Effect.* This Agreement shall extend and be binding upon the successors and assigns of the respective parties hereto.

14.2 *No Waiver.* Any waiver by either party of any one or more defaults by the other hereunder shall not operate as a waiver of any future default of defaults, whether of a like or different character.

14.3 *Amendment.* This Agreement may be amended only by an instrument in writing executed by both parties hereto.

14.4 *Access.* To the extent that Producer has the legal right to do so, Producer hereby grants to Gatherer, subject to safety considerations and at no cost to Gatherer: (a) the right of ingress and egress to and from any and all of Producer's Dedicated Leases and Producer's platforms and facilities for the purpose of carrying out the terms of this Agreement and Gatherer's obligations hereunder; (b) the right to construct, maintain, operate, repair, alter, replace and remove facilities associated with the Gathering System for the gathering and transportation of oil across, under or on the Dedicated Leases; and (c) access to and a reasonable amount of work space on Producer's platform and other facilities for Gatherer's facilities. Gatherer's activities on Producer's platform shall not unreasonably interfere with Producer's operations and shall comply with Producer's safety

practices then in effect. All employees and contractors of Gatherer shall comply with all instructions, rules, and regulations (written or verbal) of Producer when working onboard Producer's facilities. Gatherer's activities on Producer's facilities shall be governed by the terms of Exhibit F, Platform Access Terms, attached hereto.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed in multiple originals of equal dignity, to be effective as of the date first above written.

*PRODUCER*:

AMOCO PRODUCTION COMPANY

By: ______________________

Title: Vice President

*GATHERER*:

MAIN PASS OIL GATHERING COMPANY

By: Amoco Main Pass [redacted] Gathering Company,
a general partner

By: D. G. ______________________

Title: PRESIDENT