# EXHIBIT 1-B

# OIL GATHERING AGREEMENT

THIS OIL GATHERING AGREEMENT ("Agreement"), dated as of the 2nd day of January, 2002, is by and between BP EXPLORATION & PRODUCTION INC., a Delaware corporation ("Producer") and MAIN PASS OIL GATHERING COMPANY, a Delaware general partnership ("Gatherer"). Producer and Gatherer are sometimes referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

A. Producer owns interests in the offshore Gulf of Mexico leases described in Exhibit A-1 (including any renewals or extensions of such leases) (the "Dedicated Lease") and plans to deliver crude oil and condensate ("Oil") from the Dedicated Lease to the Gathering System (defined below), via Marlin Tension Leg Platform ("Marlin TLP") in Viosca Knoll Block 915 ("VK Block 915") and associated gathering pipeline owned by the Marlin TLP owners connecting the Marlin TLP to Gatherer's existing 18" pipeline (the "Gathering System") on the production platform in Main Pass Block 225 (the "MP225 Platform") described in Exhibit C.

B. Gatherer will use the Gathering System to gather Oil produced from or attributable to the Dedicated Lease for delivery to Equilon Pipeline Company's ("Equilon") and/or to Cypress Pipeline Company's ("Cypress") Main Pass Block 69 terminal facilities located in Plaquemines Parish, Louisiana ("MP 69") as designated by Producer.

C. Producer desires that Gatherer gather in the Gathering System and deliver to MP 69 Oil produced from or attributable to the Dedicated Lease for the account of Producer in the Gathering System, and Gatherer desires to gather in the Gathering System and deliver to MP 69 for Producer's account all such quantities of Oil, subject to the terms, conditions, and limitations of this Agreement.

D. The Parties previously contracted for the gathering of Producer's Oil from the Dedicated Lease under that certain Oil Gathering Agreement between the Parties dated January

19, 1996 (the "1996 Agreement"), covering the Dedicated Lease (referred to in the 1996 Agreement as the "King Prospect"), and also covering certain other leases and lands which were described in the 1996 Agreement as the "Nile Prospect," the "Marlin Prospect," and the "Swordfish Prospect" (collectively referred to in this Agreement as the "Other Dedicated Leases"). The Parties now desire to restate their agreement as to this Dedicated Lease only. The Parties acknowledge that the 1996 Agreement (including all amendments and supplemental agreements executed pursuant thereto) will remain in full force and effect as to the Other Dedicated Leases.

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein, the Parties agree as follows:

**ARTICLE 1**

**SCOPE OF AGREEMENT**

1.1 *Gathering from Dedicated Lease.* Subject to the terms, conditions, and limitations hereof, and commencing on the date of initial deliveries of Oil produced by Producer from the Dedicated Lease and processed at the Marlin TLP to the Gathering System from the Dedicated Lease ("Commencement Date"), Producer agrees to deliver to the Receipt Point (described in Exhibit "B") for gathering on the Gathering System and delivery to the Delivery Point (described in Exhibit "B"), and Gatherer agrees to receive and accept into its Gathering System at the Receipt Point and to deliver to the Equilon or to the Cypress facilities (as designated by Producer) at the Delivery Point for the account of such Producer, or its designee, such Producer's working interest share of such Oil produced from or attributable to the Dedicated Lease. Producer shall have no obligation to Gatherer unless and until Producer proceeds with development of the Dedicated Lease, and Oil is actually produced and handled at the Marlin TLP. Gatherer represents that it currently has the right to receive Oil from the Marlin TLP at the Receipt Point under a separate agreement with the operator of the Receipt Point; however, such

rights of Gatherer are subject to the terms and conditions of that separate agreement.

1.2 *Memorandum.* If requested by the Gatherer, Producer agrees to execute a memorandum, in recordable form, that sets forth the principal terms of this Agreement which may be filed by Gatherer in the real property records of all applicable jurisdictions.

1.3 *Loss Allowance.* Gatherer shall operate and maintain the Gathering System and shall redeliver to the Delivery Point all quantities of Producer's Oil received at the Receipt Point, less Producer's Loss Allowance. "Producer's Loss Allowance" means (i) the total actual line loss on the Gathering System (including shrinkage, evaporation, and any and all other losses except losses attributed to the Gatherer's Gross Negligence or Willful Misconduct) multiplied by (ii) a fraction the numerator of which is the quantity of Oil delivered by Producer and the denominator of which is the total quantity of Oil delivered to the Gathering System. Oil received at the Receipt Point shall be determined by the custody transfer equipment on the Marlin TLP. The Receipt Point is described in Exhibit B.

