# EXHIBIT 1-C

# OIL GATHERING AGREEMENT

**DATED: JANUARY 24, 2022**

**BETWEEN**

**MAIN PASS OIL GATHERING COMPANY, LLC**

**AND**

**ANADARKO US OFFSHORE LLC**

# TABLE OF CONTENTS


Article I. SCOPE OF AGREEMENT .......... 1

Article II. TERM .......... 6

Article III. RECEIPT POINT PRESSURE .......... 8

Article IV. DEDICATION OF LEASES .......... 8

Article V. GATHERING FACILITY .......... 9

Article VI. GATHERING FEE .......... 9

Article VII. QUALITY AND MEASUREMENT .......... 9

Article VIII. ALLOCATION AND NOMINATIONS .......... 10

Article IX. BILLING AND PAYMENT .......... 11

Article X. LAWS AND REGULATIONS .......... 13

Article XI. FORCE MAJEURE .......... 13

Article XII. INSURANCE .......... 14

Article XIII. POSSESSION OF OIL, INDEMNIFICATION AND WARRANTY OF TITLE .......... 20

Article XIV. NOTICE .......... 23

Article XV. REPRESENTATIONS AND WARRANTIES .......... 24

Article XVI. OTHER PROVISIONS .......... 25

Exhibit A Dedicated Leases

Exhibit B Receipt Point and Delivery Point

Exhibit C Description of MPOG System

Exhibit D Quality

Exhibit E MDQ Profile

Exhibit F Gravity Bank Procedure

Exhibit G Measurement Practices

Exhibit H Approved Engineering Firms

Exhibit I Form of Memorandum

Exhibit J Producer’s Loss Allowance Methodology

# OIL GATHERING AGREEMENT

THIS OIL GATHERING AGREEMENT (this "Agreement"), dated January 24, 2022 ("Execution Date"), is made by and between Anadarko US Offshore LLC ("Producer") and Main Pass Oil Gathering Company, LLC ("Gatherer"). Producer and Gatherer are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

WHEREAS, Producer holds certain interests in offshore Gulf of Mexico leases described in EXHIBIT "A" (such leases described in EXHIBIT "A", the "Dedicated Leases"), and plans to deliver its working interest share of crude oil and condensate from the Dedicated Leases ("Dedicated Oil") to Gatherer's 18" Main Pass Oil Gathering System (the "MPOG System") beginning in Main Pass 289, via the Producer-owned Horn Mountain Spar (the "Spar") in Mississippi Canyon Block 127 and the associated Producer-owned Horn Mountain Pipeline ("HMPL"); and

WHEREAS, Producer desires to dedicate and deliver to the MPOG System at the Receipt Point defined on EXHIBIT "B," all Dedicated Oil. The interconnect between the HMPL and the MPOG System will be established pursuant to that certain Offshore Connection Agreement between the Parties dated January 24, 2022 (the "Interconnect Agreement"); and

WHEREAS, upon the Commencement Date (as defined in Section 2.2 of this Agreement), Gatherer will receive into the MPOG System, subject to the terms, conditions, and limitations of this Agreement, all Dedicated Oil for delivery, for the account of Producer (or its Designee, as defined below), to Crescent Midstream, LLC ("Crescent") at the Main Pass 69E ("MP 69E") terminal facilities for further downstream delivery to Shell Pipeline Company's ("Shell") Main Pass Block 69P ("MP 69P") terminal facilities located in Plaquemines Parish, Louisiana or, alternatively, such other mutually agreeable Alternative Delivery Point(s) (as defined in EXHIBIT "B"), as may become available in the future; and

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I. SCOPE OF AGREEMENT

1.1 **Oil Gathering.** Subject to the terms, conditions, and limitations herein, and commencing on the Commencement Date, Producer agrees to deliver to the Receipt Point, and Gatherer agrees to receive and accept into its MPOG System at the Receipt Point and to deliver to Crescent Midstream at the Main Pass 69E Delivery Point or other mutually agreed Alternative Delivery Point, for the account of Producer, or its Designee, Dedicated Oil. For purposes of this Agreement, "Designee" shall mean any person or business entity who has been designated by Gatherer or Producer to perform some duty or carry out some specific role on behalf of such Party.

1.2 **Memorandum.** If requested by the Gatherer, Producer agrees to execute a memorandum, which shall be substantially in the form attached hereto as EXHIBIT "I", that sets forth the principal terms of this Agreement, which may be filed by Gatherer in the real property records of all applicable jurisdictions.

1.3 **Loss Allowance.** From and after the Commencement Date, Gatherer shall operate and maintain the MPOG System and shall redeliver to the Delivery Point all quantities of Dedicated Oil received

at the Receipt Point, less Producer's Loss Allowance, which Gatherer shall retain. Producer's Loss Allowance shall be determined according to the methodology set forth in EXHIBIT “J”; provided, however, Producer’s Loss Allowance will not exceed two-tenths of one percent (0.20%) of the Dedicated Oil delivered to Gatherer under this Agreement in any calendar quarter; and, provided, further, Producer’s Loss Allowance will initially be one-eighth of one percent (0.125%).

1.4 **Quantity**.

a) **Quantity**. Subject to the limitations stated herein, Gatherer shall, on a Firm Service basis (as defined below), receive and accept at the Receipt Point and gather on behalf of Producer (or Producer's Designee) on each day all quantities of Dedicated Oil delivered by Producer, or its Designee, to the Receipt Point, subject to this Section 1.4 and all other limitations, terms, and conditions of this Agreement, immediately upon Producer's delivery thereof to the Receipt Point. If Gatherer gives notice of capacity limitations in accordance with Section 8.4, beginning on the first day after the date specified in such notice that the nominations for the MPOG System are greater than the capacity of the MPOG System, and continuing during the period specified in such notice, Gatherer shall only be obligated to accept at the Receipt Point a quantity of Dedicated Oil equal to the Maximum Daily Quantity for the Receipt Point.

b) **Maximum Daily Quantity.** “Maximum Daily Quantity” or “MDQ” shall mean the maximum daily quantity of Dedicated Oil, expressed in units of barrels per day, which Gatherer is obligated to receive (excluding Producer’s Loss Allowance) and transport on a Firm Service basis, in all cases subject to the other provisions hereof, including this Section 1.4, for the account of Producer on each day during the Delivery Period from the Receipt Point to the Delivery Point. Gatherer shall not sell more Firm Services than the design of the pipeline capacity at a maximum allowable operating pressure of up to 1950 psig at the Receipt Point. “Firm Service” means a service that is not subject to interruption except as provided elsewhere in this Agreement including as a result of Force Majeure, but in any event, a level of service equal to no less than the highest level of service offered to any person by Gatherer for gathering on the MPOG System. “Delivery Period” means a calendar quarter as depicted on the MDQ Profile, as defined below. The first Delivery Period shall begin on the Commencement Date and terminate at the end of the then-current calendar quarter. “MDQ Profile” means, with respect to the Dedicated Leases (and as updated or modified as provided for herein), Producer’s good faith estimate of the Dedicated Leases total quantity (by Delivery Period) of Dedicated Oil to be produced for the remaining life of the Dedicated Leases, in the form set forth in EXHIBIT “E” and as may be modified from time to time in accordance with this Agreement. Gatherer agrees to reserve MDQ for the Producer according to the MDQ Profile on EXHIBIT “E”, as revised from time to time.

The Parties agree that Gatherer may temporarily curtail receipt of Dedicated Oil due to routine operations and maintenance on the MPOG System, provided that Gatherer shall use commercially reasonable efforts to coordinate with Producer and schedule routine operations and maintenance so as to avoid service interruptions. To the extent reasonably known by Gatherer, Gatherer shall notify Producer in writing of the routine

operations and maintenance projects that it or any known downstream pipelines have planned for each upcoming year and shall immediately notify Producer of any unplanned operations and maintenance projects. Gatherer shall use reasonable efforts to provide at least six (6) months' advance notice of planned routine operations and maintenance projects to Producer.

c) **Contract Year**. "Contract Year" means the balance of the year beginning on the Commencement Date and each year occurring thereafter.

d) **MDQ Adjustments.**

1. On or before October 1st of each Contract Year occurring following the Commencement Date and as long as this Agreement is in effect, Producer shall submit to Gatherer an updated MDQ Profile for the Dedicated Leases. The adjusted MDQ Profile shall be effective the first day of the succeeding Delivery Period.

2. On January 1st of each Contract Year occurring following the fifth (5th) anniversary of the Commencement Date, and as long as this Agreement is in effect, Gatherer shall have the right to adjust Producer's MDQ Profile downwards if Dedicated Oil produced during the preceding twelve (12) consecutive months is less than seventy-five percent (75%) of the then-current MDQ Profile. In the event Gatherer elects to reduce Producer's MDQ Profile for said Contract Year, Gatherer will provide sixty (60) days' prior written notice to Producer and shall reduce the MDQ Profile to equal one hundred ten percent (110%) of Producer's highest month of Dedicated Oil produced during the preceding twelve (12) consecutive months.

3. In order to avoid oversubscription of the MPOG System, Gatherer may cause a downward adjustment of Producer's proposed MDQ Profile using the form set forth in EXHIBIT "E" only for any Delivery Period in which (i) an updated MDQ Profile indicates an increase relative to the previously-established MDQ Profile, and (ii) such increase results in total MPOG System anticipated throughput exceeding the actual capacity of the MPOG System, when in total with other Firm Service contracted MDQ Profiles for the MPOG System.

