**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MAIN PASS OIL GATHERING COMPANY, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**SUBSEA 7 MARINE (US) INC.,**<br><br>Defendant. | CIVIL ACTION NO. 25-00890<br><br>JUDGE IVAN L.R. LEMELLE<br><br>MAG. JUDGE EVA J. DOSSIER |

**ANADARKO'S OPPOSITION TO**
**MPOG'S PARTIAL MOTION TO DISMISS**
**ANADARKO'S SECOND AMENDED COMPLAINT-IN-INTERVENTION**

Plaintiffs-in-Intervention, Anadarko Petroleum Corporation and Anadarko US Offshore LLC (collectively, "Anadarko"), respectfully submit the following memorandum in Opposition to the Partial Motion to Dismiss Anadarko's Second Amended Complaint-in-Intervention filed by Main Pass Oil Gathering Company, LLC ("MPOG") [Rec. Doc. 82]:[1]

**MAY IT PLEASE THE COURT:**

In asking the Court to reconsider its ORDER AND REASONS of August 31, 2026 [Rec. Doc. 71], MPOG disregards the fact that:

- The *Alta Power*[2] decision relied on by MPOG does not address, much less call into question, either the *Smith v. Golden Triangle*[3] line of cases invalidating waivers of future tort liability for gross negligence on public policy grounds or the *Zachry*[4] decision invalidating waivers of future

[1] Third Coast Infrastructure, LLC and Panther Operating Company, LLC have filed Motions to Join in MPOG's Partial Motion to Dismiss. Rec. Docs. 84, 85. Anadarko has concurrently filed a separate opposition relating thereto.

[2] Alta Power, LLC v. Gen. Elec. Int'l, Inc., 180 F.4th 681 (5th Cir. 2026).

[3] Smith v. Golden Triangle Raceway, 708 S.W.2d 574, 576 (Tex. App. – Beaumont 1986, no writ).

[4] Zachry Const. Corp. v. Port of Houston Auth of Harris Cnty., 449 S.W.3d 98, 116 (Tex. 2014).

liability in breach of contract cases for gross negligence by the party in breach.

- Louisiana Civil Code Article 2004 does not permit contractual provisions that exclude or limit liability for gross negligence.
- The contractual provisions themselves in the Oil Gathering Agreements do not evince an intent that the consequential damages waivers apply to gross negligence.
- The damages sought by Anadarko are direct, not "consequential", damages. And,
- The public policy considerations are different with respect to contractual indemnification versus a pre-suit waiver or release.

For these reasons, and for the additional reasons set forth below, MPOG's Partial Motion to Dismiss Anadarko's Second Amended Complaint-in-Intervention should be denied.

**The Court Has Already Resolved the Question of Whether Anadarko Has Properly Pleaded its Economic Damages**

On August 31, 2026, the Court denied MPOG's motion to dismiss Anadarko's claim for economic damages under either OPA or for breach of contract. [Rec. Doc. 71]. MPOG now asks the Court to reconsider the same question it squarely decided nearly two months ago. This request should be denied. The general practice of courts in the Eastern District of Louisiana is to adhere to the reconsideration standard required under FRCP 59(e) and reconsider interlocutory orders only where the correctness of a judgment is called into question. Gulf Fleet Tiger Acquisition, L.L.C. v. Thoma-Sea Ship Builders, L.L.C., 282 F.R.D. 146, 152 (E.D. La. 2012). While a district court's discretion is broad, "it must be exercised sparingly in order to forestall the perpetual reexamination of orders and resulting burdens and delays." Marine Power Holding, LLC v. Malibu Boat, LLC, No. CV 14-912, 2016 WL 366721, at *3 (E.D. La. Jan. 29, 2016). Courts must carefully balance the interests of justice with the need for finality. Gulf Fleet, 282 F.R.D. at 152. Motions for reconsideration are "not the proper vehicle for rehashing evidence,

legal theories, or arguments" and instead "serve the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." Id. at 153.

As discussed more fully herein, MPOG's reliance on *Alta Power* does not justify reconsideration because *Alta Power* did not change the law. The Fifth Circuit acknowledged that it was "bound by Texas law," and the Texas law it applied came from *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, decided in February 2019, more than seven years ago. 572 S.W.3d 213 (Tex. 2019). *Alta Power* merely applied that precedent to a different set of facts. MPOG could have raised *Bombardier* when it briefed its original motion to dismiss. It did not. A motion for reconsideration is not a vehicle for raising arguments or authority that were available earlier but not presented. *See Marine Power Holding*, 2016 WL 366721, at *3. This later federal decision applying existing state-court precedent is not an intervening change in controlling law, nor does it render this Court's previous judgment incorrect. The Court correctly determined that Anadarko adequately pled its causes of action for economic damages in August, and it should reaffirm that decision now.