1.4 *Quantity.*

(a) *Quantity.* Subject to the limitations stated below, Gatherer shall receive and accept at the Receipt Point and gather on behalf of Producer on each day all quantities of Oil delivered by Producer to the Receipt Point. Gatherer agrees to accept receipt from Producer, subject to this Article 1.4, and all other terms and conditions of this Agreement, immediately upon Producer's delivery thereof to the Receipt Point when Gathering System is operating under normal conditions. If Gatherer gives notice of capacity limitations in accordance with Article 8, beginning on the first day after the date specified in such notice that the Gathering System is or will be full, and continuing during the period specified in such notice, Gatherer shall only be obligated to accept at the Receipt Point on any day that the Gathering System remains full, a quantity of Producer's Oil equal to the Maximum Daily Quantity, as defined herein, for the Receipt Point.

(b) *Maximum Daily Quantity Definition.* "Maximum Daily Quantity" for the Receipt Point means a quantity of Oil equal to 100% of Producer's nomination for such month for the

Receipt Point divided by the number of days in such month, not to exceed the Maximum Amount. "Maximum Amount" means 30,000 barrels per day for the first Contract Year; and for each Contract Year thereafter the lesser of (i) 25,000 barrels per day or (ii) the quantity per day set forth in the most recent Production Plan (as hereinafter defined) in accordance with Article 1.4 (c) herein for the Dedicated Lease for such Contract Year.

(c) *Meeting*. Upon no less than 30 days' prior written notice by one Party to the other Party, Gatherer and Producer shall meet at a mutually agreeable date, time, and location, to discuss the estimated production rates for the Dedicated Lease for a minimum duration of the following twelve months. Within 20 days after the date of such notice, Producer shall provide to Gatherer a report showing Producer's estimate of the production rates from the Dedicated Lease for a minimum duration of the following twelve months, which shall be based on the greatest daily average number of barrels of Oil production from the Dedicated Lease during any six consecutive month period of the immediately preceding Contract Year but shall also take into consideration (i) historical and projected curtailment, if any, of Oil or gas production from the Dedicated Lease, and (ii) expected production from any new wells drilled or to be drilled or recompletions or workovers of existing wells (as shown in the operator's most recently approved budget or authority for expenditure) on the Dedicated Lease (the "Production Plan"). The Production Plan shall be prepared, and the production rates for the Dedicated Lease set forth therein shall be estimated by Producer, in accordance with good and sound reservoir engineering practices. . The Production Plan shall remain in effect until redetermined by Producer. Gatherer agrees that by furnishing the Production Plan, Producer is not warranting or representing to Gatherer the accuracy of the reserves and production rates in the Production Plan. At the meeting of Gatherer and Producer, Gatherer shall provide Producer with an estimate of the capacity in the Gathering System that Gatherer believes will be available to all shippers during the following twelve months. Producer agrees that by furnishing such information Gatherer is not warranting or representing to Producer that all or any portion of such capacity will be available to Producer or to any other shipper during such 12-month period. Notwithstanding the

foregoing, Gatherer will have the obligation to accept Producer's Maximum Daily Quantity of Oil, as stated in Section 1.4.a and subject to the limitations described therein.

(d) *Contract Year*. "Contract Year" means the balance of the calendar year beginning on the Commencement Date and each subsequent calendar year thereafter.

## ARTICLE 2

## TERM

2.1 *Term*. This Agreement shall be effective as of the date hereof, and unless sooner terminated as provided herein, shall continue in full force and effect for the economic life of production from the Dedicated Lease as determined by the Producer in its sole discretion.