4. If, in Gatherer's reasonable, good faith opinion, any MDQ Profile submitted by Producer fails to reflect a reasonable forecast of Dedicated Oil production for the Dedicated Leases, Gatherer shall, within thirty (30) days of receiving the MDQ Profile, notify Producer in writing of Gatherer's disagreement therewith, which notice shall include Gatherer's detailed explanation as to why the MDQ Profile does not reflect a reasonable forecast of Dedicated Oil production for the Dedicated Leases, or if Gatherer wants to decrease Producer's MDQ pursuant to this Section 1.4 and Producer does not agree to such decrease, then in either case the dispute resolution procedures set forth in Section 16.5 shall govern. Gatherer and Producer shall, during the thirty (30) days following the date of Producer's receipt of said notice ("Notice Date"), make a good faith attempt to agree on a reasonable replacement MDQ Profile. When agreed upon, such replacement MDQ Profile shall be immediately

effective. If Gatherer and Producer cannot reach agreement on such replacement MDQ Profile within such thirty (30)-day period, then each Party shall, no later than sixty (60) days following the Notice Date, submit data reasonably supporting its position to one of the engineering firms listed on EXHIBIT "H" to this Agreement. The engineering firm selected from EXHIBIT "H" must be independent of each Party and each Party's affiliates and shall be mutually selected by the Parties. For the purpose of this Agreement, "affiliates" shall mean any person which (a) controls either directly or indirectly a Party, or (b) is controlled directly or indirectly by such Party, or (c) is directly or indirectly controlled by a person which directly or indirectly controls such Party, for which purpose "control" shall mean the right to exercise fifty percent (50%) or more of the voting rights in the appointment of the directors or similar representation of a person. Within ninety (90) days following the Notice Date, such engineering firm, in consultation with Producer and Gatherer, shall issue a report establishing Producer's replacement MDQ Profile. Such replacement MDQ Profile shall be binding on Producer and Gatherer for purposes of this Agreement and shall become effective the first Day of the next Delivery Period. All costs and fees of the engineering firm with respect to the development of the replacement MDQ Profile under this Section shall be shared 50% to Gatherer and 50% to Producer, unless the engineering firm issuing the report finds the MDQ Profile submitted by Producer to be accurate and validated by the supporting data submitted by Producer without change to the MDQ Profile, in which case, Gatherer will be solely responsible for the costs of such engineering firm. This Agreement shall be automatically deemed amended to reflect any adjustments to the MDQ Profile made pursuant to this Section.

e) **Release from Dedication**.

1. **Temporary Release**. In the event Producer delivers to Gatherer written notice of any Dedicated Oil that Producer is ready, willing and able to deliver in accordance with this Agreement, but that Gatherer is unable or fails to confirm or receive at the Receipt Point for reasons other than Force Majeure or Producer's acts or omissions ("Gatherer Inability"), then Producer and Gatherer shall discuss the cause and anticipated duration of such Gatherer Inability. Gatherer shall diligently work to remove the cause and use commercially reasonable efforts to begin or resume receiving and transporting the quantities of Dedicated Oil that Gatherer is unable or fails to confirm or receive as a result of Gatherer Inability (the "Impacted Quantities") as soon as possible. Thirty (30) Days after Producer's written notice above and the exercise of commercially reasonable efforts by the Parties (including exploring the possible use by the Parties of alternative downstream pipelines), if there are still Impacted Quantities, such Impacted Quantities will be temporarily released for the duration of such Gatherer Inability (subject to the remainder of this Section 1.4(e)) from the Dedication, and Producer may tender such Impacted Quantities for transportation on another system and will use commercially reasonable efforts to limit any such tender to a period that coincides as much as reasonably practicable

with the anticipated duration of the Gatherer Inability, provided that in no event will the Impacted Quantities be returned for transportation and be subject to the Dedication under this Agreement later than the first day of the month that occurs following sixty (60) days after receipt by Producer of Gatherer's written notice that it is able to accept the Impacted Quantities, unless Gatherer previously represented to Producer a specific period of time to take action to enable Gatherer to receive the Impacted Quantities, and Producer relied on such representation in committing to alternate transportation arrangements.

2. **Permanent Release.** In the event a Gatherer Inability lasts for more than ninety (90) consecutive or one hundred and twenty (120) non-consecutive Days during any rolling twelve (12) month period, Producer may request in writing from Gatherer a prospective permanent release of up to the average daily Impacted Quantities from the obligations set forth in Article IV. Within thirty (30) days of the date of receipt of Producer's release request, Gatherer shall review with Producer the steps or actions Gatherer is taking, or proposes to take, to enable Gatherer to receive the Impacted Quantities from Producer. If Producer agrees, in its reasonable judgment and if such steps and/or actions that Gatherer is proposing to take will enable Gatherer to receive the Impacted Quantities from Producer as soon as possible, but no later than twelve (12) months from the date of review and Producer or Gatherer, as applicable, has received approval of such steps and/or actions by any applicable governmental authority, Gatherer will commence remedial action immediately after notice of Producer's agreement. If such steps and/or actions are not ultimately approved by the applicable governmental authority, then at Producer's option the Impacted Quantities will be immediately and permanently released and if the Impacted Quantities constitute seventy percent (70%) or more of Producer's MDQ, then Producer may terminate this Agreement. If Gatherer is unable to receive deliveries of the Impacted Quantities from Producer at the end of such twelve (12) month period, such Impacted Quantities will be permanently released from this Agreement upon such expiration of the twelve (12) month period and if the Impacted Quantities constitute seventy percent (70%) or more of Producer's MDQ, then Producer may terminate this Agreement.

   Should the MPOG System maximum pressure be changed to 1,700 psig or below for longer than one hundred and eighty (180) consecutive days while Dedicated Oil is being transported on the MPOG System, and such change results in a Gatherer Inability to receive deliveries of Dedicated Oil constituting ninety percent (90%) or more of Producer's MDQ from Producer, then Producer may request in writing from Gatherer a prospective permanent release of all Dedicated Oil, and Gatherer will grant such request in writing in the event the MPOG System's maximum pressure is not permanently restored to above 1,700 psig within sixty (60) days of such Producer request.

f) **Right of First Refusal**. If Gatherer receives a bona fide offer from any third party to contract for firm transportation on the MPOG System (excluding, however, the current offer of up to 12,500 bbls/d MDQ, for which discussions are in progress with a third party, as of the Execution Date) (a "Transportation Offer") from the Execution Date through the twelfth (12th) anniversary of the Execution Date, then Producer shall have a right of first refusal with respect to such offered firm transportation service, and Gatherer shall provide Producer written notice containing the terms of such Transportation Offer prior to entering into a contract for the offered firm transportation service (the "Transportation Offer Notice"). The Transportation Offer Notice shall specify all key terms of the Transportation Offer, including the applicable offered capacity, the receipt point, the delivery point, term, and price. Upon Producer's receipt of the Transportation Offer Notice, Producer shall have the exclusive right to participate in the Transportation Offer by entering into a firm gathering service agreement upon the terms specified in the Transportation Offer Notice by sending written notice of such participation to Gatherer within sixty (60) days after Producer's receipt of the Transportation Offer Notice (the "Offer Response Time"). If Producer fails to exercise its right of first refusal with respect to a Transportation Offer Notice within the Offer Response Time, then Producer will be deemed to have waived its right of first refusal with respect to such Transportation Offer. Notwithstanding the foregoing, Producer's rights under this paragraph are subject to any requirement applicable to Gatherer and its operation under federal and state law, including the Outer Continental Shelf Lands Act, as amended.

**ARTICLE II. TERM**

2.1 **Term.** This Agreement shall become effective on the Execution Date and, unless sooner terminated as provided in Section 2.3, shall continue in full force and effect until the economic life of all of the Dedicated Leases has expired, as determined by the Producer in its sole discretion (the "Term"); provided, however, that expiration of the economic life of a Dedicated Lease shall include reversion of ownership of such Dedicated Lease to the applicable regulatory authority, including the Bureau of Ocean Energy Management or its successor entity.

2.2 **Commencement Date**. For purposes of this Agreement, the term "Commencement Date" shall mean the date on which the last of the following to occur, occurs:

a) execution of both of the Interconnect Agreement and this Agreement;

b) Oxy Mechanical Completion as defined in, and in accordance with, the Interconnect Agreement of, and receipt of all regulatory and/or governmental approvals required for, the Interconnecting Pipeline (as defined in the Interconnect Agreement), the Isolation Valve (as defined in the Interconnect Agreement), and the Connection Facilities (as defined in the Interconnect Agreement); and

c) Producer's initiation of the flow of Dedicated Oil into the MPOG System; provided, however, that Producer shall not initiate the flow of Dedicated Oil into the MPOG System unless and until items (a) and (b) above have occurred.

2.3 **Termination.** This Agreement shall become terminable by the Party indicated upon the occurrence of any of the following:

a) by either Party, in accordance with Section 11.3 (Force Majeure termination);

b) by Gatherer, in accordance with Section 2.5 (uneconomic);

c) by Gatherer, in accordance with Section 9.6 of this Agreement (default);

d) by either Party, upon termination of the Interconnect Agreement;

e) by Gatherer if, within sixty (60) days following notice from Gatherer to Producer of MPOG Mechanical Completion as defined in, and in accordance, with the Interconnect Agreement of, and receipt of all regulatory and/or governmental approvals required for, the Interconnecting Pipeline (as defined in the Interconnect Agreement) and the Isolation Valve (as defined in the Interconnect Agreement), Producer has not initiated the flow of Dedicated Oil into the MPOG System and such failure to initiate flow is not directly caused by the actions of Gatherer; provided, however, if Producer is using commercially reasonable efforts to initiate such flow, such sixty (60) day period shall be extended up to an additional thirty (30) days (unless such time period is further extended by mutual agreement of the Parties); or

f) by Producer, in accordance with Section 1.4(e)(2) (permanent release).

In the event either Party elects to terminate this Agreement in accordance with this Section 2.3, the terminating Party shall provide timely written notice to the other Party outlining the reason for termination and any particulars that support such election.

2.4 **Reimbursement Amount**. In the event this Agreement is terminated in accordance with Section 2.3, the terms of Section VI(3) of the Interconnect Agreement shall apply.