**The Motion Must Be Denied Because It Asks the Court to Resolve Contested, Fact-Bound Questions on the Pleadings**

To survive a Rule 12(b)(6) motion, a complaint need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Court must accept all well-pleaded facts as true and view them in the light most favorable to Anadarko. In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007). A contract may be considered on a motion to dismiss only where it is central to the claim and its terms are undisputed, and an ambiguous contract cannot support dismissal, because its construction and the parties' intent present questions that cannot be resolved on the face of the

pleadings. Here, MPOG asks the Court to decide contested questions — whether the waivers reach gross negligence, which sovereign's law governs, and whether each item of Anadarko's damages is direct or consequential — against the non-movant. Rule 12(b)(6) does not permit that, and at a minimum these questions are sufficiently fact-bound that dismissal should be denied or deferred.

**As the Court has Already Found, Texas Law Prohibits Pre-Injury Waivers of Liability Arising from Gross Negligence as a Matter of Public Policy**

Texas courts have historically embraced the generally accepted principle that pre-incident waivers of tort liability are unenforceable where the defendant is guilty of gross negligence, recklessness, or intentional misconduct, as a matter of public policy.[5]

This general principle was extended by the Texas Supreme Court to breach of contract cases in 2014. Specifically, in *Zachry,* the Court explained that:

> We have indicated that pre-injury waivers of future liability for gross negligence are void as against public policy. Generally, a contractual provision "exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy." **We think the same may be said of contract liability. To conclude otherwise would incentivize wrongful conduct and damage contractual relations.** This conclusion is supported by Texas lower court decisions and court decisions in at least 28 American jurisdictions. We join this overwhelming consensus.[6]

The *Alta Power* case relied on by MPOG does not address either of these lines of precedent. It is based, rather, on the *Bombardier*[7] decision, in which the Texas Supreme Court

---

[5] *See, e.g.,* Smith v. Golden Triangle Raceway, 708 S.W.2d 574, 576 (Tex. App. – Beaumont 1986, no writ). *See also* Zachry Const. Corp. v. Port of Houston Auth of Harris Cnty., 449 S.W.3d 98, 116 and fns.86-87 (Tex. 2014) (*citing* RESTATEMENT (Second) OF CONTRACTS § 195(1) (1981); Fairfield Ins. Co. v. Stephens Martin Paving, LP, 246 S.W.3d 653, 687 (Tex. 2008) (Hecht, J., concurring); Crowell v. Hous. Auth. of Dallas, 495 S.W.2d 887, 889 (Tex. 1973); Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 219–222 (Tex. 2002); Memorial Med. Ctr. of E. Tex. v. Keszler, 943 S.W.2d 433, 435 (Tex. 1997) (observing that courts of appeals have "found a pre-injury release of gross negligence invalid as against public policy")).

[6] Zachry, supra, 449 S.W.3d at 116 (emphasis supplied).

[7] Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC, 572 S.W.3d 213 (Tex. 2019) (emphasis supplied).

addressed the different question of whether pre-incident, and indeed pre-contractual, fraud-in-the-inducement might or might not invalidate a contractual waiver in a subsequent breach of contract situation. As the Court explained:

> when sophisticated parties represented by counsel **disclaim reliance on representations about a specific matter in dispute**, the disclaimer may conclusively negate the element of reliance **in a suit for fraudulent inducement**.[8]

Although the defendant in *Alta Power* argued that fraud was simply insufficient to invalidate a contractual waiver, the U.S. Fifth Circuit recognized that the Texas Supreme Court in *Bombardier* took a more nuanced approach. Specifically, the Court "balanced the competing interests between unintentionally waiving fraud claims and respecting freedom of contract," and concluded that "parties can bargain to limit ***exemplary*** damages." Alta Power, 180 F.4th at 688 (*quoting* Bombardier, 572 S.W.3d at 232) (emphasis added in *Alta Power*). "And because the parties did not waive a claim for fraud but only the ability to recover punitive damages for fraud, their limitation-of-liability clauses were enforceable." Alta Power, 180 F.4th at 688 (*quoting* Bombardier, 572 S.W.3d at 232).