2.2 *Uneconomic*. If the Gathering System becomes uneconomical (in Gatherer's sole discretion) at any time, Gatherer may cease operation of the Gathering System after 30 days' prior written notice to Producer and all other shippers on the Gathering System. (The date on which the Gatherer ceases operation of the Gathering System is referred to as the "Termination Date"). If Gatherer gives such notice to Producer, Producer may request that Gatherer continue operation of the Gathering System if Producer and/or other shippers on the Gathering System agree to pay or cause to be paid all of Gatherer's Operating Costs (as defined in Section 2.4 below). If Producer and/or other shippers agree to pay Gatherer monthly, and continue to pay timely each month, Gatherer's Operating Costs for the Gathering System, Gatherer shall continue to operate the Gathering System under this Agreement. In such event, and if Producer agrees to pay or contributes to the payment of all of Gatherer's Operating Costs for the Gathering System, then Producer shall not be obligated to pay the Gathering Fee in any such month. If Gatherer elects to cease operation of the Gathering System and Producer and/or other shippers on the Gathering System do not elect to pay Gatherer's Operating Costs under this Section 2.2, this Agreement shall terminate on the Termination Date.

2.3 *Inability to Receive or Re-deliver*. If Gatherer loses the contractual right, under the terms of its separate agreements with the platform owners, to receive or re-deliver oil for

Producer's account and such loss of contractual right results in Gatherer's inability to so receive or re-deliver, and the inability cannot be remedied within sixty (60) days of the date of commencement of that inability, then, after the expiration of such sixty (60) day period, Producer shall have the right to terminate this Agreement upon ten (10) days advance written notice to Gatherer.

2.4 *Gatherer's Operating Costs.* "Gatherer's Operating Costs" means all costs attributable to operating and maintaining the Gathering System in accordance with usual and customary accounting practices in the industry, including, but not limited to:

(i) the cost of labor and other services necessary for the maintenance and operation of the Gathering System;

(ii) the cost of materials, supplies, transportation, repairs, and replacements (including replacements of or repair to all equipment, pumps, pipes, or other materials) used in the maintenance and operation of the Gathering System,;

(iii) the cost of repairing, modifying, or altering the Gathering System; and

(iv) all other costs and expenses allocated to the operation and maintenance of the Gathering System in accordance with Gatherer's usual and customary accounting practices (including overhead charges under the operating agreement then in effect between gatherer and the party then operating the Gathering System, if any).

## ARTICLE 3

## RECEIPT POINT PRESSURE

Producer shall deliver, or cause to be delivered, Oil for gathering hereunder at a pressure sufficient to effect delivery into the Gathering System at the Receipt Point against the pressure prevailing therein from time to time, but not at a pressure in excess of the maximum allowable operating pressure of the Gathering System as it may be established from time to time, but in no event shall the maximum allowable operating pressure exceed 1950 psi.

## ARTICLE 4

## DEDICATION OF LEASE

Producer dedicates to the Gatherer pursuant to the terms and conditions of this Agreement, Producer's working interest share of all Oil (i) produced from or attributable to the Dedicated Lease, and (ii) processed at the Marlin TLP other than condensate that leaves Producer's facility in a gas stream and subsequently liquefies in or is processed from such gas stream. This Agreement shall be a covenant running with the Dedicated Lease. Producer shall not assign its interest in the Dedicated Lease unless the Producer imposes on the assignee and the assignee assumes in the conveyance instrument for such Dedicated Lease the obligations of this Agreement as well as the obligation to impose such similar assumption obligation on any subsequent assignee of the Dedicated Lease. Such imposition of and assumption of the obligations under this Agreement shall have the effect of releasing the assigning Party from any further obligations hereunder after the effective date of such transfer.

## ARTICLE 5

## GATHERING FACILITY

A description of the Gathering System is shown in Exhibit C.

## ARTICLE 6

## GATHERING FEE

Producer shall pay Gatherer a gathering fee of $0.7805 per barrel of Oil delivered to the Receipt Point and accepted by Gatherer (the "Gathering Fee"). The Gathering Fee shall escalate 1% (rounded to the nearest one-tenth of a cent) per annum beginning January 1, 2002 and each January 1 thereafter until the Gathering Fee has increased to a maximum of $0.95 per barrel. However, effective on the first day of the month following the day on which the Payout of the Gathering System occurs, pursuant to the terms of Article 6 of the 1996 Agreement, the Gathering Fee then in effect shall be reduced by $0.10 per barrel, subject thereafter to annual escalations of 1% per annum as provided above. Within 60 days after the end of each Contract Year, Gatherer shall furnish to Producer a written statement of the Payout status of the Gathering System.