2.5 **Uneconomic**. Notwithstanding the provisions of Section 2.1 above, at any time after a period of twelve (12) years from the Commencement Date, if this Agreement has not yet been terminated pursuant to this Article II and Producer wishes to continue service under this Agreement but (i) Oil volumes from Producer and all other producers on the MPOG System are such that, for each month, Gatherer's costs to operate (and/or repair, if applicable) the MPOG System (not including depreciation or decommissioning costs) exceed the sum of (1) the revenue and (2) any other consideration derived by Gatherer related to the MPOG System (including any Insurance Amounts as may be applicable to repair damage to the MPOG System), and (ii) Gatherer reasonably and in good faith expects such adverse economic conditions with no reasonable expectation to recover, then Gatherer may so notify Producer of this adverse economic condition in writing and shall provide all supporting documentation with such notice. After Producer's receipt of all supporting documentation reasonably requested, the Parties under this Agreement shall negotiate in good faith to amend this Agreement in a manner that will alleviate this adverse economic condition. If the Parties are not able to agree to such amendment within the later of (i) three (3) months from the date of Gatherer's notice or (ii) three (3) months from the date that Gatherer delivers all

relevant supporting documentation to Producer (if Producer has requested supporting documentation), then Gatherer may cease operation of the MPOG System after eighteen (18) months' prior written notice to Producer and all other shippers on the MPOG System and terminate this Agreement. For clarification, notice of intent to cease operations will be issued after the three (3) months' deliberation noted above. For purposes of this Section 2.5, the date on which the Gatherer ceases operation of the MPOG System will be the termination date.

**ARTICLE III. RECEIPT POINT PRESSURE**

Producer shall deliver, or cause to be delivered, Dedicated Oil to the Receipt Point at sufficient pressure to enter the MPOG System, but not to exceed 1,950 psig, or such lower pressure as Gatherer may establish from time to time due to normal operational interruption, subject to Section 1.4(e)(2). In no event will Producer be required to deliver Dedicated Oil to the Receipt Point at a pressure that exceeds the capability of the upstream pipeline at the Receipt Point. In no event shall Gatherer be obligated to operate at a reduced pressure to accommodate Dedicated Oil.

**ARTICLE IV. DEDICATION OF LEASES**

As of the Commencement Date, Producer dedicates to Gatherer for the economic life of the Dedicated Leases, pursuant to the terms and conditions of this Agreement, (i) the Dedicated Oil and (ii) all of the rights, titles and interest of Producer and of its affiliates and its and their successors and assigns in and to the Dedicated Leases as they relate to the Dedicated Oil. Producer conveys to Gatherer, as a servitude in the nature of a real covenant burdening all of the rights, titles, and interests of Producer and of its affiliates and its and their successors and assigns in and to the Dedicated Leases and the Dedicated Oil, the exclusive right to receive from Producer, gather, and deliver, all of Dedicated Oil (the "Dedication"). Notwithstanding the foregoing, Producer reserves the right to (i) deliver royalty Oil directly to a royalty owner, (ii) process Dedicated Oil prior to delivery by the use of such processes that normally occur on an offshore production facility, (iii) operate the Dedicated Leases free from control of Gatherer, including, without limitation, the right (but not the obligation) to drill new wells, to repair and rework old wells, to shut in wells, plug and abandon wells and relinquish any or all of the Dedicated Leases in whole or in part; and (iv) use Dedicated Oil as reasonably necessary for lease and Horn Mountain Platform operations. As of the Commencement Date, this Agreement shall be a covenant running with the Dedicated Leases that burdens Producer's and/or its affiliates and its and their successors and assigns interests in the Dedicated Leases. After the Commencement Date, Producer shall not assign all or any portion of its interest in the Dedicated Leases unless the Producer imposes on the assignee, and the assignee assumes in the conveyance instrument for such Dedicated Leases, the obligations of this Agreement as well as the obligation to impose such similar assumption obligation on any subsequent assignee of the Dedicated Leases. Such imposition of, and assumption of, the obligations under this Agreement shall have the effect of releasing the assigning Party from any further obligations hereunder after the effective date of such transfer, but only insofar as to the interest transferred. Any assignment done not in accordance with this Article IV shall be void ab initio.

Producer may dedicate to Gatherer under this Agreement additional Producer owned leases within seven (7) years from the Execution Date so long as written notice is provided by Producer and the MPOG System has sufficient capacity. Such new leases will be amended into the Agreement as part of Dedicated Leases and be provided the same rights and obligations as Dedicated Leases existing as of the Execution Date.

It is the intent of the Parties that all of the terms, covenants, provisions and conditions of this Agreement, including the Dedication, are: (i) deemed to be covenants running with the land with respect to the Dedicated Leases; and (ii) binding on the respective successors and assigns of the interest of Producer and each of its affiliates in and to the Dedicated Lease(s) and the Dedicated Oil.

**ARTICLE V. GATHERING FACILITY**

A description of the MPOG System is shown in EXHIBIT “C”. It is understood that EXHIBIT "C" may be modified from time to time by Gatherer upon notice to Producer. Any reference in this Agreement to the "MPOG System" shall apply to the latest configuration of the MPOG System shown on EXHIBIT “C” (as modified pursuant to this Article V) at the time the Agreement is to be applied.

**ARTICLE VI. GATHERING FEE**

Subject to Section VI(3) of the Interconnect Agreement, Producer shall pay Gatherer a Gathering Fee of seventy cents ($0.70) per barrel of Dedicated Oil delivered by Producer to the Receipt Point (the "Gathering Fee"). The Gathering Fee shall escalate one percent (1%) (rounded to the nearest one-tenth of a cent) per annum beginning January 1, 2027, and each January 1 thereafter until a maximum rate of eighty-five cents ($0.85) per barrel is reached. Once reached, the Gathering Fee will be held constant.

**ARTICLE VII. QUALITY AND MEASUREMENT**

7.1 **Quality.** All Dedicated Oil tendered by Producer to Gatherer at the Receipt Point and delivered by Gatherer to Producer at the Delivery Point shall conform to the minimum quality specifications set forth in EXHIBIT “D”, the quality requirements of any pipeline transporting Producer's Dedicated Oil immediately downstream of current or future Delivery Points (including the Shell Pipeline Delta System originating at Crescent’s pump station at MP 69E) and any more stringent requirements prescribed by law from time to time. Gatherer shall not accept for shipment through the MPOG System any Dedicated Oil production unless it meets the minimum quality specifications set forth in EXHIBIT “D”. Only merchantable Dedicated Oil production shall be accepted into the MPOG System. No liquefied petroleum gases or crude oil to which liquefied petroleum gases have been added shall be delivered into the MPOG System.

Gatherer will consider on a case-by-case basis, in consultation with the downstream pipelines, any request by Producer to temporarily transport non-conforming quality specification Dedicated Oil (“Non-Conforming Dedicated Oil”); provided that the decision to accept such request shall be in Gatherer’s sole discretion. Such request shall be in writing and shall contain the following information: (i) Producer’s cause for transporting Non-Conforming Dedicated Oil, (ii) a detailed account of the quality specifications of the Non-Conforming Dedicated Oil and how such quality specifications differ from the minimum quality specifications set forth in EXHIBIT “D”, (iii) the volume of Non-Conforming Dedicated Oil being transported and (iv) the duration in which the Non-Conforming Dedicated Oil will flow through the MPOG System. Gatherer will then respond in writing whether the MPOG System can or cannot accept such Non-Conforming Dedicated Oil. In the event Gatherer approves transport of Non-Conforming Dedicated Oil, such approval may be rescinded at any time by Gatherer in Gatherer’s sole discretion via written notification to Producer.

Producer shall be responsible for furnishing and injecting chemicals into the pipeline to mitigate against corrosion, paraffin, coagulation, sludge build-up, or any other problem as directed by Gatherer in the event that Dedicated Oil does not meet the minimum quality specifications set forth in EXHIBIT “D”.

It is recognized that Dedicated Oil will be commingled for handling and that all production on the MPOG System will lose its identity and distinguishing characteristics. Therefore, it is agreed that Gatherer will establish a gravity bank in which Producer and all other third-party producers on the MPOG System shall be required to participate.

7.2 **Gravity Bank.** The gravity bank procedure in EXHIBIT “F” shall apply to Dedicated Oil gathered under this Agreement.

7.3 **Sulfur Bank**. Upon the request of any shipper on the MPOG System, Gatherer shall establish and maintain a market-based sulfur bank (the “Sulfur Bank”) that is unanimously acceptable to all shippers (including Producer) on the MPOG System and reasonably acceptable to Gatherer. If the shippers are unable to unanimously agree upon the terms of the Sulfur Bank, then Gatherer shall establish and maintain the Sulfur Bank as applicable, on behalf of all shippers, with terms and conditions deemed acceptable by Gatherer and a shipper group representing a minimum of seventy-five percent (75%) of the oil throughput on the MPOG System for the year in which the sulfur bank is established. The Sulfur Bank will make adjustments based on the average sulfur content of the common oil stream in the MPOG System and the sulfur content of the Dedicated Oil at the Receipt Point.

7.4 **Measurement**. The Lease Automatic Custody Transfer (“LACT”) unit, or other mutually approved measurement equipment for metering receipts into the MPOG System shall be located on the Spar and shall be owned, maintained, and operated by Producer (“LACT Meter Facility”). Producer shall ensure that measurement equipment for receipts into the MPOG System be designed, constructed, installed, operated, maintained, modified, replaced, calibrated, and proved in accordance with measurement practices set forth in EXHIBIT “G”, as such practices may be amended by Gatherer from time to time as mutually agreed to by the Parties. The same equipment and practices shall be adhered to by Gatherer, only to the extent that such may relate to its ownership and operation of the measurement equipment for deliveries from the MPOG System at MP 69E or future Delivery Points. The Parties shall have the right to witness and verify all such activities and measurements applicable to this Agreement.