The *Alta Power* decision says nothing about "gross negligence" and indeed cites *Zachry* for the proposition that "generally, contractual provisions exempting a party from all future tort liability for intentional or reckless harm are unenforceable." Alta Power, 180 F.4th at 690-691 (*citing* Zachry, 449 S.W.3d at 116-117 *and* RESTATEMENT (Second) OF CONTRACTS § 195 (1981)). To be sure, the Fifth Circuit rejected the plaintiff's claim in *Alta Power* that, based on the specific contractual language in question, those parties did not intend nor agree to waive claims for damages arising from intentional acts.[9] But the Court does not anywhere address the

---

[8] Alta Power, LLC v. Gen. Elec. Int'l, Inc., 180 F.4th 681, 687 (5th Cir. 2026) (*quoting* Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 332 (Tex. 2011)).

[9] *See* Alta Power, 180 F.4th at 691.

issue of whether a general contractual limitation of liability would be enforceable in the event of post-contractual gross negligence, recklessness, or willful misconduct on the part of the breaching party.

Unlike the *Bombardier* rule, which attempts to balance the protection of parties from unintentionally waiving a claim for fraud with the ability of parties to fully and finally resolve disputes between them,[10] the *Smith v. Golden Triangle* and *Zachry* rules are grounded in deterrence: If a party can purchase immunity in advance for its own conscious indifference to an extreme risk – precisely the conduct alleged herein – there will be no incentive to act with care in exactly the situation where care matters most. A rule that allowed a party to write off liability for its own gross negligence before the fact would reward recklessness and eliminate a primary function of tort law. That is why the prohibition is categorical, and cannot be evaded as a mere "measure of damages" limitation. When a clause operates to strip a grossly negligent actor of responsibility for the overwhelming bulk of the harm it caused, it is doing the very thing that Texas law forbids, as a matter of public policy.

Indeed, and notably, the Oil Pollution Act itself embraces the same need for deterrence as an essential element of statutory and public policy: while the damages owed by a responsible party are generally capped under the Act, there is no limitation of liability available to a responsible party that is guilty of gross negligence, willful misconduct, or the violation of an applicable operating, construction or safety regulation. *See* 33 U.S.C. 2704(c)(1).

---

[10] *See* Alta Power, 180 F.4th at 688 (*citing* Italian Cowboy, supra, 341 S.W.3d at 332).

Lastly, it is significant to note that the *Hill v. Fitness International* case cited by the Court in its previous ruling was decided in 2023,[11] four years after the *Bombardier* decision.[12] The *Hill* case was a tort suit arising from a slip-and-fall on the defendant's premises. The trial court granted summary judgment, based on a pre-suit waiver or release. The Texas Court of Appeal reversed and remanded with respect to the plaintiff's gross negligence claims. Not surprisingly, the court did not reference or address the *Bombardier* decision, as fraud-in-the-inducement was not at issue. Instead, the Court of Appeal followed the *Zachry* decision, holding that "pre-injury waivers of future liability for gross negligence are void as against public policy." Hill v. Fitness Int'l, LLC, No. 02-22-00142-CV, 2023 WL 2607646 at *8 (Tex. App. Mar. 23, 2023) (*citing* Zachry, supra, 449 S.W.3d at 116; Memorial Medical Center v. Keszler, supra, 943 S.W.2d at 435 (acknowledging the holding in *Smith v. Golden Triangle* that a release of gross negligence is against public policy); McCloskey v. Clubs of Cordillera Ranch, LP, No. 04-17-00234-CV, 2017 WL 6502444, at *3 (Tex. App. – San Antonio Dec. 20, 2017, no pet.) (citing *Zachry* for the proposition that a pre-injury release of future liability for gross negligence is void against public policy); Tex. Moto-Plex, Inc. v. Phelps, No. 11-03-00336-CV, 2006 WL 246520, at *2 (Tex. App. – Eastland Feb. 2, 2006, no pet.) ("Pre-accident releases of gross negligence violate Texas public policy")).

**Louisiana's Civil Code Article 2004 Unequivocally Precludes Such Waivers with Respect to Damages Arising from Gross Negligence**

If the Court agrees with the foregoing, it may end its analysis there. However, if the Court is inclined to apply *Bombardier*, the Texas choice-of-law clauses do not end the inquiry.

[11] *See* ORDER AND REASONS (Aug. 31, 2026) [Rec. Doc. 71] at p.6; *citing* Hill v. Fitness Int'l, LLC, No. 02-22-00142-CV, 2023 WL 2607646 at *8 (Tex. App. Mar. 23, 2023).

[12] Bombardier v. SPEP, 572 S.W.3d 213 (Tex. 2019).