## ARTICLE 7

## QUALITY AND MEASUREMENT

7.1 *Quality*. All Oil tendered by Producer to Gatherer at the Receipt Point and delivered by Gatherer to Producer at the Delivery Point shall conform to the minimum quality specifications set forth in Exhibit D, the quality requirements of all pipelines transporting Producer's oil downstream of the Delivery Point, including the pipeline systems originating at Equilon's pump station at MP 69 and Cypress Pipelines pump station at MP 69 and any more stringent requirements prescribed by law from time to time.

7.2 *Gravity Bank*. The market based gravity bank procedure ("Gravity Bank") set forth in Exhibit E shall apply to Oil gathered under this Agreement.

7.3 *Sulfur Bank*. Upon the request of any shipper on the Gathering System, Gatherer shall establish and maintain a market based sulfur bank ("Sulfur Bank") that is unanimously acceptable to all shippers delivering oil to the Gathering System, and reasonably acceptable to Gatherer. If the shippers are unable to unanimously agree upon the terms of a Sulfur Bank, Gatherer shall establish and maintain a Sulfur Bank on behalf of all shippers, with terms and conditions deemed acceptable by Gatherer to all shippers. The Sulfur Bank will make

adjustments based on the average sulfur content of the common oil stream in the Gathering System and the sulfur content of Producer's Oil at the Receipt Point.

7.4 *Measurement.* The measurement equipment for receipts into the Gathering System shall be on the Marlin TLP and shall be owned and operated by the Marlin TLP owners. The measurement equipment for deliveries from the Gathering System shall be at MP 69 and shall be owned and operated by the Gatherer. Gatherer shall require of the Marlin TLP operator, by separate contract, that measurement equipment for receipts into the Gathering System shall be designed, constructed, installed, operated, maintained, modified, replaced, calibrated, and proved in accordance with measurement practices set forth in Exhibit F (which exhibit in its entirety shall be binding only on the operator of the Marlin TLP and not on the Producer), as such practices may be amended by Gatherer from time to time as mutually agreed to by the Parties. The same equipment and practices shall be adhered to by Gatherer, only to the extent that such may relate to its ownership and operation of the measurement equipment for deliveries from the Gathering System at MP 69. The Parties shall have the right to witness and verify all such activities and measurements applicable to this Agreement.

## ARTICLE 8

## NOMINATIONS

Producer shall nominate Oil production to the Gathering System monthly in accordance with the nomination requirements as established by Gatherer from time to time, which nomination requirements shall be consistent with Gatherer's nomination procedures for other similarly situated oil gathering pipelines operated by Gatherer. Gatherer shall give Producer at least 30 days written notice prior to modifying or changing such nomination procedures. In any given month, if nominations for the Gathering System are greater than the capacity of the Gathering System, Gatherer shall give Producer at least forty-eight (48) hours written notice prior to such date on which such capacity limitations shall take effect as to Producer.

## ARTICLE 9

## BILLING AND PAYMENT

9.1 *Monthly Payment.* Beginning on the Commencement Date and continuing throughout the term hereof, Producer shall pay Gatherer each month the product of (i) the Gathering Fee multiplied by (ii) the quantity of Oil (in barrels) measured at the Receipt Point and allocated to Producer in each such month after deducting Producer's Loss Allowance from such quantity.

9.2 *Billing.* Gatherer shall bill Producer on or before the tenth (10th) day of each month for amounts owing under Section 9.1 for the preceding month. Producer shall pay Gatherer within twenty (20) days of receipt of the bill, regardless of whether billed before, on, or after the tenth (10th) day of the month, the amount specified on the bill unless the bill is disputed in accordance with the provisions of Article 9.3. Such payment shall be by electronic transfer of federal funds.

9.3 *Disputed Payment.* Producer may dispute in good faith the amount of any such bill. Producer shall timely pay to Gatherer all amounts which Producer concedes are correct. Producer and Gatherer agree to begin discussions to settle any amount in dispute within thirty (30) days of notification by one Party to the other of such dispute. If Producer fails to pay any disputed amount within 30 days after the date on which the Parties have finally resolved or settled such amount or payment of such disputed amount has been finally adjudicated or otherwise resolved, whichever occurs first, Gatherer, in addition to any other remedies it may have, may suspend service under this Agreement. No payment by Producer of the amount of a disputed bill shall prejudice the right of Producer to claim an adjustment of the disputed bill.