**ARTICLE VIII. ALLOCATION AND NOMINATIONS**

8.1 The Parties recognize that it is essential to ensure the continual flow of production through the MPOG System. Accordingly, Gatherer has the right to refuse Dedicated Oil until it receives evidence that Producer has made necessary arrangements for acceptance of delivery downstream of the MPOG System. If there is a failure of Producer taking Dedicated Oil at its destination, then Gatherer shall have the right to notify Producer in advance of its intent and to sell such Dedicated Oil at private sale for the best price obtainable if Producer has not remedied the situation within twenty-four (24) hours. Out of the proceeds of said sale, Gatherer may pay itself all necessary expenses of the sale and the balance shall be turned over to Producer with supporting details of such transaction.

8.2 The production delivered and metered at the MPOG System Delivery Point(s) shall be allocated by Gatherer to each point of receipt into the MPOG System (or to laterals connected to the MPOG System) in the ratio that the net metered volume for such Receipt Point bears to the total of the net metered volumes for all points of receipt into the MPOG System. Any physical losses occurring in any of the lateral lines or segments shall be borne by the shippers on such lateral lines or segments in proportion to throughput during the period when such physical loss occurred. "Net metered volume" means the volume of production received into the MPOG System at the Receipt Point as determined by adjusting the gross metered volume for meter calibration factor, compressibility, and temperature (corrected to 60 degrees F), and the BS&W content of such production.

8.3 After the completion of the production month, Gatherer will provide Producer with an "Allocation of Oil Report" which details receipts and deliveries for the MPOG System. Producer shall provide Gatherer with volume allocation for HMPL shippers/interest owners that correspond with Gatherer provided Allocation of Oil Report. This information shall be furnished to Gatherer by the 15th day of the month following receipt of the Allocation of Oil Report.

8.4 Producer shall nominate Dedicated Oil production to the MPOG System monthly in accordance with the nomination requirements as established by Gatherer from time to time, which nomination requirements shall be consistent with Gatherer's nomination procedures for other similarly situated oil gathering pipelines operated by Gatherer. Gatherer shall give Producer at least thirty (30) days' written notice prior to modifying or changing such nomination procedures. In any given month, if nominations for the MPOG System are greater than the capacity of the MPOG System, Gatherer shall give Producer at least forty-eight (48) hours' written notice prior to such date on which such capacity limitations shall take effect as to Producer.

**ARTICLE IX. BILLING AND PAYMENT**

9.1 **Monthly Payment.** Beginning on the Commencement Date and continuing throughout the Term hereof, Producer shall pay Gatherer each month, the product of the Gathering Fee, in accordance with Article VI, then in effect, multiplied by the actual net quantity of Dedicated Oil measured at the Receipt Point and allocated to Producer in each such month after deducting Producer's Loss Allowance from such quantity.

9.2 **Authorized MDQ Overrun**. Gatherer may authorize Producer to deliver at the Receipt Point(s) daily overrun quantities ("Daily Overrun") of Dedicated Oil to the extent that, in the sole judgment of Gatherer, the capacity for the MPOG System will permit such gathering service without jeopardizing the ability of Gatherer to meet all of its other Firm Service obligations. The term "Authorized Daily Overrun Quantity" shall mean the quantity of Dedicated Oil which is authorized and received by Gatherer during any day in excess of Producer's MDQ. Any request for Authorized Daily Overrun Quantity must be made by Producer at least twenty-four (24) hours prior to the beginning of the day to which such request relates.

9.3 **MDQ Notice Waiver**. Gatherer may waive a part or all of such advance notice requirement, if in its judgment, operating conditions permit such waiver.

9.4 **Billing.** From and after the Commencement Date, Gatherer shall bill Producer on or before the

tenth (10th) day of each month for amounts owing under Section 9.1 for the preceding month. Producer shall pay Gatherer within twenty (20) days of receipt of the bill, regardless of whether billed before, on, or after the tenth (10th) day of the month, the amount specified on the bill unless the bill is disputed in accordance with the provisions of Section 9.5. Such payment shall be by wire transfer or ACH.

9.5 **Disputed Payment.** Producer may in good faith dispute the amount of any such bill. Producer shall timely pay to Gatherer all amounts which Producer concedes are correct. Producer and Gatherer agree to begin discussions to settle any amount in dispute within thirty (30) days of written notice by one Party to the other of such dispute. No payment by Producer of the amount of a disputed bill shall prejudice the right of Producer to claim an adjustment of the disputed bill. In the event the Parties are unable to resolve an invoice dispute in good faith within sixty (60) days from presenting all support of disputed position, the Parties will engage the process outlined in Section 16.5 of this Agreement.

9.6 **Default.** Should Producer fail to pay part or all of the amount of any undisputed bill after thirty (30) days from the date payment is due, Gatherer may charge interest at an annual rate equal to the prime rate of Citibank, N.A., New York, New York (or any successor thereto) plus two percent (2%) on the unpaid portion of the bill computed from the date payment is due until the date payment is received. If such failure to pay any undisputed bill continues for thirty (30) days after payment is due, Gatherer shall issue a notice of default to Producer and if such default is not cured within thirty (30) days of receipt by Producer of such notice, in addition to any other remedy it may have hereunder or otherwise, may suspend further service for Producer under this Agreement until such undisputed amount is paid, or terminate this Agreement upon notice to Producer.

9.7 **Audit.** Each Party shall have the right at all reasonable times during the Term and within two (2) years following termination to examine the books and records of the other Party to the extent necessary to verify the accuracy of any statement, charge, computation, invoice, or demand made pursuant to, or otherwise related to the services, obligations or rights provided by this Agreement. The Parties shall preserve all the aforesaid documents so as to satisfy this provision. Any payment shall be final as to both Parties unless questioned within two (2) years from the date of such payment.

9.8 **Producer Bankruptcy**. In the event the Producer applies for bankruptcy or is forced into bankruptcy under Title 11 of the United States Code, 11 U.S.C. 101, et seq., (the "Bankruptcy Act"), or if Gatherer, in its sole but reasonable opinion, has reason to believe that Producer may not be capable of meeting its obligations set out in this Agreement and Producer does not provide adequate assurance of its capability to Gatherer in a form reasonably acceptable to Gatherer and in an amount not to exceed the prior two (2) months of payments by Producer to Gatherer hereunder, then Gatherer may suspend further service under this Agreement to the Producer; provided, however, Gatherer shall continue such service if the Producer pays to Gatherer prior to each month, the amount due for services during that month based upon the Producer's nominations for such month or furnishes good and sufficient surety bond, or other good and sufficient security reasonably satisfactory to Gatherer, which shall not exceed the prior two (2) months of payments by Producer to Gatherer hereunder.

9.9 **Gatherer Bankruptcy**. If Gatherer applies for bankruptcy or is forced into bankruptcy under the Bankruptcy Act, Producer may place in escrow all monies due Gatherer under this Agreement until otherwise directed by a bankruptcy court. Gatherer shall not suspend or discontinue service but shall continue its obligations under the Agreement during such time as monies are escrowed or paid as directed by the bankruptcy court.

**ARTICLE X. LAWS AND REGULATIONS**

10.1 **Regulations.** This Agreement is made subject to, and the Parties agree to abide by, all existing and future lawful rules, regulations, orders, codes, and laws of any duly constituted governmental authority having jurisdiction over the Parties or the subject matter hereof.

10.2 **Choice of Law. THIS AGREEMENT AND ALL MATTERS PERTAINING HERETO, INCLUDING MATTERS OF PERFORMANCE, NON-PERFORMANCE, BREACH, REMEDIES, PROCEDURES, RIGHTS, DUTIES AND INTERPRETATIONS OR CONSTRUCTION, SHALL BE GOVERNED BY THE SUBSTANTIVE AND PROCEDURAL LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO CHOICE OF LAW PROVISIONS**. Both Parties consent to the sole and exclusive jurisdiction of any state or federal court located within Houston, Harris County, State of Texas.

**ARTICLE XI. FORCE MAJEURE**

11.1 **Excused Performance.** If either Party is rendered unable, wholly or in part, by Force Majeure to carry out its obligations under this Agreement, other than to make payments due hereunder, it is agreed that on such Party's giving notice and full particulars of such Force Majeure in writing to the other Party as soon as possible after the occurrence of the cause relied on, the obligations of the Party giving such notice, so far as they are affected by such inability, shall be excused for the duration of such Force Majeure event. Force Majeure events shall be remedied, subject to the other provisions hereof, with all reasonable dispatch.

11.2 **Definition.** The term "Force Majeure" as employed herein shall mean any event or circumstance not reasonably within the control of the Party claiming Force Majeure and which, by the exercise of due diligence, such Party has been unable to prevent or overcome, including, to the extent meeting the foregoing requirements, acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, terrorism, war, blockades, insurrections, riots, epidemics, pandemics, lightning, earthquakes, fires, hurricanes, tropical storms and disturbances and other storms, storm warnings, floods, washouts, arrests and restraints of governments and people, orders, requests, directives, restraints and requirements of the government and governmental agencies, civil disturbances, explosions, breakage or accidents to machinery or lines of pipe, freezing of wells or pipelines, emergency maintenance of equipment or facilities, or any other causes not reasonably within the control of the Party claiming suspension, whether similar or dissimilar to any of the foregoing causes. Such term shall likewise include, in those instances where either Party is required to obtain right-of-way grants, permits or licenses to enable such Party to fulfill its obligations hereunder, to the extent meeting the requirements of the lead in to the first sentence of this Section 11.2, the inability of such Party to acquire, or the delays on the part of such Party in acquiring, at reasonable costs and after the exercise of reasonable diligence, such right-of-way grants, permits or licenses. The settlement of strikes or lockouts shall be entirely

at the discretion of the Party involved therein, and the above requirements that any Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of the opposing Party when such course is inadvisable in the discretion of the Party involved.