Even where the parties have chosen Texas law, that choice governs the interpretation of the agreements but cannot be used to enforce a waiver that the otherwise-applicable law declares void; Louisiana's prohibition on waiving gross fault reaches these contracts by either of two independent routes. The first route is Louisiana's own choice-of-law rule. Although Louisiana generally observes contractual choice-of-law provisions, the Code refuses to recognize party autonomy in situations where such law is in contravention of the public policy of the state whose law would otherwise apply. LA. CIV. CODE ART. 3540.[13] In this particular case, there is a plausible basis for Louisiana law to apply. *See* LA. CIV. CODE ART. 3537 (looking to, among other things, the contacts of the state to "the place of … performance of the contract, the location of the object of the contact," and "the nature, type and purpose of the contract").[14] Louisiana's public policy is embraced by Civil Code Article 2004, which expressly provides that: "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party." The U.S. Fifth Circuit has specifically recognized that Louisiana Civil Code Article 2004 "stands as a legislative pronouncement of public policy which parties to a contract cannot ignore." Occidental Chemical Corp. v. Elliott Turbomachinery Co., 84 F.3d 172, 177 (5th Cir. 1996).

[13] MPOG assumes that Texas Law will apply to the contractual issues by virtue of the choice-of-law provisions in the Oil Gathering Agreements. Of course, the Court first looks to the choice-of-law rules of Louisiana as the forum state under Klaxon v. Stentor Electric Manufacturing, 313 U.S. 487, 496 (1941). Nevertheless, Texas Law is the same on this point: Specifically, the Texas Supreme Court has adopted section 187 of the RESTATEMENT (Second) OF CONFLICT OF LAWS, holding that parties "cannot by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply." DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 677 (Tex. 1990). Under Section 187, the law chosen by the parties will not be applied where "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which … would be the state of the applicable law in the absence of an effective choice of law." RESTATEMENT (Second) OF CONFLICT OF LAWS § 187(2)(b) (1971); *accord* Cardoni v. Prosperity Bank, 805 F.3d 573, 580-582 (5th Cir. 2015).

[14] *See, e.g.,* REVISION COMMENT (e), La.C.C. art. 3537 (1991) ("the place of the performance of a contract would normally be more important than most other factual contacts combined, if the issue in dispute is the availability of specific performance and the contract is considered immoral under the law of the place of performance").

The second route is OCSLA, which does not depend on a public-policy exception at all. The reason the OCS focus of these agreements matters — even though the contracts select Texas law — is that it determines which choice-of-law rule governs in the first place. Where a contract is centered on the Outer Continental Shelf, OCSLA supplies the rule of decision and adopts the law of the adjacent State, Louisiana, as surrogate federal law; and because that adoption is a congressional command, it displaces a contrary contractual choice of law rather than yielding to it. The focus of the Oil Gathering Agreements is to collect and transport OCS production. *See* SECOND AMENDED COMPLAINT-IN-INTERVENTION [Rec. Doc. 74] ¶ 20. The platforms, the bulk of the pipeline, and the hydrocarbons they carry are all OCS facilities and OCS activities. The mere fact that one segment of the gathering line crosses into inshore waters, where the seal in question happened to fail, does not change the OCS-centered character of the operations governed by the relevant contracts. Grand Isle Shipyard, Inc. v. Gulf Island Marine Fabricators, LLC, 589 F.3d 778, 787-788 (5th Cir. 2009) (en banc) (looking to the focus of the contract to locate the controversy for OCSLA purposes); *see also, e.g.,* Union Texas Petroleum v. PLT Engineering, Inc., 895 F.2d 1043, 1047-1048 (5th Cir. 1990) ("the gathering line exactly fits the statutory definition of an 'other device permanently or temporarily attached to the seabed ... erected thereon for the purpose of ... developing, or producing resources therefrom'"). Under OCSLA, Louisiana Civil Code Article 2004 would apply irrespective of the presence of the Texas choice-of-law provisions in the Oil Gathering Agreements to the contrary.[15] The Fifth Circuit applied exactly this framework in Houston Exploration Co. v. Halliburton Energy Services, Inc., 269 F.3d 528, 531 & n.5 (5th Cir. 2001), where, in a dispute arising from a Gulf

[15] PLT Engineering, supra, 895 F.2d at 1050 ("Although Louisiana's choice of law rules might enforce this choice of law provision, OCSLA will not. We find it beyond any doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary").

of Mexico well blowout, the court applied Louisiana law under OCSLA and relied on Civil Code Article 2004 to confirm that a party cannot, in advance, release liability for its own gross negligence.

**The Contractual Provisions Themselves Do Not Evince an Intent That the Consequential Damages Waivers Apply to Gross Negligence**

Separate and apart from public policy considerations, the Court would have to determine that the consequential damages waivers in question extended to losses caused by gross negligence. Five features of the Oil Gathering Agreements, read together, however, make it clear that the parties did not intend nor agree to this.