9.4 *Default.* Should Producer fail to pay part or all of the amount of any undisputed bill after thirty (30) days from the date payment is due, Gatherer may charge interest at the rate equal to the prime rate of Citibank, N.A., New York, New York plus two percent (2%) on the unpaid portion of the bill computed from the date payment is due until the date payment is

received. If such failure to pay continues for sixty (60) days after payment is due, Gatherer, in addition to any other remedy it may have hereunder or otherwise, may suspend further service for Producer under this Agreement until such undisputed amount is paid. During any such suspension, production of Oil from the Dedicated Lease shall remain dedicated to this Agreement and shall not be delivered to any third party pipeline facility. In the event, however, service is suspended under Article 9.3 or this Article 9.4 for a period of three (3) or more months, then Gatherer, in addition to any other remedies it may have hereunder, may terminate this Agreement by giving Producer thirty (30) days prior written notice of such termination.

9.5 *Audit.* Each Party hereto shall have the right at all reasonable times during the term of this Agreement and within two (2) years following termination to examine the books and records of the other Party to the extent necessary to verify the accuracy of any statement, charge, computation, invoice, or demand made pursuant to, or otherwise related to the services, obligations or rights provided by this Agreement. The Parties shall preserve and shall cause all subcontractors to preserve all of the aforesaid documents so as to satisfy this provision. Any payment shall be final as to both Parties unless questioned within two (2) calendar years from the date of such payment.

9.6 *Producer Bankruptcy.* In the event the Producer applies for bankruptcy or is forced into bankruptcy under Title 11 of the United States Code, 11 U.S.C. 101, *et seq.*, (the "bankruptcy act"), Gatherer may suspend further service under this Agreement to the Producer; provided, however, Gatherer shall continue such service if the Producer pays to Gatherer prior to each month the amount due for services during that month based upon the Producer's nominations for such month or furnishes good and sufficient surety bond, or other good and sufficient security.

9.7 *Gatherer Bankruptcy.* If Gatherer applies for bankruptcy or is forced into bankruptcy under the bankruptcy act, Producer may place in escrow all monies due Gatherer under this Agreement until otherwise directed by a bankruptcy court. Gatherer shall not suspend or discontinue service but shall continue its obligations under the Agreement during such time as

monies are escrowed or paid as directed by the bankruptcy court.

## ARTICLE 10

## LAWS AND REGULATIONS

10.1 *Regulations.* This Agreement is made subject to and the Parties agree to abide by all existing and future lawful rules, regulations, orders, and laws of any duly constituted governmental authority having jurisdiction over the Parties hereto or the subject matter hereof.

10.2 *Access.* Producer recognizes that under the provisions of the Interstate Commerce Act and the Outer Continental Shelf Lands Act a regulatory agency may act to reduce the volume of Producer's Oil pro rata to allow other producers access to the Gathering System.

10.3 *Choice of Law.* THIS AGREEMENT AND ALL MATTERS PERTAINING HERETO, INCLUDING WITHOUT LIMITATION, MATTERS OF PERFORMANCE, NON-PERFORMANCE, BREACH, REMEDIES, PROCEDURES, RIGHTS, DUTIES AND INTERPRETATIONS OR CONSTRUCTION, SHALL BE GOVERNED BY THE SUBSTANTIVE AND PROCEDURAL LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO CHOICE OF LAW PROVISIONS.

## ARTICLE 11

## FORCE MAJEURE

11.1 *Excused Performance.* If either Party is rendered unable, wholly or in part, by Force Majeure to carry out its obligations under this Agreement, other than to make payments due hereunder, it is agreed that on such Party's giving notice and full particulars of such Force Majeure in writing to the other Party as soon as possible after the occurrence of the cause relied on, the obligations of the Party giving such notice, so far as they are affected by such inability, shall be excused for the duration of such Force Majeure event. Force Majeure events shall be remedied, subject to the other provisions hereof, with all reasonable dispatch.