11.3 **Force Majeure Termination.** Within thirty (30) days after the occurrence of a Force Majeure event, the Party experiencing the Force Majeure event shall give written notice to the other Party of such Party's estimate of the expected duration of the Force Majeure event and such Party's plans to remedy the Force Majeure event.

If the Party claiming Force Majeure fails to cause the Force Majeure event to be remedied within twelve (12) months from the commencement thereof, the Party not experiencing such Force Majeure may, at any time thereafter but prior to the remedying of such Force Majeure, terminate this Agreement to the extent affected by such Force Majeure on thirty (30) days prior written notice.

Notwithstanding the above, if Gatherer experiences a Force Majeure event that causes Producer's Dedicated Oil to be shut-in for more than thirty (30) consecutive days, then Producer may, at its sole cost and expense, temporarily flow such Dedicated Oil to an alternate source. In that event, Gatherer shall notify Producer when it is capable of again receiving Producer's Dedicated Oil production and Producer shall, within sixty (60) days of such notice, resume the flow all its Dedicated Oil to Gatherer. If the repairs to Gatherer's facilities take longer than six (6) months from the date of the Force Majeure occurrence, then Producer may terminate this Agreement on thirty (30) days prior written notice, unless and except if the delays beyond six (6) months are a result of unfavorable weather conditions for making necessary repairs or delays attributed to the availability or procurement of necessary parts or equipment and such situation is known and communicated prior to the expiration of the six month-period. Notwithstanding the preceding, however, if such repairs take longer than twelve (12) months from the date of the Force Majeure occurrence, then Producer may terminate this Agreement on thirty (30) days prior written notice.

**ARTICLE XII. INSURANCE**

12.1 Insurance Producer – Producer shall carry and maintain insurance for duration of this Agreement.

A. Producer agrees to carry and maintain the following insurance, from carriers with an A.M. Best rating of at least A-/VIII:

(a) Statutory Coverage Workers' Compensation Insurance (including Occupational Disease Coverage) in accordance with the laws of the states where the work is to be performed (with such coverage including Other States Endorsement and Voluntary Compensation Endorsement);

(i) If Producer performs work on or adjacent to navigable waterways Producer shall furnish a certificate of insurance showing compliance with the provisions of the Federal Longshoremen's and Harbor Workers' Compensation Law and the Outer Continental Shelf Lands Act.

(ii) Maritime Employers Liability Insurance with limits of liability of not less than $5,000,000 for injury to or death of any one person and not less than $5,000,000 for injury to or death of more than one employee resulting from any one accident. Coverage shall also include transportation, wages, maintenance, and cure, "In Rem" endorsement stating that an action "In Rem" shall be treated as a claim against the insured "in person am" and coverage for Liability under the Merchant Marine Act and Death on High Seas Act.

(b) Employer's Liability Insurance with limits of not less than $5,000,000 per occurrence and $5,000,000 "occupational disease" for each employee.

(c) Commercial General Liability Insurance insuring the indemnity agreement set forth in this contract with a combined single limit of not less than $10,000,000 per occurrence and in the aggregate. All policies shall include blanket/broad form contractual liability, Sudden and Accidental Pollution, Products/Completed Operations, Premises and Operations Coverage.

(d) Comprehensive Automobile Liability Insurance covering liability arising out of any auto (owned, hired, and non-owned); with a combined single limit of not less than $10,000,000. If necessary, the policy shall be endorsed to provide contractual liability coverage.

(e) For work involving a vessel, Producer shall provide or cause owner/operator of the vessel to provide the following insurance:

(i) Hull and Machinery Insurance, covering each vessel owned or bareboat chartered by Producer in connection with the operations under this contract, to the actual value of each vessel and its equipment. If any vessel shall engage in towing operations, said insurance shall include full Tower's Liability with the sistership clause unamended. Coverage shall include full collision liability unless included under the P&I section below.

(ii) Protection and Indemnity Insurance with minimum limits of $25,000,000 per occurrence including coverage for contractual liability, including coverage for crew and personnel on such vessels, Collision and Tower's Liability, Cargo Legal Liability (to the extent applicable), and coverage for liabilities for the removal of wreck or debris as compulsory under statute or where such wreck or debris interferes with the operations of Producer or third parties.

(iii) Charterer's Liability Insurance with minimum limits of $25,000,000 per occurrence to cover liabilities arising out of operation and use of any time or voyage charted vessels including contractual liability and pollution liability.

(iv) Vessel Pollution Liability Insurance on WQIS form (or its equivalent) with limits of at least $25,000,000 per occurrence.

(v) The policies required under (i) and (ii) above shall be endorsed:

1. To provide full coverage to Gatherer Group as additional insured without limiting coverage to liability "as owner of the vessel" and to delete any "as owner" clause or any other language purporting to limit coverage to liability of an insured "as owner of the vessel"; and

2. To delete any language limiting coverage for Gatherer Group in the event of the applicability of the Limitation of Liability Statute.

(f) Umbrella Insurance following the form of the employer's liability, general liability, auto liability, Protection and Indemnity Insurance and Comprehensive Aircraft Liability Insurance set out in Sections 12.1(A)(b), 12.1(A)(c), 12.1(A)(d), 12.1(A)(e) and 12.1(A)(g) with limits of $100,000,000. Such umbrella policy shall be in excess of those underlying policies without gaps in limits and provide coverage at least as broad as the underlying.

(g) Comprehensive Aircraft Liability Insurance with combined bodily injury, including passengers, and property damage liability single limits of not less than $25,000,000 each occurrence. This coverage is necessary only when Producer uses owned or non-owned aircraft in connection with work performed under this Agreement.

The above insurance coverages and limits may be insured through a combination primary or excess/umbrella layers of insurance. Excess/umbrella coverage shall be no less restrictive than the scope of the coverage afforded by the primary layer. Oxy may self-insure for any of the above risks.

B. All insurance policies carried by Producer applicable hereunder shall name Gatherer Group as additional insured with respect to the risks and liabilities assumed by Producer under this Agreement.

C. All insurance policies required to be carried by Producer hereunder shall, with respect to the risks and liabilities assumed by Producer under this Agreement, include a waiver of subrogation against Gatherer Group.

D. Before commencing any performance under this Agreement, Producer shall furnish Gatherer with Certificates of Insurance evidencing insurance coverage and provisions provided for in this Agreement. Failure of Producer to furnish such evidence of insurance coverage shall not be considered a waiver by Gatherer of the requirements for such coverage.

E. With respect to the risks and liabilities assumed by Producer under this Agreement, this insurance shall apply as primary insurance with respect to any other insurance or self-insurance programs afforded to or maintained by or providing coverage to any member of Gatherer Group and shall not require the exhaustion or contribution of any other coverage.

F. Prior to the elimination of any of the required insurance coverage, Producer will endeavor to notify Gatherer no less than thirty (30) days prior to such elimination of the required insurance coverage.

G. Producer shall promptly notify Gatherer when any insurance policy required above is not reasonably available and shall state the reasons, therefore.

H. With respect to the risks and liabilities assumed by Producer under this Agreement, all deductibles, self-insured retentions and self-insurance carried by the Producer under its insurance program are the sole responsibility of the Producer and will not be borne in any way by any member of Gatherer Group. Producer will indemnify Gatherer Group, in full, for any amounts related to the above.

I. Producer shall endeavor to require all its subcontractors to provide the foregoing coverage, as well as any other coverage that Producer may consider necessary.

12.2 Insurance Gatherer - Gatherer shall carry and maintain insurance for the duration of this Agreement.

A. Gatherer agrees to carry and maintain the following insurance, from carriers with an A.M. Best rating of at least A-/VIII.

(a) Statutory Coverage Workers' Compensation Insurance (including Occupational Disease Coverage) in accordance with the laws of the states where the work is to be performed;

(i) If Gatherer performs work on or adjacent to navigable waterways Gatherer shall furnish a certificate of insurance showing compliance with the provisions of the Federal Longshoremen's and Harbor Workers' Compensation Law.

(ii) For Masters and Members of the Crew, insurance with limits of liability of not less than $5,000,000 for injury to or death of any one person and not less than $5,000,000 for injury to or death of more than one employee resulting from any one accident. Coverage shall also include transportation, wages, maintenance, and cure and "In Rem" endorsement stating than an action "In Rem" shall be treated as a claim against the insured "in person am".

(b) Employer's Liability Insurance with limits of not less than $5,000,000 per occurrence.

(c) Commercial General Liability Insurance insuring the indemnity agreement set forth in this contract with a combined single limit of not less than $10,000,000 per occurrence and in the aggregate. All policies shall include blanket/broad form contractual liability, Sudden and Accidental Pollution, Products/Completed Operations, Premises and Operations Coverage.

(d) Comprehensive Automobile Liability Insurance covering liability arising out of any auto (owned, hired, and non-owned); with a combined single limit of not less than $10,000,000. If necessary, the policy shall be endorsed to provide contractual liability coverage.

(e) For work involving a vessel, Gatherer shall provide, or cause owner/operator of the vessel to provide, the following insurance:

(i) Hull and Machinery Insurance, covering each vessel owned or bareboat chartered by Gatherer in connection with the operations under this contract, to the actual value of each vessel and its equipment. If any vessel shall engage in towing operations, said insurance shall include full Tower's Liability with the sistership clause unamended.

(ii) Protection and Indemnity Insurance with minimum limits of $25,000,000 per occurrence including coverage for contractual liability, including coverage for crew and personnel on such vessels, Collision and Tower's Liability, Cargo Legal Liability (to the extent applicable), and coverage for liabilities for the removal of wreck or debris as compulsory under statute or where such wreck or debris interferes with the operations of Producer or third parties.