*First,* the waivers are limited by their own terms to "the maximum extent permitted by law." Each consequential damages waiver opens with that preface.[16] Texas law was clear when the agreements were executed that damage waivers of all kinds were ineffective where gross negligence is proven, and therefore the language "to the maximum extent permitted by law" demonstrates the parties' mutual understanding and intent that gross negligence would preclude the consequential damages provisions from applying. The waiver stops where the law stops it, and the parties said as much in the relevant contracts. The clause by its own terms does not reach gross negligence. The parties did not purport to waive more than the law would allow.

*Second,* the waivers list legal theories, not degrees of fault. Each clause extends the waiver across "contract, warranty, negligence, strict liability, or any other remedy at law or equity."[17] Every item on that list is a ***theory of recovery.*** None is a ***level of culpability.*** "Gross negligence" is not a separate cause of action to be listed alongside contract and warranty; it is a

[16] Horn Mountain Oil Gathering Agreement § 13.4 [Rec. Doc. 82-4]; 1996 Marlin Oil Gathering Agreement § 12.2 [Rec. Doc. 82-2]; 2002 Marlin Oil Gathering Agreement § 12.2 [Rec. Doc. 82-3].

[17] Horn Mountain Oil Gathering Agreement § 13.4; 1996 Marlin Oil Gathering Agreement § 12.2; 2002 Marlin Oil Gathering Agreement § 12.2.

heightened degree of fault. The parties enumerated the claims the waiver would bar; they never addressed the degree of fault that would trigger it. A list of theories cannot silently be read to resolve a question about culpability that the list does not speak to.

*Third,* the parties expressly carved gross negligence out of every neighboring risk-allocation provision — which shows they knew how to address it and chose not to in the waiver. In the very same articles of the very same contracts that contain the consequential damages waivers, the parties excepted "gross negligence" from every other allocation of risk. The Horn Mountain possession and environmental indemnity, the injury-and-death indemnity, the property-damage indemnity, and the risk-of-loss provision each apply "but not to the extent due to the gross negligence or willful misconduct" of the responsible party.[18] The Marlin agreements similarly carve "gross negligence" out of their possession and risk-of-loss provisions.[19] The drafters plainly knew the term "gross negligence" and used it deliberately whenever they meant to deal with it. Its conspicuous absence from the consequential damages waivers – sitting side by side with provisions that invoke it expressly – is powerful indication that the omission was intentional. Had the parties meant the waiver to reach gross negligence, they would have said so, exactly as they did a few lines away.

These carve-outs confirm Anadarko's reading. MPOG contends that because the parties excepted gross negligence from the neighboring indemnities but not from the consequential-damages waiver, they must have deliberately left gross negligence inside the waiver. The inference does not hold. The waiver is expressly capped "to the maximum extent permitted by law," so the parties' silence cannot be read as an affirmative agreement to waive what the law

[18] Horn Mountain Oil Gathering Agreement §§ 13.1, 13.2, 13.3, 13.6.

[19] 1996 Marlin Oil Gathering Agreement §§ 12.1, 12.4; 2002 Marlin Oil Gathering Agreement §§ 12.1, 12.4.

makes non-waivable; silence about an unlawful result is not consent to it. The carve-outs show the opposite of what MPOG claims: they prove that when these parties intended a risk-allocation provision to turn on gross negligence, they said so expressly — as they also did in the 1999 Tie-In Agreement, discussed below — so the absence of any such language in the consequential-damages waiver reflects the parties' understanding that gross negligence was already outside its reach. At the very least, MPOG's competing reading confirms that the waiver is ambiguous as to gross negligence, which forecloses dismissal at this stage of the proceeding.

*Fourth,* the parties wrote an express gross-negligence waiver in a related agreement – proving they knew precisely how to do it when that was their intention to do so. In a related 1999 Marlin Riser Reimbursement and Tie-In Agreement that MPOG tellingly relied on in its first Motion to Dismiss but has now quietly dropped, the parties agreed that:

> In no event, regardless of a party's negligence (including … gross negligence or willful misconduct …) shall any party be liable to the other part[y] for any incidental, indirect, consequential, special or punitive damages or loss of profits.[20]

That is what a consequential-damages waiver intended to reach gross negligence looks like. Yet the three Oil Gathering Agreements contain no such language. That the drafters wrote this express "gross negligence" waiver in one agreement, and yet conspicuously omitted it from the three Oil Gathering Agreements, is the clearest possible evidence that the omission from the Oil Gathering Agreements was deliberate. The parties clearly knew how to waive consequential damages for gross negligence; but in the Oil Gathering Agreements, they did not do it.