11.2 *Definition.* The term "Force Majeure" as employed herein shall mean acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, war, blockades, insurrections, riots, epidemics, lightning, earthquakes, fires, hurricanes, tropical storms and disturbances and other storms, storm warnings, floods, washouts, arrests, and restraints of governments and people, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, freezing of wells or pipelines, partial or entire failure of wells or other sources of oil supply, emergency or unscheduled, or otherwise required (including routine) maintenance of equipment or facilities, or any other causes not reasonably within the control of the Party claiming suspension, whether similar or dissimilar to any of the foregoing causes, and which, by the exercise of due diligence, such Party has been or is unable to prevent or overcome. Such term shall likewise include, in those instances where either Party hereto is required to obtain right-of-way grants, permits or licenses to enable such Party to fulfill its obligations hereunder, the inability of such Party to acquire, or the delays on the part of such Party in acquiring, at reasonable costs and after the exercise of reasonable diligence, such right-of-way grants, permits or licenses. The settlement of strikes or lockouts shall be entirely at the discretion of the Party involved therein, and the above requirements that any Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of the opposing Party when such course is inadvisable in the discretion of the Party involved.

11.3 *Termination.* Within thirty (30) days after the occurrence of a Force Majeure event, the Party experiencing the Force Majeure event shall give written notice to the other Party of such Party's estimate of the expected duration of the Force Majeure event and such Party's plans to remedy the Force Majeure event. If (i) the notice states that the Force Majeure event will not be remedied within six (6) months from the commencement thereof; or (ii) if the notice states that the Force Majeure event will be remedied within six (6) months after the commencement thereof but the Party fails to cause the Force Majeure event to be remedied within such six (6) month period, the Party not experiencing such Force Majeure may, at any

time thereafter but prior to the remedy of such Force Majeure, terminate this Agreement to the extent affected by such Force Majeure on ten (10) days prior written notice.

## ARTICLE 12

## POSSESSION OF OIL, INDEMNIFICATION AND WARRANTY OF TITLE

12.1 *Possession and Indemnification.* Producer shall be deemed to be in control and possession of the Oil deliverable hereunder and shall be responsible for, and shall indemnify Gatherer against, any damage (including pollution damages), claim, demand, cause of action or injury caused thereby until the Oil shall have been delivered by Producer to Gatherer at the Receipt Point and after the Oil is redelivered to Producer, or Producer's designee, at the Delivery Point, EVEN IF SUCH DAMAGE OR INJURY IS CAUSED BY THE SOLE, JOINT, AND/OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF GATHERER, EXCEPT TO THE EXTENT DUE TO THE GROSS NEGLIGENCE OR WILFUL MISCONDUCT OF GATHERER. After delivery of the Oil by Producer to Gatherer at the Receipt Point, Gatherer shall be deemed to be in control and possession of the Oil and shall be responsible for, and shall indemnify Producer against, any damage (including pollution damages), claim, demand, cause of action or injury caused thereby until the Oil shall have been redelivered by Gatherer, to Producer, or Producer's designee, at the Delivery Point, EVEN IF SUCH DAMAGE OR INJURY IS CAUSED BY THE SOLE, JOINT, AND/OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF PRODUCER, EXCEPT TO THE EXTENT DUE TO THE GROSS NEGLIGENCE OR WILFUL MISCONDUCT OF PRODUCER.

12.2 *WAIVER.* TO THE MAXIMUM EXTENT PERMITTED BY LAW, A PARTY SHALL NOT BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, IRRESPECTIVE OF WHETHER CLAIMS OR ACTIONS FOR SUCH DAMAGES ARE BASED UPON CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER REMEDY AT LAW OR EQUITY.

12.3 *Title Warranty and Indemnity.* Title to the Oil received by Gatherer from Producer at the Receipt Point shall remain with Producer during its transportation in the Gathering System. Producer represents that it has the right to deliver Producer's Oil for gathering hereunder, free of any adverse claims. Producer shall indemnify, defend, and hold harmless Gatherer from all claims, demands, suits, actions, damages, costs, losses, and expenses arising from adverse claims about the ownership of or title to Producer's Oil delivered hereunder.

12.4 *Risk of Loss.* Producer agrees to indemnify Gatherer and hold it harmless from all suits, actions, debts, accounts, damages, costs, losses and expenses arising from or out of adverse claims of any or all persons to said Oil or to royalties or charges thereon, whether or not directly or indirectly related to Gatherer's gathering of the Oil as provided for in this Agreement. All risk of loss of Producer's Oil by Gatherer in the Gathering System shall remain with Producer, EVEN IF SUCH LOSS IS CAUSED BY THE SOLE, JOINT, AND/OR COMPARATIVE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF GATHERER, EXCEPT IN THE EVENT OF LOSS DUE TO GROSS NEGLIGENCE OR WILFUL MISCONDUCT OF GATHERER.