(iii) Charterer's Liability Insurance with minimum limits of $25,000,000 per occurrence to cover liabilities arising out of operation and use of any time or voyage charted vessels including contractual liability and pollution liability.

(iv) Vessel Pollution Liability Insurance on WQIS form (or its equivalent) with limits of at least $25,000,000 per occurrence.

(v) The policies required under (i) and (ii) above shall, with respect to the risks and liabilities assumed by Gatherer under this Agreement, be endorsed:

1. To provide full coverage to Producer Group as additional insured without limiting coverage to liability "as owner of the vessel" and to delete any "as owner" clause or any other language purporting to limit coverage to liability of an insured "as owner of the vessel"; and

2. To delete any language limiting coverage for Producer Group in the event of the applicability of the Limitation of Liability Statute.

(f) Umbrella and any additional Excess Liability Insurance following the form of the employer's liability, general liability, auto liability, Protection and Indemnity Insurance and Comprehensive Aircraft Liability Insurance set out in Sections 12.2(A)(b), 12.2(A)(c), 12.2(A)(d), 12.2(A)(e) and 12.2(A)(g) with limits of $100,000,000. Such umbrella policy shall be in excess of those underlying policies without gaps in limits and provide coverage at least as broad as the underlying.

(g) Comprehensive Aircraft Liability Insurance with combined bodily injury, including passengers, and property damage liability single limits of not less than $25,000,000 each occurrence. This coverage is necessary only when Gatherer uses owned or non-owned aircraft in connection with work performed under this Agreement.

The above insurance coverages and limits may be insured through a combination primary or excess/umbrella layers of insurance. Excess/umbrella coverage shall be no less restrictive than the scope of the coverage afforded by the primary layer.

B. All insurance policies carried by Gatherer applicable hereunder shall name Producer Group as additional insured with respect to the risks and liabilities assumed by Gatherer under this Agreement.

C. All insurance policies required to be carried by Gatherer shall, with respect to the risks and liabilities assumed by Gatherer include a waiver of subrogation against Producer Group.

D. Before commencing any performance under this Agreement, Gatherer shall furnish Producer with Certificates of Insurance evidencing insurance coverage and provisions provided for in this Agreement. Failure of Gatherer to furnish such evidence of insurance coverage shall not be considered a waiver by Producer of such coverage.

E. With respect to the risks and liabilities assumed by Gatherer under this Agreement, this insurance shall apply as primary insurance with respect to any other insurance or self-insurance programs afforded to or maintained by or providing coverage to any member of Producer Group and shall not require the exhaustion of any other coverage.

F. All insurance policies shall provide that the insurance carrier will notify the Producer no less than thirty (30) days prior to the termination or cancellation of any policy.

G. Gatherer shall promptly notify Producer when any insurance policy required above is not reasonably available and shall state the reasons, therefore.

H. With respect to the risks and liabilities assumed by Gatherer under this Agreement, all deductibles, self-insured retentions and self-insurance carried by Gatherer under its insurance program are the sole responsibility of Gatherer and will not be borne in any way by any member of Producer Group. Gatherer will indemnify Producer Group, in full, for any amounts related to the above.

I. Gatherer shall endeavor to require all its subcontractors to provide the foregoing coverage, as well as any other coverage that Gatherer may consider necessary. In the event of sale or assignment of Producer's facilities, the insurance coverage required of the Gatherer by this Section will extend to Producer's successors-in-interest.

12.3 In the event, and only in the event, non-maritime work is to be performed in or offshore Louisiana for which the Louisiana Oilfield Anti-Indemnity Act (La.R.S. 9:2780) or the Louisiana Construction Anti-Indemnity Act (La.R.S. 9:2780.1) would apply, each Party (as the "Providing Party") shall, as a separate line item, have its insurance brokers or insurers invoice the other Party (as the "Paying

Party”), for the premium for the extension of the Providing Party’s insurance to cover the Paying Party and its Group as an additional insureds (together with a waiver of subrogation and a provision that such coverage is to be primary and non-contributory for the Paying Party and its Group) to the extent of the risks and liabilities assumed by the Providing Party (except that if the Louisiana Construction Anti-Indemnity Act applies, the insurance shall not be required to cover sole negligence of the additional insured). Each Party warrants and represents it has communicated with its brokers and insurer(s) regarding this obligation. Each Party agrees that if such premium shall exceed $5,000.00, the Providing Party shall advise the Paying Party prior to execution of this Agreement. Each Party warrants that such premium shall constitute all of the material cost for such extension of coverage. At each renewal, each Party shall advise the other Party with respect to the amount for the premium required for such extension of coverage and shall arrange to have the other Party invoiced for the appropriate premium.

**ARTICLE XIII. POSSESSION OF OIL, INDEMNIFICATION AND WARRANTY OF TITLE**

13.1 **Possession and Indemnification**.

(a) Subject to Section 13.2 and Section 13.3, Producer shall be deemed to be in control and possession of the Dedicated Oil deliverable hereunder and shall be responsible for, and shall indemnify, release, and hold harmless each member of Gatherer Group from and against, any actions, claims, settlements, judgments, demands, liens, losses, liabilities, damages, fines, penalties, interest, costs, expenses (including expenses attributable to the defense of any actions or claims) and reasonable attorneys’ fees and other legal expenses, costs and losses (including spill response, environmental pollution and contamination, cleanup and remediation costs) (collectively, “Losses”), in each case, relating to damage or harm to the environment arising out of or attributable to the period (1) prior to delivery of the Dedicated Oil by Producer to Gatherer at the Receipt Point and (2) after the Dedicated Oil is redelivered to Producer, or Producer's Designee, at the Delivery Point, **EVEN IF SUCH LOSSES ARISE OUT OF INGRESS, EGRESS, LOADING AND UNLOADING OF PERSONNEL OR CARGO OR ARE CAUSED IN WHOLE OR IN PART BY THE UNSEAWORTHINESS OR UNAIRWORTHINESS OF ANY VESSEL OR CRAFT OR THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT), STRICT LIABILITY, OR OTHER FAULT OF ANY MEMBER OF GATHERER GROUP, BUT NOT TO THE EXTENT DUE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF GATHERER GROUP**. For purposes of this Agreement, "Gatherer Group" shall mean, individually or in any combination, Gatherer and its respective affiliates, members, contractors, subcontractors, vessels and Designees under this Agreement and each of the managers, officers, directors, employees, agents, insurers, invitees and other representatives of Gatherer or its respective affiliates, members, contractors, subcontractors and Designees under this Agreement, and, in each case, any of its or their successors and assigns.

(b) Subject to Section 13.2 and Section 13.3 and EXHIBIT “D”, Section 2, Gatherer shall be deemed to be in control and possession of the Dedicated Oil delivered hereunder and shall be responsible for, and shall indemnify, release and hold harmless each member of Producer Group from and against any Losses relating to damage or harm to the environment arising out of or attributable to the period after delivery of the Dedicated

Oil to Gatherer at the Receipt Point until the Dedicated Oil is redelivered by Gatherer to Producer, or Producer's Designee, at the Delivery Point, **EVEN IF SUCH LOSSES ARISE OUT OF INGRESS, EGRESS, LOADING AND UNLOADING OF PERSONNEL OR CARGO OR ARE CAUSED IN WHOLE OR IN PART BY THE UNSEAWORTHINESS OR UNAIRWORTHINESS OF ANY VESSEL OR CRAFT OR THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT), STRICT LIABILITY, OR OTHER FAULT OF ANY MEMBER OF PRODUCER GROUP, BUT NOT TO THE EXTENT DUE TO THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF ANY MEMBER OF PRODUCER GROUP**. For purposes of this Agreement, "Producer Group" shall mean, individually or in any combination, Producer and its respective affiliates, members, contractors, subcontractors, vessels, joint interest owners, partners, co-venturers, and Designees under this Agreement and each of the managers, officers, directors, employees, agents, insurers, invitees and other representatives of Producer or its respective affiliates, members, contractors, subcontractors and Designees under this Agreement, and, in each case, any of its or their successors and assigns; provided, however, that Producer Group shall not include any member of Gatherer Group.

13.2 **Indemnity for Illness, Injury, or Death. FROM AND AFTER THE COMMENCEMENT DATE, GATHERER SHALL RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS EACH MEMBER OF PRODUCER GROUP FROM AND AGAINST ANY LOSSES ARISING OUT OF, OR OTHERWISE IN RESPECT OF, ILLNESS, INJURY OR DEATH OF INDIVIDUALS OF GATHERER GROUP. FROM AND AFTER THE COMMENCEMENT DATE, PRODUCER SHALL RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS EACH MEMBER OF GATHERER GROUP FROM AND AGAINST ALL LOSSES ARISING OUT OF, OR OTHERWISE IN RESPECT OF, ILLNESS, INJURY OR DEATH OF INDIVIDUALS OF PRODUCER GROUP. THE INDEMNITY OBLIGATIONS SET FORTH IN THIS SECTION 13.2 (INDEMNITY FOR ILLNESS, INJURY, OR DEATH) SHALL INCLUDE LOSSES ARISING OUT OF INGRESS, EGRESS, LOADING AND UNLOADING OF PERSONNEL OR CARGO AND SHALL APPLY EVEN THOUGH AN EVENT GIVING RISE TO INDEMNITY MAY BE CAUSED IN WHOLE OR IN PART BY THE UNSEAWORTHINESS OR UNAIRWORTHINESS OF ANY VESSEL OR CRAFT OR THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT), STRICT LIABILITY, OR OTHER FAULT OF THE INDEMNIFIED PERSON OR ENTITY ("INDEMNITEE"), BUT NOT TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNITEE.**