*Finally,* confirmation from the express negligence clause. The Horn Mountain agreement contains an "Express Negligence" provision stating that the releases and limitations apply even

[20] Marlin Tie-In Agreement § 12 (quoted by MPOG at Rec. Doc. 27-1, at 5) [Rec. Doc. 27-4].

to "sole, joint or concurrent, active or passive negligence, strict liability or fault."[21] The parties thus spelled out, in detail, the kinds of fault the limitations would cover – and they stopped short of gross negligence. A clause drafted precisely to list the degrees of negligence swept in cannot be read to include the one degree it pointedly left out.

The same conclusion follows from Texas's fair-notice requirements. A party that seeks to be relieved of the consequences of its own fault must satisfy the fair-notice doctrines — express negligence and conspicuousness — which require that any such intent be stated in specific, conspicuous terms within the four corners of the agreement. Ethyl Corp. v. Daniel Constr. Co., 725 S.W.2d 705 (Tex. 1987); Dresser Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d 505 (Tex. 1993). The Oil Gathering Agreements nowhere state, in specific terms, any intent to relieve MPOG of the consequences of its own gross negligence. To the contrary, the Horn Mountain "Express Negligence" provision spells out the degrees of fault the limitations reach and conspicuously stops short of gross negligence. The waiver therefore fails the fair-notice test as to gross negligence for the independent reason that it does not clearly and conspicuously say what MPOG now asks the Court to read into it. *See* Van Voris v. Team Chop Shop, LLC, 402 S.W.3d 915 (Tex. App. 2013) (where "Texas's strong public policy prohibiting extraordinary risk-shifting provisions absent fair notice" lead the court to conclude that the plaintiff had not released his gross negligence claims where the contract released pre-injury claims based on negligence but did not mention gross negligence).

Read as a whole, the agreements reflect a deliberate, consistent choice. The parties allocated ordinary risks broadly, barred the usual theories of recovery, and limited the resulting damages – but each time they confronted gross negligence, they either carved it out or, in the one

[21] Horn Mountain Oil Gathering Agreement § 16.16.

agreement where they meant to waive it, said so in plain words. The consequential damages waivers in the Oil Gathering Agreements do neither. The only reading faithful to the text is that the parties did not intend to waive consequential damages for gross negligence.

**The Damages Anadarko Seeks Are Not "Consequential" Damages**

The parties explicitly contemplated that Anadarko would be entitled to recover damages arising from oil lost while in MPOG's possession. Under the Horn Mountain agreements,[22] Anadarko is entitled to recover "the value of Dedicated Oil lost while in [MPOG's] custody or control,"[23] and "Losses relating to damage or harm to the environment arising out of or attributable to the period after delivery of the Dedicated Oil to [MPOG] at the Receipt Point."[24] Similarly, under the Marlin Agreements,[25] "[MPOG] shall be deemed to be in control and possession of the Oil and shall be responsible for, and shall indemnify [Anadarko] against, any damage … caused thereby until the Oil shall have been redelivered by [MPOG], to [Anadarko], at the Delivery Point[.]"[26] Thus, under the plain terms of the contracts, Anadarko may recover damages arising from the over one million gallons of oil released by MPOG during the MPOG Release.

---

[22] The Horn Mountain agreements are the January 24, 2022 Oil Gathering Agreement and the January 24, 2022 Offshore Pipeline Connection Agreement [Rec. Doc. 27-6], which were executed simultaneously with one another.

[23] Horn Mountain Oil Gathering Agreement § 13.6 (explicitly stating that such claims are not released in the event of MPOG's gross negligence).

[24] Horn Mountain Oil Gathering Agreement § 13.1(b) (stated more fully, "Gatherer shall be deemed to be in control and possession of the Dedicated Oil delivered hereunder and shall be responsible for, and shall indemnify, release and hold harmless each member of the Producer Group from and against any Losses relating to damage or harm to the environment arising out of or attributable to the period after delivery of the Dedicated Oil to Gatherer at the Receipt Point until the Dedicated Oil is redelivered by Gatherer to Producer, or Producer's Designee, at the Delivery Point.")

[25] The Marlin agreements are the January 19, 1996 Oil Gathering Agreement and the January 2, 2002 Oil Gathering Agreement, § 1.1, both of which pertain to Anadarko's Marlin platform.

[26] 2002 Marlin Oil Gathering Agreement, § 12.1; *see also* 1996 Marlin Oil Gathering Agreement, § 12.1 (using similar language).