12.5 *Taxes.* Gatherer warrants to Producer that Gatherer has good title to the Gathering System and has the requisite authority to enter into this Agreement. Gatherer assumes liability for the payment of any taxes and assessments attributed to the Gathering System. Gatherer agrees to indemnify Producer and hold it harmless from all suits, actions, debts, accounts, damages, costs, losses and expenses arising from or out of adverse claims related to ownership of the Gathering System or, except as expressly provided otherwise herein, operation of the Gathering System.

## ARTICLE 13

## NOTICE

Unless otherwise provided in this Agreement, any notice, request, or demand which either Party desires to serve upon the other respecting this Agreement, shall be in writing and shall be

considered as delivered when hand delivered or, upon receipt if sent by United States certified mail, with postage prepaid or, if sent by facsimile transmission, when receipt is confirmed by the equipment of the transmitting Party, provided if receipt of a facsimile transmission is confirmed after normal business hours, receipt shall be deemed to be the beginning of the recipient's next business day. Such notice shall be given to the other Party at the following address:

PRODUCER: Notices/Statements:

BP Exploration & Production Inc.
200 WestLake Park Boulevard
Houston, TX 77079
Attn: Marlin Delivery Manager –
GoM Deepwater Production Business Unit

GATHERER: Notices:

Main Pass Oil Gathering Company
c/o BP Pipelines (North America)
801 Warrenville Road
Lisle, Illinois 60532
Attn: President - Main Pass Oil Gathering Company

PAYMENTS: To the bank and account number designated on the invoice.

or to such other address as either Party may designate, from time to time, by notice in the manner provided above.

## ARTICLE 14

## OTHER PROVISIONS

14.1 *Binding Effect.* This Agreement shall extend and be binding upon the successors and assigns of the respective Parties hereto.

14.2 *No Waiver.* Any waiver by either Party of any one or more defaults by the other hereunder shall not operate as a waiver of any future default or defaults, whether of a like or different character.

14.3 *Amendment.* This Agreement may be amended only by an instrument in writing executed by both Parties hereto.

14.4 *Dispute Resolution.* All claims, disputes and other matters in question arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association ("AAA") in accordance with the AAA's Commercial Arbitration Rules. The award rendered by the Arbitrator shall be final, and judgment may be entered upon it in accordance with the applicable law in any court having jurisdiction thereof. The Parties shall continue to perform under this Agreement during any arbitration proceeding, unless otherwise agreed in writing or unless this Agreement permits a Party to unilaterally cease or suspend its performance hereunder.

14.5 *Conflict of Provisions.* The attached Exhibits are an integral part of this Agreement. If there is any conflict between the provisions contained in this base Agreement and the attached Exhibits, the provisions of this base Agreement will govern.

14.6 *Entire Agreement.* Except as provided below in Article 14.9, this Agreement constitutes the entire agreement of the Parties regarding the matters contemplated herein and supersedes all prior and contemporaneous agreements and understandings of the Parties in connection therewith. No covenant, representation, or condition which is not expressed in this Agreement shall affect, or be effective to interpret, change, or restrict, the express provisions of

this Agreement.

14.7 *Counterparts.* This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument and agreement.

14.8 *Authority.* Each of the Parties represents that the person signing below on its behalf has the authority to execute this Agreement and to bind that Party.

14.9 *1996 Agreement.* This Agreement is intended to restate the agreement of the Parties regarding the gathering of oil from this Dedicated Lease only, and the Parties agree that this Agreement, as to only this Dedicated Lease, supercedes and replaces the 1996 Agreement. The Parties further acknowledge that the 1996 Agreement (and all amendments and supplemental agreements executed pursuant thereto) shall continue to govern the Other Dedicated Leases covered thereby.

14.10 *Article and Paragraph Headings.* The article and paragraph headings of this Agreement are inserted for convenience only and are in no way to be construed as part of this Agreement or as a limitation or enlargement of the scope or meaning of the particular sections or paragraphs to which they refer and shall not affect the interpretation of any provisions of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this instrument to be executed in multiple originals of equal dignity, to be effective as of the date first above written.

*PRODUCER*:

BP Exploration & Production Inc.

By: [signature]

Title: Commercial Manager

*GATHERER*:

MAIN PASS OIL GATHERING COMPANY

By: Amoco Main Pass Gathering Company,
a general partner

By: Timothy S. H[illegible]

Title: PRESIDENT