13.3 **Indemnity for Property Damage. FROM AND AFTER THE COMMENCEMENT DATE, GATHERER SHALL RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS EACH MEMBER OF PRODUCER GROUP FROM AND AGAINST ALL LOSSES ARISING OUT OF, OR OTHERWISE IN RESPECT OF, DAMAGE TO OR LOSS OF PROPERTY OF ANY MEMBER OF GATHERER GROUP. FROM AND AFTER THE COMMENCEMENT DATE, PRODUCER SHALL RELEASE, DEFEND, INDEMNIFY, AND HOLD HARMLESS EACH MEMBER OF GATHERER GROUP FROM AND AGAINST ALL LOSSES ARISING OUT OF, OR OTHERWISE IN RESPECT OF, DAMAGE TO OR LOSS OF PROPERTY OF ANY MEMBER OF PRODUCER GROUP. THE INDEMNITY OBLIGATIONS SET FORTH IN THIS SECTION 13.3 (INDEMNITY FOR PROPERTY DAMAGE) SHALL INCLUDE LOSSES ARISING OUT OF INGRESS, EGRESS, LOADING AND UNLOADING OF PERSONNEL OR CARGO AND SHALL APPLY EVEN THOUGH AN EVENT GIVING RISE TO INDEMNITY MAY BE CAUSED IN WHOLE OR IN PART BY THE UNSEAWORTHINESS OR UNAIRWORTHINESS OF ANY VESSEL OR CRAFT OR THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT), STRICT LIABILITY, OR OTHER FAULT OF THE**

**INDEMNITEE, BUT NOT TO THE EXTENT CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE INDEMNITEE.**

13.4 **WAIVER**. **NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, EXCEPT TO THE EXTENT CLAIMED AGAINST AN INDEMNIFIED PARTY BY A THIRD PARTY, TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY EXPRESSLY RELEASES, AND SHALL CAUSE EACH OF ITS GROUP MEMBERS TO RELEASE, ALL LOSSES AGAINST THE OTHER PARTY AND ITS GROUP FOR PUNITIVE OR EXEMPLARY DAMAGES AND EXPRESSLY RELEASES, AND SHALL CAUSE EACH OF ITS GROUP MEMBERS TO RELEASE, ALL LOSSES FOR THE RELEASING PARTY'S OWN SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, OR DAMAGES ARISING FROM LOST PROFITS, BUSINESS INTERRUPTION, LOST PRODUCTS, OR DELAYED PRODUCTION ("CONSEQUENTIAL DAMAGES"), AGAINST THE OTHER PARTY AND ITS GROUP, IRRESPECTIVE OF WHETHER SUCH LOSSES OR ACTIONS FOR SUCH DAMAGES ARE BASED UPON CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY, OR ANY OTHER REMEDY AT LAW OR EQUITY.**

13.5 **Title, Warranty and Indemnity.** Gatherer warrants to Producer that Gatherer has good title to the MPOG System and has the requisite authority to enter into this Agreement. Title to the Dedicated Oil received by Gatherer from Producer at the Receipt Point shall remain with Producer, or its Designee, during its transportation in the MPOG System. Producer represents that it has the right to deliver Producer's Dedicated Oil for gathering hereunder, free of any adverse claims and Producer will indemnify and defend and hold Gatherer Group harmless from and against any and all losses arising out of or related to any such adverse claims. Gatherer agrees to release, indemnify and hold Producer Group harmless from and against all losses arising from or out of adverse claims related to ownership of the MPOG System or, except as expressly provided otherwise herein, operation of the MPOG System.

Gatherer will not be responsible for any losses resulting from any partial or total failure of title by the shipper tendering production for transportation through the MPOG System. Any lien, mortgage or other encumbrance or charge against production being transported by Producer shall be wholly withstood and suffered by Producer.

13.6 **Risk of Loss**. Notwithstanding anything to the contrary herein, Producer agrees to release, indemnify and hold harmless Gatherer Group from and against all adverse claims of any or all persons to said Dedicated Oil or to royalties or charges thereon, or the value of Dedicated Oil lost while in Gatherer's custody and control as described in Section 13.1 (including any losses attributable to Producer's Loss Allowance), whether or not related to Gatherer's gathering of the Dedicated Oil as provided for in this Agreement. All risk of loss of Producer's Dedicated Oil by Gatherer in the MPOG System with respect to such claims described above shall remain with Producer, EVEN IF SUCH LOSS IS CAUSED BY THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT), STRICT LIABILITY, OR OTHER FAULT OF GATHERER GROUP, BUT NOT IN THE EVENT OF LOSS DUE TO GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF GATHERER GROUP.

13.7 **Taxes and Royalties.**

(a) Gatherer assumes liability for the payment of any taxes and assessments attributed to the MPOG System.

(b) Producer shall be responsible for all royalties and applicable occupation, production, severance, sales, or first use and ad valorem taxes (pertaining to Producer's property value) and all taxes of similar nature or equivalent in effect which are now or hereafter imposed by any authority having jurisdiction over Dedicated Oil gathered pursuant to this Agreement, including any federal, state, or local taxes or costs imposed in relation to greenhouse gas emissions, regardless of whether Producer or Gatherer is given the responsibility for collecting or paying such tax. If Gatherer has paid any such taxes on behalf of Producer, Producer shall remit reimbursement to Gatherer upon receiving an invoice with detail supporting such payment.

13.8 The Parties agree that the indemnities provided by Producer under this Agreement shall be supported by insurance or self-insurance available to Producer, and the indemnities provided by Gatherer shall be supported by insurance or self-insurance available to Gatherer. The minimum limits of insurance supporting the Parties' indemnity obligations shall be the total limits of Producer's insurance (or self-insurance) or the total limits of Gatherer's insurance (or self-insurance) (whether or not required by this Agreement), whichever is less, provided that in no event shall such limits be less than the amount required in Article XII. Any deductibles, self-insurance, or self-insured retention under either Party's insurance policies shall be for the sole account of that Party, and the other Party (and its Group) shall have no liability for same. The Parties agree that the insurance requirements of this Article XIII shall support but not limit the Parties' indemnity obligations, except to the extent mandated by applicable law, including the Texas Civil Practice & Remedies Code at §§ 127.001–007. For the avoidance of doubt, the Parties agree that the requirements to name the other Party (or Gatherer Group or Producer Group, as the case may be) as additional insured contained in Section 12.1(B) and Section 12.2(B) shall apply to any insurance obtained under this Section 13.8.

**ARTICLE XIV. NOTICE**

Unless otherwise provided in this Agreement, any notice, request, order or demand which either Party desires to serve upon the other respecting this Agreement, shall be in writing and shall be considered as delivered when hand delivered or, upon receipt if sent by United States certified mail, postage prepaid or by courier service, and if sent by email, when receipt is confirmed by the recipient via reply email received by the transmitting Party, provided if receipt of an email is confirmed after normal business hours, receipt shall be deemed to be the beginning of the recipient's next business day. Such notice shall be given to the other Party at the following address:

**PRODUCER: Notices/Statements:**

**ANADARKO US OFFSHORE LLC**
1201 Lake Robbins Drive
The Woodlands, TX 77380
Attn: Ms. Heather Breitenbach
Phone: 713-553-1893
Email: heather_breitenbach@oxy.com

With copy to Producer Marketing:

Occidental Energy Marketing, Inc.
5 Greenway Plaza, Suite 110
Houston, TX 77046-0504
Attention: General Counsel
Phone: (713) 366-5890
Fax: (713) 215-7593

**GATHERER: Notices:**

**MAIN PASS OIL GATHERING COMPANY, LLC**
1501 McKinney St., Suite 800
Houston, Texas 77010
Attn: John Ridgway
Phone: (346) 241-3588
Email: jridgway@3cmidstream.com

**PAYMENTS:** To the bank and account number designated on the invoice or to such other address as either Party may designate, from time to time, by notice in the manner provided above.

**ARTICLE XV. REPRESENTATIONS AND WARRANTIES**

15.1 Gatherer Representations. Gatherer represents and warrants to Producer that as of the Execution Date:

(a) Gatherer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware, and Gatherer's principal place of business, chief executive office and the place where it regularly keeps records concerning the construction of MPOG System are kept is: 1501 McKinney Street, Suite 800, Houston, TX 77010.

(b) Gatherer has all requisite power and authority to own and operate the MPOG System and to enter into and perform this Agreement, is qualified to do business in all jurisdictions required for the performance of its obligations pursuant to this Agreement, and has taken all limited liability company actions necessary to authorize its execution and delivery of this Agreement, and such actions have been so duly authorized.

(c) This Agreement has been executed by Gatherer's duly authorized officer or other authorized representative and, upon delivery shall constitute its legal, valid and binding obligations enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy or other similar laws affecting the rights and remedies of creditors generally as well as by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), and no consent or approval of any other person or entity is required in connection with its execution, delivery and performance of this Agreement.

15.2 Producer Representations. Producer represents and warrants to Gatherer that as of the Execution Date:

(a) Producer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware, and Producer's principal place of business and the place where its records concerning the Dedicated Leases are kept is The Woodlands, Texas.

(b) Producer has all requisite power and authority to own and operate its assets, including the Dedicated Leases, and to enter into and perform this Agreement, is qualified to do business in all jurisdictions required for the conduct of its business, and has taken all limited liability company actions necessary to authorize its execution and delivery of this Agreement, and such actions have been so duly authorized.

(c) This Agreement has been executed by Producer's duly authorized officer or other authorized representative and, upon delivery, shall constitute its legal, valid and binding obligation enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy or other similar laws affecting the rights and remedies of creditors generally as well as by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), and no consent or approval of any other person or entity is required in connection with its execution, delivery and performance of this Agreement.

(d) Producer has good title to its interests in the Dedicated Leases free and clear of any overriding royalty interests or other adverse interests, including any other dedications of the Dedicated Leases that will not terminate by the Commencement Date if such dedications are in conflict with the dedication under this Agreement. There are no other agreements, burdens, or encumbrances that would have the effect of diminishing, at any time after the Execution Date, Producer's rights to its interests in the Dedicated Leases or the production therefrom.