Even with respect to ordinary negligence or other contractual breaches, none of the relevant agreements waive Anadarko's ability to recover ***direct*** damages.[27] "Direct damages" are those "inherent in the nature of the breach of the obligation between the parties, and they compensate a plaintiff for a loss that is conclusively presumed to have been foreseen by the defendant as a usual and necessary consequence of the defendant's act." DaimlerChrysler Motors Co., LLC v. Manuel, 362 S.W.3d 160, 179 (Tex. App. 2012); Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 816 (Tex. 1997). "Consequential damages," on the other hand, "are those said to result naturally but not necessarily from the wrongful act." DaimlerChrysler, 362 S.W.3d at 180.

Courts have repeatedly recognized that the line between direct damages and consequential damages is not a clear one, especially with respect to lost profits. *See, e.g.,* DaimlerChrysler, supra, 362 S.W.3d at 180 ("Damages that might be considered 'consequential' in one contract may be direct damages in another") (*citing* Kerr S.S. Co. v. Radio Corp. of Am., 245 N.Y. 284, 157 N.E. 140, 141 (1927) (also noting that damages for delay may be direct in some instances and consequential in others); Rexnord Corp. v. DeWolff Boberg & Assocs., Inc., 286 F.3d 1001, 1004 (7th Cir.2002) (Posner, J.) (stating that common law "distinguishes between direct and consequential damages, the difference lying in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach"); Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1071 n.5 (8th Cir. 2000) ("We are not convinced that the [contract's] restriction on 'special, incidental, or consequential damages,' standing alone, precludes the

[27] *See* 1996 Marlin Oil Gathering Agreement, § 12.2; 2002 Marlin Oil Gathering Agreement, § 12.2; Horn Mountain Oil Gathering Agreement, § 13.4; January 24, 2022 Offshore Pipeline Connection Agreement, § 10.1.

recovery of lost profits.... [I]t is incorrect to classify mechanically ... lost profits ... as consequential damages")).

Where "the language of the contract indicates that the parties contemplated lost profits as the probable result of the breach, then those lost profits are more properly seen as a part of the contract, itself, and thus a form of direct damages." DaimlerChrysler, 362 S.W.3d at 180 (*citing* ViaStar Energy, LLC v. Motorola, Inc., No. 1:05–CV–1095–DFH–WTL, 2006 WL 3075864, at *5–6 (S.D.Ind. Oct. 26, 2006)). Or, stated another way: "Profits lost on the contract itself – such as the amount a party would have received on the contract minus its saved expenses – are direct damages." Cherokee Cnty. Cogeneration Partners, L.P. v. Dynegy Mktg. & Trade, 305 S.W.3d 309, 314 (Tex. App. 2009). Hence, "lost profits that represent the benefit-of-the-bargain measure of damages required to restore the plaintiff to the economic position he would have enjoyed if the contract had been performed are 'direct' damages when shown to be 'conclusively presumed' to have been foreseen by the parties as a usual and necessary consequence of the breach." DaimlerChrysler, 362 S.W.3d at 180.

In this case, the transport and redelivery of oil is the fundamental purpose of these contracts; transport and redelivery which did not occur for months as a result of MPOG's gross negligence. Each of the relevant agreements provide that Anadarko will produce crude oil from its platforms and such oil will be gathered and transported by MPOG before being placed back into Anadarko's possession.[28] Under the Horn Mountain agreements, Anadarko "agree[d] to deliver to the Receipt Point," and MPOG "agree[d] to receive and accept into its MPOG System at the Receipt Point and to deliver to [Delivery Point], for the account of [Anadarko], Dedicated

[28] SECOND AMENDED COMPLAINT-IN-INTERVENTION [Rec. Doc. 74] ¶ 21 ("Interconnection Agreements and Oil Gathering Agreements between Anadarko and MPOG provide that MPOG is responsible for the gathering of crude oil and condensate produced by Anadarko at the Horn Mountain and Marlin platforms and for the delivery of such crude oil and condensate to Anadarko or its designee at the agreed upon delivery point").

Oil."[29] Similarly, under the Marlin agreements, Anadarko "agree[d] to deliver to the Receipt Point … for gathering on the Gathering System and delivery to the Delivery Point," and MPOG "agree[d] to receive and accept into its Gathering System at the Receipt Point and to deliver to the …Delivery Point for the account of [Anadarko], [Anadarko's] working interest share of such Oil produced from or attributable to the Dedicated Lease."[30] Put simply, Anadarko has contracted for the transportation of its oil from its offshore platforms to delivery locations; while shut-in, Anadarko was deprived of its ability to transfer produced oil to market and consequently suffered damages.