**ARTICLE XVI. OTHER PROVISIONS**

16.1 **Binding Effect**. This Agreement shall extend and be binding upon the successors and assigns of the respective Parties.

16.2 **No Waiver**. Any waiver by either Party of any one or more defaults by the other hereunder shall not operate as a waiver of any future default or defaults, whether of a like or different character, and any waiver hereunder only shall be valid if made in a writing signed by the waiving Party.

16.3 **Amendment**. This Agreement may be amended only by an instrument in writing executed by both Parties.

16.4 **Assignment to Designee.** Subject to Article IV, Producer shall have the right, without the prior consent of Gatherer, to assign its rights to gathering service under this Agreement to a Designee who is responsible for marketing the Dedicated Oil, or who is purchasing Dedicated Oil at or before the Receipt Point; provided that Producer shall remain primarily liable to Gatherer for any

and all obligations of Producer under this Agreement. Assignment of the Dedicated Leases is subject to, and must be in accordance with, Article IV hereof.

16.5 **Dispute Resolution**. The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly. If unable to resolve such dispute in the normal course of business, either Party may give the other Party written notice ("Dispute Notice") in accordance with this Section 16.5. Within fifteen (15) days after delivery of a Dispute Notice, the receiving Party shall submit to the other Party a written response. The Dispute Notice and any responses made pursuant to this Section 16.5 shall include (i) a statement of each Party's position and a summary of arguments supporting that position, and (ii) the name and title of the executive who has authority to settle the dispute and who will represent that Party and of any other person who will accompany the executive. Within thirty (30) days after delivery of the Dispute Notice, the executives of all Parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. If the matter has not been resolved by these persons within sixty (60) days after delivery of the Dispute Notice, either Party may initiate a lawsuit. Notwithstanding the provisions of this Section 16.5, any Party may seek from any court having jurisdiction hereof any interim, provisional or injunctive relief that may be necessary to protect the rights or property of any Party or maintain the status quo before, during or after the pendency of the negotiation process. The institution and maintenance of any judicial action or proceeding for any such interim, provisional or injunctive relief shall not constitute a waiver of the right or obligation of any Party to submit the dispute to negotiation as described above, including any claims or disputes arising from the exercise of such interim, provisional or injunctive relief. All negotiations pursuant to this clause are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.

16.6 **Conflict of Provisions**. The attached Exhibits are an integral part of this Agreement and are hereby incorporated by reference. If there is any conflict between the provisions contained in this base Agreement and the attached exhibits, the provisions of this base Agreement will govern.

16.7 **Entire Agreement.** This Agreement constitutes the entire agreement of the Parties regarding the matters contemplated herein and supersedes all prior and contemporaneous agreements and understandings of the Parties in connection therewith. No covenant, representation, or condition which is not expressed in this Agreement shall affect, or be effective to interpret, change, or restrict, the express provisions of this Agreement.

16.8 **Counterparts.** This Agreement may be executed by facsimile or e-mail and in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument and agreement.

16.9 **Authority.** Each of the Parties represents that the person signing below on its behalf has the authority to execute this Agreement and to bind that Party.

16.10 **Interpretation.** The article and paragraph headings of this Agreement are inserted for convenience only and are in no way to be construed as part of this Agreement or as a limitation or enlargement of the scope or meaning of the particular sections or paragraphs to which they refer and shall not affect the interpretation of any provisions of this Agreement. References to

"day", "month", and "year" shall be deemed to be references to a calendar day, calendar month, and calendar year, respectively, unless otherwise provided. All references to "this Agreement", "herein", "hereby", "hereunder", "hereof", and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, subsection, clause, or other subdivision unless expressly so limited. References to "this Article", "this Section", "this subsection", "this clause", and words of similar import refer only to the Article, Section, subsection, and clause hereof in which such words occur. "Including" (in its various forms) means including without limitation. Reference herein to any federal, state, local, or foreign law shall be deemed to also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise, and shall also be deemed to refer to such laws as in effect as of the date of execution of this Agreement or as hereafter amended. Except as otherwise specifically provided in this Agreement, any agreement, instrument, or writing defined or referred to herein means such agreement, instrument, or writing as from time to time amended, supplemented or otherwise modified. Pronouns in masculine, feminine, or neuter genders shall be construed to state and include any other gender, and words, terms, and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

16.11 **Cumulative Rights, Obligations and Remedies.** Except as expressly provided herein, the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations or remedies otherwise available at law or in equity. Nothing herein shall be considered an election of remedies.

16.12 **No Third-Party Beneficiaries**. This Agreement is for the sole and exclusive benefit of the Parties. Except as expressly provided herein to the contrary, nothing herein is intended to benefit any other person or entity not a Party, and no such person or entity shall have any legal or equitable right, remedy or claim under this Agreement. To the extent insurance protections in Article XII and indemnities in Article XIII extend to benefit members of Producer Group and Gatherer Group, members of those groups are expressly intended as third-party beneficiaries with respect to Article XII and Article XIII.

16.13 **Survival**. Notwithstanding anything else in the Agreement that may be construed to the contrary, despite expiration or termination of the Agreement for any reason, all provisions that by their nature should survive such expiration or termination, all provisions specifically providing for survival, all provisions relating to representations, warranties, releases, defense obligations and indemnities, and all provisions relating to audit, confidentiality, insurance, disclaimer of certain remedies, limitations of liability, retention and inspection of records, governing laws and regulations, dispute resolution, and all causes of action or obligations which arose or have accrued prior to completion or termination, including payment obligations, shall survive indefinitely until, by their respective terms they have expired, are no longer operative, or are otherwise limited by an applicable statute of limitations.

16.14 **No Partnership.** Nothing herein is intended to create a partnership, joint venture, agency or other relationship creating fiduciary or quasi fiduciary duties or similar duties and obligations or otherwise subject the Parties to joint and several or vicarious liability or to impose any duty, obligation or liability that would arise therefrom with respect to either Party.

16.15 **Confidentiality.** Each Party agrees to keep in confidence until the termination of this Agreement the Confidential Information of the other Party, save and except:

(a) to their respective affiliates, subcontractors and consultants and their respective employees, servants or agents actively engaged in the operations hereunder and administration hereof to the extent that they need to know for purposes related to this Agreement, provided that the disclosing Party shall be liable for any disclosure of the Confidential Information by any such affiliates, subcontractors and consultants and their respective employees, servants or agents,

(b) if and to the extent that it becomes required or requested to do so by any law or by any governmental authority, but not beforehand, and provided that the disclosing Party will, if permitted to do so, notify the other Party as soon as possible upon becoming aware of any such requirement and use reasonable efforts to obtain confidential treatment of the disclosed Confidential Information under applicable law,

(c) to any bona fide prospective assignee of all or any portion of a Party's interest in the MPOG System or Dedicated Leases, provided that such prospective assignee has executed a confidentiality agreement requiring it to maintain the secrecy and confidentiality of the Confidential Information,

(d) as is permitted pursuant to the Interconnect Agreement,

(d) as necessary for a Party to enforce its rights under this Agreement or to defend any claim brought or threatened by a Party to this Agreement,

(e) as necessary for a Party to perform its obligations under this Agreement.

"Confidential Information" means (i) all terms and conditions of this Agreement and (ii) all written or oral data, maps, reports, drawings, specifications, records, technical or engineering information, and computer programs and software concerning a Party's operations, processes, or equipment that are provided, acquired, or exchanged in connection with the performance of this Agreement, and all written or oral notes, analyses, compilations, studies, summaries, copies, and other materials containing any information in the foregoing categories. Notwithstanding the foregoing, "Confidential Information" does not include information that the receiving Party can demonstrate was (a) already in the possession of the receiving Party at the time of disclosure without breach of an obligation of confidentiality; (b) acquired independently from a third party that, to the receiving Party's knowledge, has the right to disseminate the information; (c) already available to the public other than through the act or omission of the receiving Party contrary to any obligation of confidentiality; or (d) independently developed by the receiving Party or its representatives without use of the disclosing Party's Confidential Information.

16.16 **Express Negligence**. **UNLESS OTHERWISE SPECIFICALLY STATED HEREIN, ALL RELEASES, DISCLAIMERS, LIMITATIONS ON LIABILITY AND INDEMNITIES IN THIS AGREEMENT, INCLUDING THOSE IN ARTICLE XIII, SHALL APPLY EVEN IN THE EVENT OF THE SOLE, JOINT OR CONCURRENT, ACTIVE OR PASSIVE NEGLIGENCE, STRICT LIABILITY OR FAULT OF THE PARTY WHOSE LIABILITY IS RELEASED, DISCLAIMED, LIMITED OR INDEMNIFIED.** The Parties agree that this Section 16.16

and Article XIII meet any requirements of conspicuousness or similar concepts imposed by applicable law.

16.17 **Construction**. The Parties acknowledge that (a) the Parties have had the opportunity to exercise business discretion in relation to the negotiation of the details of the transaction contemplated hereby, (b) this Agreement is the result of arms-length negotiations from equal bargaining positions, and (c) the Parties and their respective counsel participated in the preparation and negotiation of this Agreement. Any rule of construction that a contract be construed against the drafter shall not apply to the interpretation or construction of this Agreement.

[*Signature Page Follows.*]

IN WITNESS WHEREOF, this instrument is executed the 24th day of January 2022.

PRODUCER

ANADARKO US OFFSHORE LLC

BY: AH Kershaw

NAME: ANDREW H. KERSHAW

TITLE: EXEC VP OFFSHORE

GATHERER

MAIN PASS OIL GATHERING COMPANY, LLC

BY: Ryan Rupe

NAME: Ryan Rupe

TITLE: SVP, Chief Commercial Officer