MPOG's failure to transport Anadarko's oil for the duration of the shut-in thus gives rise to direct damages, including lost profits, that are recoverable under the terms of the agreements. *See, e.g.,* Cherokee Cnty., supra, 305 S.W.3d at 315 (holding that lost profits from the buyer's inability to resell gas not delivered to customers at a higher market value were direct damages as wrongful interference with a contractual right "would naturally and necessarily cause [the buyer] to suffer direct damage in the form of profits on the [a]greement itself").

**MPOG Ignores the Public Policy Distinctions that Apply to Indemnification Agreements Versus Those that Apply to a Pre-Suit Waiver or Release**

While MPOG may be correct that OPA generally allows the responsible party to pursue contractual ***indemnification*** for damages claimed by third parties arising from the responsible party's own gross negligence,[31] a first-party ***release*** will be void on public policy grounds where

[29] Horn Mountain Oil Gathering Agreement § 1.1; *see also* January 24, 2022 Offshore Pipeline Connection Agreement, preamble ("Oxy desires to utilize the Interconnecting Pipeline and Connection Facilities for the purpose of delivering Horn Mountain oil and condensate dedicated to the MPOG System … for downstream transportation").

[30] 2002 Marlin Oil Gathering Agreement, § 1.1; *see also* 1996 Marlin Oil Gathering Agreement, § 1.1 (using substantially similar language).

[31] *See* MEMO IN SUPPORT OF MOT TO DISMISS [Rec. Doc. 82-1] at p.11 (*citing* In re Oil Spill by the Oil Rig Deepwater Horizon, 841 F.Supp.2d 988, 1002–1003 (E.D. La. 2012)).

a party commits "an act of unreasonable character in reckless disregard of the risk known to him." Houston Exploration v. Halliburton, 269 F.3d 528, 532 (5th Cir. 2001). As Judge Barbier notes in the *Deepwater Horizon* decision that MPOG relies upon:

> At the outset, it is noted that terminology can cloud this issue. For example, courts and contracts sometimes broadly use the term "indemnity" to refer to a contract whereby one party agrees in advance to release the other contracting party from liability in the event the former party is damaged. Though other names are applicable, the Court will refer to such a clause as a "release." *See, e.g., Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 507–508 (Tex.1993) (Texas law) (contrasting a release with an indemnity, and explaining, "In general, a release surrenders legal rights or obligations between the parties to an agreement"). As distinguished from a release, a true "indemnity" agreement determines which party to a contract will ultimately bear the risk of injury to a third party. *See St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply, Inc.,* 409 F.3d 73, 86 (2d Cir. 2005) (New York law) ("It is important, however, to distinguish between ... exculpatory clauses [*i.e.,* releases] and indemnity clauses that simply shift the source of compensation without restricting the injured party's ability to recover")…. Given these differences, **a release implicates different policy concerns than an indemnity[.]**

In re Deepwater Horizon, 841 F.Supp.2d at 998 (emphasis supplied). Judge Barbier goes on to explain that, in a first-party release situation, (as we have here), the injured party is left uncompensated for its injury, because it has waived its cause of action against the grossly negligent wrongdoer. In an indemnity situation, on the other hand, the public policy concerns are not as great – as the injured third party is typically not restrained from seeking compensation. *See* Deepwater Horizon, 841 F.Supp.2d at 1001 (*citing* RESTATEMENT (Second) OF CONTRACTS § 195(1) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy")).[32] The fact, therefore, that OPA allows a

[32] Yet, at the same time: "The rule stated in this Section does not apply to an agreement by a third person to indemnify a party against liability in tort." RESTATEMENT (Second) OF CONTRACTS § 195(1), cmt. (b) (updated 2011).

responsible party to indemnify itself with respect to third party claims does not mean that the owner or operator can obtain a release or waiver, in advance, from its own gross negligence.

**Conclusion**

For the reasons stated herein, Anadarko respectfully requests the Court deny MPOG's Partial Motion to Dismiss Anadarko's Second Amended Complaint-in-Intervention.

Respectfully submitted,

*/s/ James R. Swanson*

James R. Swanson (La. Bar No. 18455)
Stephen J. Herman (La. Bar No. 23129)
Zoe C. Vogel (La. Bar No. 40982)
FISHMAN HAYGOOD LLP
201 St. Charles Ave, Ste 4600
New Orleans, LA 70170
Tel: (504) 586-5252
Fax: (504) 586-5250
jswanson@fishmanhaygood.com
sherman@fishmanhaygood.com
zvogel@fishmanhaygood.com

*Counsel for Anadarko Petroleum Corporation, Anadarko US Offshore LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing pleading has been served upon all counsel of record through the CM/ECF filing system with the Clerk of Court of the United States Court for the Eastern District of Louisiana, this 20th day of October, 2026.

*/s/ James R. Swanson*